**PUBLIC VERSION**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| VEXAS CORP. d/b/a ATLAS,<br><br>*Plaintiff,*<br><br>BINTELLI, LLC,<br><br>Consolidated Plaintiff,<br><br>VENOM EV, LLC,<br><br>Consolidated Plaintiff,<br><br>v.<br><br>UNITED STATES; U.S. CUSTOMS AND BORDER PROTECTION; and ERIC CHOY, in his official capacity as Executive Director, Trade Remedy Law Enforcement Directorate, Office of Trade, U.S. Customs and Border Protection,<br><br>*Defendants*. | Consol. Court No. 26-03809<br><br>**PUBLIC VERSION** |

**PLAINTIFF'S AMENDED MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**[1]

Dated: September 8, 2026

Faegre Drinker Biddle & Reath LLP

Daniel R. Wilson
Carolyn Bethea Connolly
1500 K Street, N.W., Ste. 1100
Washington, DC 20005
Phone: (202) 230-5000
Fax: (202) 842-8465
daniel.wilson@faegredrinker.com
carrie.connolly@faegredrinker.com

Lawrence G. Scarborough
Jovana Crncevic
1177 Avenue of the Americas, 43rd Floor
New York, New York 10036
Phone: (212) 248-3140
Fax: (212) 248-3141
lawrence.scarborough@faegredrinker.com
jovana.crncevic@faegredrinker.com

*Counsel for Plaintiff Bintelli, LLC*

---

[1]Plaintiff files its Amended Motion for Temporary Restraining Order and/or Preliminary Injunction ("Motion") in this consolidated action to facilitate the filing of Confidential Information under seal pursuant to the Stipulated Protective Order. *See* ECF No. 23; *Bintelli, LLC v. United States et al.*, Ct. No. 26-3812 (ECF No. 9) (original motion).

PUBLIC VERSION

# TABLE OF CONTENTS

INTRODUCTION ..........1

BACKGROUND ..........3

A. Bintelli's Electric Golf Cart Frame Assemblies Are Not Subject Rolling Chassis And Its Finished Golf Carts Are Manufactured In Vietnam And Thailand, Using Parts And Materials From Those Countries. ..........3

B. Without Providing Bintelli Notice Or Any Opportunity To Be Heard, And Without Determining That Bintelli's Imports Are Subject To The AD/CVD Orders, CBP Has Imposed Interim Measures That Amount To A Shutdown Order ..........6

SUMMARY OF ARGUMENT ..........13

ARGUMENT ..........14

A. Standard Of Review. ..........14

B. This Court Has Jurisdiction To Stop Unconstitutional Interim Measures Before They Render Later Review Meaningless. ..........15

C. Bintelli Is Likely To Succeed On The Merits Because CBP Violated The Fifth Amendment By Denying Bintelli The Pre-Deprivation Process The Constitution Requires ..........17

D. Bintelli Will Suffer Irreparable Harm Absent Injunctive Relief. ..........22

E. The Balance Of Equities And Public Interest Favor An Injunction. ..........26

F. The Court Should Set Any Bond At Zero Or At A Nominal Amount. ..........27

CONCLUSION ..........28

PUBLIC VERSION

**TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*Am. Signature, Inc. v. United States*,
598 F.3d 816 (Fed. Cir. 2010)....26

*Bennett v. Spear*,
520 U.S. 154 (1997)....16

*Brock v. Roadway Exp., Inc.*,
481 U.S. 252 (1987)....19

*Canon, Inc. v. GCC Int'l Ltd.*,
263 F. App'x 57 (Fed. Cir. 2008)....22

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012)....24, 26

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985)....13, 17

*Ford Motor Co. v. United States*,
44 F. Supp. 3d 1330 (Ct. Int'l Trade 2015)....18

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022)....22

*Hylsa v. United States*,
22 C.I.T. 44 (1998)....15

*ICON EV LLC v. United States*,
Court No. 26-02759, Slip Op. 26-42 (Ct. Int'l Trade April 24, 2026).... *passim*

*ICON EV LLC v. United States*,
Court No. 26-02759, Slip Op. 26-55 (Ct. Int'l Trade May 26, 2026).... *passim*

*Invenergy Renewables LLC v. United States*,
422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019)....26

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020)....27

*Kwo Lee, Inc. v. United States*,
24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014)....25

PUBLIC VERSION

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 27

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......... 17, 18

*NEC Corp. v. United States*,
151 F.3d 1361 (Fed. Cir. 1998) .......... 16

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 15

*One World Technologies, Inc. v. United States*,
380 F. Supp. 3d 1300 (Ct. Int'l Trade 2019) .......... 24

*Phoenix Metal Co. v. United States*,
Court No. 23-00048, Slip Op. 24-68 (Ct. Int'l Trade June 10, 2024) .......... 18

*Queen's Flowers de Colombia v. United States*,
947 F. Supp. 503 (Ct. Int'l Trade 1996) .......... 23, 27

*Royal Brush Mfg., Inc. v. United States*,
75 F.4th 1250 (Fed. Cir. 2023) .......... 17

*Scripps-Howard Radio, Inc. v. FCC*,
316 U.S. 4 (1942) .......... 16

*Superior Com. Sols., LLC v. United States*,
811 F. Supp. 3d 1363 (Ct. Int'l Trade 2025) .......... 17, 21

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 17

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 15, 22

*Zenith Radio Corp. v. United States*,
710 F.2d 806 (Fed. Cir. 1983) .......... 26

**Constitutional Provisions**

Fifth Amendment to the U.S. Constitution .......... *passim*

**Statutes, Rules & Regulations**

19 C.F.R. 141.64 .......... 10, 21

19 C.F.R. § 165.15(d)(1) .......... 17

PUBLIC VERSION

90 Fed. Reg. 38,759 (Dep't Com. Aug. 12, 2025) ........ 3, 4

19 U.S.C. § 1517 ........ 15

19 U.S.C. § 1517(e) ........ 15

19 U.S.C. § 1517(g)(3) ........ 16

28 U.S.C. § 1581(i)(1)(D) ........ 15

28 U.S.C. § 1581(c) ........ 14, 15, 16

Federal Rule of Civil Procedure 65(c) ........ 27

## INTRODUCTION

The Fifth Amendment to the U.S. Constitution prohibits deprivation of "life, liberty, or property without due process of law." This case presents the very due-process deprivation the Fifth Amendment is designed to prevent. A federal agency has imposed business-ending sanctions first and offered process later. Plaintiff and U.S. importer Bintelli, LLC ("Plaintiff" or "Bintelli") has been swept into Enforce and Protect Act ("EAPA") Case No. 8286 and subjected to interim measures that could force Bintelli to pay more than $150 million in duties for past imports and over 519 percent on any future ones. On a business that had a net profit of less than [ ] in the past year, these staggering interim measures amount to a shutdown order and the death knell of Bintelli.

This is all the more devastating because the government's de facto shutdown order is based on the agency's garbled interpretation of the "precise and limited scope" of antidumping ("AD") and countervailing duty ("CVD") (collectively, "AD/CVD") orders that this Court has already found to be facially deficient in the context of an identical EAPA investigation to the one at issue here based on the same U.S. Department of Commerce ("Commerce") orders and the same products. *See ICON EV LLC v. United States*, Court No. 26-02759, Slip Op. 26-42, Order Granting Preliminary Injunction (Ct. Int'l Trade April 24, 2026) ("*ICON PI Order*").

U.S. Customs and Border Protection ("CBP") may not administer EAPA in a manner that "essentially precludes {Bintelli} from vindicating a constitutional right." *ICON EV LLC v. United States*, Court No. 26-02759, Slip Op. 26-55, Opinion Denying Government's Motion to Dismiss, at 6 (Ct. Int'l Trade May 26, 2026) ("*ICON MTD Opinion*"). Of course, CBP may investigate suspected evasion vigorously. But CBP may not, consistent with due process, act as judge, jury, and executioner of a U.S. importer by imposing measures that will destroy a company before

giving that company notice of the accusation and a meaningful opportunity to be heard in response. Yet CBP has done precisely that in this case.

CBP imposed these interim measures without providing Bintelli advance notice of the allegation, without disclosing the basis for its suspicion, and without providing Bintelli any meaningful pre-deprivation opportunity to answer. The resulting measures do not merely preserve liquidation. They put Bintelli in jeopardy of having to pay more than $150 million in duties on entries already made and more than [ ] in future duties on shipments already en route to the United States, block ordinary entry, require substantial cash deposits or security, and reach merchandise that CBP has not shown is even plausibly within the Orders. This is precisely the sort of agency action this Court has already held cannot be imposed first and justified later.

The standard for the emergency relief that Bintelli requests here is satisfied and is supported by precedent in another EAPA investigation covering the same AD/CVD Orders under virtually the same facts. Bintelli is likely to prevail on the merits because CBP denied the very due process the Constitution requires by denying Bintelli the right to present evidence and testimony that its imported merchandise is not covered by the scope of the AD and CVD orders at issue here. Moreover, as the Court recently concluded, it may exercise jurisdiction to prevent interim measures from extinguishing a party before judicial review becomes available, especially when, like here, the harm is immediate, concrete, and irreparable. The equities also point in one direction: CBP may continue its investigation and preserve liquidation, but it should not be permitted to enforce company-ending cash deposits to the tune of more than $150 million and AD/CVD deposits on future entries of over 519 percent imposed without constitutionally adequate process. The Court should enter a temporary restraining order and a preliminary injunction enjoining enforcement of the interim measures while CBP continues its EAPA investigation.

## BACKGROUND

### A. Bintelli's Electric Golf Cart Frame Assemblies Are Not Subject Rolling Chassis And Its Finished Golf Carts Are Manufactured In Vietnam And Thailand, Using Parts And Materials From Those Countries.

Bintelli is a long-standing U.S.-based importer and distributor of electric vehicles, specializing in manufacturing and distributing power sport products, with a major focus on golf carts, related components, and other electric vehicles. Ex. 1, Declaration of Justin Jackrel ("Jackrel Decl.") ¶¶ 3, 9.

Founded in 2005 by Bintelli's current President, Bintelli reflects a classic American-dream story. Its joint owners—long-time friends—have built the company into an internationally recognized business. *Id.* at ¶ 3. Bintelli's golf carts consistently receive top awards; the company employs 146 people; it operates one of the largest Low Speed Vehicle assembly facilities in the United States, covering 498,000 square feet; it partners with more than 200 dealers nationwide; it offers robust warranty programs; and it contributes significantly to charitable organizations in and around its home base of Ladson, South Carolina, including the Charleston Humane Society, Operation BBQ Relief, Lasagna Love, and Lowcountry Food Bank, to which Bintelli has donated more than 100,000 meals to fight hunger throughout South Carolina. *Id.* at ¶¶ 7,8.

In August 2025, Commerce issued antidumping and countervailing duty orders on low-speed personal transportation vehicles ("LSPTVs") from the People's Republic of China. *See Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order; Amended Final Determination of Countervailing Duty Investigation and Countervailing Duty Order*, 90 Fed. Reg. 38,759 (Dep't Com. Aug. 12, 2025) (the "Orders").

The Orders cover finished LSPTVs of Chinese origin, as well as certain unfinished or unassembled LSPTVs of Chinese origin, as defined by the following scope:

PUBLIC VERSION

> An unfinished and/or unassembled LSPTV subject to these orders covers **at a minimum** a subassembly, also known as a "rolling chassis," which is typically comprised of, but not limited to, a frame or body with front and/or rear suspension components (such as arms, springs, axles, spindles, and shafts) installed and powertrain components (including either an electric motor or a gas-powered internal combustion engine) installed or ready for installation.
>
> When imported together with a rolling chassis subject to these orders, other LSPTV components, such as batteries, bumpers, wheel and tire assemblies, cowlings, fenders, grills, kick plates, steering column and steering wheel assemblies, dash assembly, seat assemblies, pedal assemblies, brake assemblies, canopy or roof assemblies, temporary rain enclosures, windshields, mirrors, headlights, taillights, lighting systems, or storage—whether assembled or unassembled, whether as part of a kit or not, and whether or not accompanied by additional components—constitute part of an unfinished and/or unassembled LSPTV that is subject to these orders. The inclusion of other products, components, or assemblies not described here does not remove the product from the scope….
>
> LSPTVs and subassemblies subject to these orders include those that are produced in the subject country whether assembled with other components in the subject country or in a third country. Processing or completion of finished and unfinished LSPTVs and subassemblies either in the subject country or in a third country does not remove the product from the scope.

*Id.*, 90 Fed. Reg. at 38,763 (emphasis added). Critically, merchandise subject to the Orders—and therefore subject to AD/CVD duties imposed by Commerce—must contain at least a Chinese-origin "subassembly, also known as a 'rolling chassis,' which is typically comprised of, but not limited to, a frame . . . with front and/or rear suspension components . . . installed and powertrain components . . . installed or ready for installation." *Id.* Absent any one of these requirements, containers arriving in port are not covered by the Orders.

On their plain language, the Orders do not cover the merchandise Bintelli imports. None of Bintelli's merchandise contain Chinese-origin rolling chassis. During the period of investigation (which commenced on September 7, 2024), Bintelli imported two different categories of merchandise relevant to the instant proceeding.

Initially, Bintelli imported parts and components from China that did not amount to a minimum covered subassembly pursuant to the scope. The parts and components, sourced from Yangzhou Whanlong Electric Vehicle Co. ("Whanlong") and Dongguan Excar Electric Vehicle Co., Ltd ("Excar"). were either used for replacement parts or to produce LSPTVs/golf carts in the United States utilizing parts and components that were not imported together on the same bill of lading as a rolling chassis at Bintelli's U.S. assembly facilities. Jackrel Decl. at ¶ 17. Specifically, Bintelli imported Chinese LSPTV frames without any powertrain or suspension components installed or ready to install, *i.e.*, these imports did not meet the minimum covered subassembly of a rolling chassis. *Id.* Separately, Bintelli also imported other components, including motors, suspension, and other parts, in other shipments on separate bills of lading and customs entries. These imports did not meet the requirements of a minimum covered subassembly either. *Id.*

Following the imposition of preliminary duties at the end of 2024, Bintelli proactively looked to adapt its supply chain to minimize disruption and ensure compliance. *Id.* at ¶ 16. Bintelli contracted with manufacturers in both Thailand and Vietnam. *Id.* at ¶¶ 21, 23. For Bintelli's carts sourced from both Thailand and Vietnam, the frames are produced from non-Chinese raw materials that is bent, welded, and formed into frames at the Thai and Vietnamese factories. *Id.* at ¶ 21. While the carts may contain certain Chinese componentry, the rolling chassis component of the cart is undeniably Vietnamese or Thai origin, and each one is shipped with a Certificate of Origin from its respective country. *Id.* at ¶¶ 23, 31. For the shipments coming from Thailand, all of the labor for the manufacturing and assembly occurs in Thailand, and more than 50 percent of all the components are Thai origin. *Id.* at ¶ 32. For the shipments coming from Vietnam, the same is true: all of the labor for the manufacturing and assembly occurs in Vietnam, and more than 50 percent of all the components are Vietnamese origin. *Id.*

In Vietnam, the Vietnamese government confirmed the Certificate of Origin for Bintelli's assemblies and components following a thorough investigation that included container inspections and site visits to the plant in June and July 2026. *Id.* at ¶ 30.

From May 2025 through February 2026, CBP examined a broad range of Bintelli's imported parts and subassemblies. Jackrel Decl. at ¶ 31; ECF No. 4.1, 6/3/2025 Letter to CBP Regarding CF 29 Response (exhibits omitted); ECF No. 4.2, 2/4/2026 CBP Emails Regarding CF 29 Response. CBP determined that Bintelli had appropriately entered the merchandise when it arrived in the Charleston port, and confirmed that the shipments were ***outside of the scope of the Orders.*** *Id.* at 4 (noting that entry "was reverted {or allowed to enter} without the AD/CVD").

Relying on CBP's decisions, Bintelli increased its workforce, expanded its assembly facility, and has successfully grown the company in the past year. Jackrel Decl. at ¶¶ 7, 8. Those decisions notwithstanding, CBP continued its inquiries into Bintelli's merchandise throughout the summer of 2026 and issued two different requests for information, or CF 28s. *Id.* at ¶ 33. Bintelli responded to each one and provided voluminous records on August 3, 2026, showing the origins and composition of its merchandise. ECF No. 4.3, 8/3/2026 Letter Response to CF 28 (FTE Vietnam Origin); ECF No. 4.4, 8/3/2026 Letter Response to CF 28 (RMA Thailand Origin).

### B. Without Providing Bintelli Notice Or Any Opportunity To Be Heard, And Without Determining That Bintelli's Imports Are Subject To The AD/CVD Orders, CBP Has Imposed Interim Measures That Amount To A Shutdown Order

On August 18, 2026, CBP sent an email informing Bintelli that "{b}ased on a review of available information, {CBP} has determined that there is reasonable suspicion of evasion of antidumping (AD) and countervailing (CVD) duties by Bintelli." ECF No. 4.5, 8/18/2026 CBP Email. Despite the back-and-forth communication over the past several months between Bintelli and CBP related to information requests from the agency, there was never any indication from CBP that an EAPA allegation of evading AD/CVD duties had been levied against Bintelli, that

CBP had initiated an EAPA investigation, or that CBP had determined that there was a reasonable suspicion of evasion. Jackrel Decl. at ¶ 35.

Just last week, on August 25, 2026, CBP issued its redacted Notice of Initiation of Investigation and Interim Measures ("Notice of Initiation") in which CBP provided the reasoning for its "reasonable suspicion." *See* ECF No. 4.6, Notice of Initiation. To date, Bintelli has not received the unredacted Notice of Initiation or its supporting exhibits. In any event, CBP concluded in its "Initial Assessment" that the information submitted by the Alleger—the American Personal Transportation Vehicle Manufacturers Coalition, which consists of two U.S.-based golf cart companies and Bintelli's direct competitors—"reasonably suggested that the Importers entered merchandise covered by the *Orders* into the customs territory of the United States through evasion." ECF No. 4.6, Notice of Initiation, at 13.

The practical effect of the 8/18/2026 CBP Email and subsequent Notice of Initiation is that CBP has imposed on Bintelli a stated intent to require immediate cash deposit that to the best of Bintelli's calculations could require Bintelli to pay [ ] in cash deposits for past entries. And Bintelli must pay a 519.23 percent *ad valorem* duty on all future entries, regardless of whether they are currently on the water or have not yet been placed on a boat for transport. Based on the shipments that Bintelli currently has on the water, this would amount to a payment of [ ] at the time the shipments are accepted at the Port of Charleston.[1] Jackrel Decl. at ¶ 53.

---

[1] Due to confidentiality concerns, the documents that substantiate the foregoing duty payments on future entries for shipments that Bintelli currently has on the water are not provided with the instant Motion; however, such documents can be made available to the Court and opposing counsel under appropriate confidentiality strictures either before or at the hearing on the Motion.

Bintelli was never provided an opportunity to respond to CBP's findings, pressure-test, let alone refute, the evidence on which CBP relied, or present any evidence or argument of its own before CBP imposed the interim measures. *See* Jackrel Decl. at ¶¶ 35-36. Had Bintelli been given the chance to do so—and if it is able to remain in business during CBP's ongoing investigation and given an opportunity to be heard—the evidence suggests that CBP's conclusions would have been different.

While the Notice of Initiation is replete with incorrect and misleading "evidence" on which CBP bases its imposition of crippling sanctions, a few examples illustrate the lack of reasonable evidence that underpins its suspicion.

*First*, CBP relies on the Alleger's claim that "Google Maps and other open-source information confirm" that Bintelli's Thai manufacturer's "facility is primarily used for assembly and distribution, not the manufacture of new vehicles from raw materials or component fabrication." ECF No. 4.6, Notice of Initiation, at 9. Not so. RMA is one of the global leaders in specialized automotive modifications and its scope of business is far greater than what the Alleger states and CBP credits. In fact, RMA's own website provides information about a myriad of additional services it provides, including "Modifications, ***Complex Manufacturing*** & Assembly, Engineering, Personalization services, and much more." (emphasis added)) https://rmagroup.com/empowering-vehicles/, last visited Aug. 27, 2026. For Bintelli specifically, RMA bends, welds, and forms frames from non-Chinese sources. *See* Jackrel Decl. ¶¶ 21, 32.

*Second*, CBP places stock in the Alleger's argument that Bintelli imported merchandise under incorrect HTSUS codes in order to evade the Orders. ECF No. 4.6, Notice of Initiation, at 6. CBP has yet to release the Alleger's allegation to Bintelli or its counsel, meaning that Bintelli is left to guess as to what third-party source Alleger may have relied for this false allegation. Based

on Bintelli's own customs data, from the CBP Automated Commercial Environment, however, there is no evidence that Bintelli ever used HTSUS codes for golf balls and golf equipment when importing golf cart merchandise. Jackrel Decl. ¶ 39. After CBP issued the Notice of Initiation, one Bintelli competitor, and one that is a part of the alleging association (*i.e.,* the Alleger) seized on this error and made public statements related to the purported "fact" that "at least one industry participant is importing 'golf balls' . . . that magically morph" into golf carts." https://www.linkedin.com/feed/update/urn:li:activity:7498457746049081344/ (last visited 8/30/2026), copy attached as Ex. 2.

*Third*, CBP notes that certain "Thai-origin entries include{d} *pro forma* invoices issued by {a company}," alluding to a company in China. ECF No. 4.6, Notice of Initiation, at 19. The nationality of the invoicing party, however, is immaterial to the determination of scope: it is the country of origin of the actual goods that matters. And Bintelli has both explained the sources of its products in this submission and also has Certificates of Origin confirming that its products are sourced from Vietnam and Thailand. Jackrel Decl. ¶¶ 27, 27, 31, 39.

And *finally*, CBP repeatedly refers to a single entry that it rejected in December 2025 and for which it imposed AD and CVD duties on Bintelli. *See* ECF No. 4.6, Notice of Initiation, at 16, 17, 19. CBP contends that the December 2025 entry "demonstrates that . . . Bintelli entered Chinese-origin LSPTV components as non-AD/CVD merchandise even though CBP later determined that the merchandise was subject to the Orders." *Id.* at 17. Again, not so. The actual facts—which Bintelli was not given the chance to present before being slapped with crippling duties—paint a different picture. The December 2025 entry at issue consisted of shocks, axles, engine, and steering parts. Jackrel Decl. ¶ 40. It was not subject to the Orders because it was ***not*** imported with a rolling chassis. *Id.* And, in fact, CBP had previously confirmed in May 2025 that

an entry of ***identical parts was not subject to the Orders***. *Id.* CBP flagged the December 2025 entry because an importer certification required under the scope was mistakenly omitted. *Id.* When CBP rejected the entry, it indicated—as it must—that Bintelli had the right under the Customs Modernization Act to correct or explain the omission. *Id.*; *see* 19 C.F.R. 141.64 ("If any errors are found, the entry and entry summary documentation . . . shall be returned to the importer for correction."). Bintelli immediately refiled the importer certification, but CBP refused to accept it and threatened liquidated damages penalties. Jackrel Decl. ¶ 40. Despite multiple requests to refile the certification, Bintelli paid the AD/CVD deposits to avoid incurring penalties and indicated that it plans to protest CBP's determination upon liquidation. *Id.*

In sum, for more than a year, Bintelli has communicated with CBP about the very issue at the center of its Notice of Initiation—whether its imported goods were subject to the Orders. CBP issued requests for information related to a limited set of entries. Jackrel Decl. at ¶¶ 7, 8; ECF No. 4.3, 8/3/2026 Letter Response to CF 28 (FTE Vietnam Origin); ECF No. 4.4, 8/3/2026 Letter Response to CF 28 (RMA Thailand Origin). And Bintelli's counsel communicated with CBP repeatedly about those requests. *Id.* Yet at no point did any of the communications or requests refer to an EAPA allegation, EAPA investigation, or contemplated interim measures. *Id.* As it appeared to Bintelli, CBP was satisfied by Bintelli's responses and, indeed had specifically concluded in 2025 and earlier in 2026 that Bintelli's entries ***were not subject to the Orders.*** Jackrel Decl. at ¶¶ 33-35; ECF No 4.5, August 18, 2026 TRLED Email.

CBP's August 18, 2026 email notification and its subsequent August 25, 2026 Notice of Initiation entirely ignore CBP's own prior decisions and the substantial amount of information Bintelli provided CBP over the past two years regarding the steps that Bintelli had taken to comply

with the Orders. Jackrel Decl. at ¶¶ 34-37; ECF Nos. 4 - 4.6. CBP's claimed "reasonable suspicion" is instead based on stale, incomplete, and incorrect information. *See* ECF Nos. 4 - 4.6.

Despite having never provided Bintelli with the opportunity to show that CBP's determinations underlying the interim measures were founded on incorrect information, CBP now imposes draconian duties on Bintelli that essentially serve as a shutdown order. Jackrel Decl. at ¶ 44.

The interim measures require CBP to:

- Extend liquidation of unliquidated entries that entered before the date of initiation of the investigation (May 20, 2026);
- Suspend liquidation of unliquidated entries entered on or after the date of initiation of the investigation (May 20, 2026), and reject any entry summaries and require a re-file for those entries that are within the entry summary reject period;
- Take such additional measures as CBP deems necessary, including requiring a single transaction bond or additional security or the posting of cash deposits with respect to covered merchandise;
- Require "live" entry for all imports of LSPTV from China and Vietnam and/or Thailand by the Importers, requiring the Importers to submit proper documentation and all duties prior to release of the merchandise;
- Impose AD/CVD rates are the "all others" rate for A-570-176 and C-570-177 on LSPTV and parts, if the U.S. Department of Commerce has not determined a separate rate that would apply to that entry.

ECF No. 4.5, 8/18/2026 CBP Email; ECF No. 4.6, Notice of Initiation.

These interim measures put Bintelli in jeopardy of having to pay [ ] for products imported during the EAPA period of investigation. Jackrel Decl. at ¶ 48; ECF No. 4.5, 8/18/2026 CBP Email. Bintelli will also be forced to pay 519.23 percent duty deposits on the value of all shipments that are currently en route as soon as they arrive in the Port of Charleston. Jackrel Decl. at ¶ 55; ECF No. 4.6, Notice of Initiation. And moving forward, the interim measures require Bintelli to pay that 519.23 percent of the value on all shipments as they arrive in port. Jackrel Decl. at ¶ 55.

The interim measures, if not enjoined by this Court, will force Bintelli to shut its doors after more than 20 years of business. Jackrel Decl. ¶¶ 44, 58. Bintelli cannot make the payments demanded by CBP and remain in business for more than 30 days, if it can even survive that long. *Id.* at ¶¶ 42, 55. Bintelli has no option to obtain financing to help it withstand these crushing amounts. *Id.* at ¶ 49. These interim measures will therefore cause Bintelli's 146 employees to lose their jobs. *Id.* at ¶ 56.

Absent an injunction, it is not just Bintelli that will suffer extraordinary harm. The more than 200 downstream dealers that rely on Bintelli's golf carts for their own business will face equally severe consequences. For exclusive dealers of Bintelli golf carts, the death sentence imposed by the interim measures likewise applies to them. *See* Ex. 3, Declaration of John Hegedus ("Hegedus Decl.") ¶ at 8 ("Because 100 percent of BGC's dealership business depends on Bintelli-sourced golf carts, I expect that all of BGC's locations {with their 81 employees} will shut down if Bintelli is forced to stop importing for even as much as 30 to 60 days"). Yet even dealers with more diversified products will have trouble surviving the severe supply chain disruption that will stem from the imposition of the interim measures on, and the subsequent demise of, Bintelli. *See* Ex. 4, Declaration of Sean Card ("Card Decl.") at ¶ 9 (detailing that Bintelli golf carts make up

about 50 percent of inventory and that "{i}f Bintelli were to shut its doors . . . {w}e likely would be able to stay open for a month or two but then would have to shut down our business as well."); *id*. at ¶ 10 (declaring that switching to different suppliers "would not be feasible to salvage the business in time").

The consumers who own Bintelli's golf carts will likewise be affected. Jackrel Decl. at ¶ 56. Bintelli and its dealers provide warranties on the products they sell. *Id.* If forced out of business, Bintelli will be unable to provide the parts necessary to service its customers or fulfill its warranty obligations. *Id.*

## SUMMARY OF ARGUMENT

The Court should grant Bintelli's motion and enjoin the enforcement of CBP's interim measures with immediate effect. Bintelli is likely to succeed on the merits because CBP imposed severe, legally consequential interim measures depriving Bintelli of its property interests without first providing Bintelli with notice or a meaningful opportunity to be heard. This Court has already held that such a pre-deprivation failure violates due process guaranteed by the Fifth Amendment of the Constitution. *See ICON TRO Order*, at 12 (holding that Icon "did not receive due process before interim measures were imposed" where the company was not provided an opportunity to respond prior to the imposition of those measures). Supreme Court precedent independently compels the same conclusion: When government action immediately deprives a party of protected property interests, process must precede the deprivation absent truly extraordinary circumstances. *See Cleveland Bd. of Educ.*, 470 U.S. at 533 ("We have described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'").

As things stand, Bintelli will be forced to shutter its business within weeks, suffering irreparable harm during the investigation, not after it. A later refund cannot restore a business that has collapsed, repair damaged customer relationships, or recover extinguished goodwill in the market and community. And because the government is the defendant, the balance of equities and public interest merge. Those factors favor process, legality, and meaningful judicial review prescribed by the Fifth Amendment and courts applying its precepts. Requiring CBP to give Bintelli a fair opportunity to respond does not weaken EAPA; it improves the accuracy and legitimacy of the investigative process.

This Court also has jurisdiction to act now. Residual jurisdiction exists to prevent agency action from inflicting injuries that later review cannot remedy. If Bintelli must wait for a final EAPA determination and later review under Section 1581(c), the interim measures will have already accomplished their ultimate purpose and will have shut Bintelli down before it can obtain meaningful judicial review. This Court has already rejected the government's contrary jurisdictional position in the parallel challenge brought by ICON EV LLC ("ICON") in the same EAPA Consolidated Case. *See ICON MTD Opinion*, at 12 (exercising § 1581(i) jurisdiction when "ICON has no statutory mechanism to challenge Customs' imposition of full interim measures with no notice").

For these reasons, the Court should enjoin the interim measures.

## ARGUMENT

### A. Standard Of Review.

The Court considers four factors in deciding whether to grant a temporary restraining order or preliminary injunction: (1) whether the movant "is likely to succeed on the merits," (2) whether the movant is "likely to suffer irreparable harm in the absence of preliminary relief," (3) whether the "balance of equities tips in {the movant's} favor," and (4) whether "an injunction is in the

public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two factors merge where, as here, the government "is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As recently as this past April, the Court enjoined CBP from imposing the same EAPA interim measures at issue here on the imports of ICON, another importer of electric golf carts, based on the identical four-factor analysis. *ICON PI Order,* at 26-42.

**B. This Court Has Jurisdiction To Stop Unconstitutional Interim Measures Before They Render Later Review Meaningless.**

As this Court recently determined, the Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1581(i)(1)(D). *See ICON MTD Opinion*. Section 1581(i)(1)(D) confers on this Court "exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for … administration and enforcement with respect to the matters referred to in … subsections (a)–(h) of this section." This action challenges CBP's imposition of interim measures under 19 U.S.C. § 1517(e), a law providing for administration and enforcement with respect to the matters referred to in subsection (c) of 28 U.S.C. § 1581—specifically, § 517 of the Tariff Act of 1930 (19 U.S.C. § 1517).

Waiting for a final evasion determination and review under 28 U.S.C. § 1581(c), by contrast, "would be manifestly inadequate." *Hylsa v. United States*, 22 C.I.T. 44, 46 (1998). Without residual jurisdiction, CBP could impose unlawful interim measures that destroy the very party entitled to seek later review. That cannot be the statutory design, and it cannot be reconciled with due process. If the interim measures are not enjoined, Bintelli will not be able to wait out the EAPA process and pursue ordinary review later; the interim measures will have already inflicted the terminal injury. This "grave economic harm which cannot be addressed pursuant to 1581(a-h)" justifies exercising residual jurisdiction. *Id*, 22 C.I.T. at 48. As the Supreme Court explained,

"{i}f the administrative agency has committed errors of law for the correction of which the legislature has provided appropriate resort to the courts, such judicial review would be an idle ceremony if the situation were irreparably changed before the correction could be made." *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 10 (1942).

Indeed, Congress anticipated that 28 U.S.C. § 1581(c) would not be the exclusive means for obtaining judicial review. In EAPA itself, Congress provided that "{n}othing" in the subsection governing judicial review "shall affect the availability of judicial review to an interested party under any other provision of law." 19 U.S.C. § 1517(g)(3). That provision would be meaningless if this Court could only review "final" evasion determinations. *See NEC Corp. v. United States*, 151 F.3d 1361, 1368–69 (Fed. Cir. 1998) (agreeing that forcing a plaintiff to wait to raise a due-process argument under § 1581(c) after a Commerce investigation concluded, instead of proceeding immediately under § 1581(i), was manifestly inadequate). This Court already has denied the government's motion to dismiss in *ICON MTD Opinion*, holding that Section 1581(i) jurisdiction applies where there is "no statutory mechanism to challenge {CBP's} imposition of full interim measures with no notice." *ICON MTD Opinion*, at 12.

Bintelli's claims are also ripe. The alleged constitutional injury occurred on August 18, 2026, when CBP imposed interim measures on Bintelli without notice or a meaningful opportunity to respond. As this Court held in *ICON MTD Opinion,* due process claims are ripe when the alleged constitutional violation occurs; "{t}hat Customs may ultimately refund the duty deposits is irrelevant to whether the due process violation is ripe for judicial adjudication." *ICON MTD Opinion*, at 7 n.9. The interim measures also constitute reviewable final agency action. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (stating that agency action is "final" when it marks the "'consummation' of the agency's decision making process" and the action is one from which

"legal consequences will flow"); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016) (affirming agency action is "final" when it is definitive and gave rise to "direct and appreciable legal consequence"). Accordingly, this Court has jurisdiction to issue injunctive relief now.

**C. Bintelli Is Likely To Succeed On The Merits Because CBP Violated The Fifth Amendment By Denying Bintelli The Pre-Deprivation Process The Constitution Requires.**

CBP's decision to impose business-ending interim measures without pre-deprivation process violated Bintelli's right to due process. The Federal Circuit has "recognized in the EAPA context that an importer participating in an administrative proceeding has a procedural due process right to notice and a meaningful opportunity to be heard." *Superior Com. Sols., LLC v. United States*, 811 F. Supp. 3d 1363, 1376 (Ct. Int'l Trade 2025) (citing *Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1257 (Fed. Cir. 2023)). Bintelli's constitutional right to due process entitles it "to notice and a meaningful opportunity to be heard" before, not solely after, a deprivation occurs. *Id.*; *see Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("some form of pretermination hearing" is generally recognized).

This Court has already applied those principles to EAPA interim measures. *See, e.g.*, *Superior Com. Sols., LLC*, 811 F. Supp. 3d at 1376-77 (concluding that CBP's practice of imposing interim measures without a meaningful pre-deprivation opportunity to respond—and 19 C.F.R. § 165.15(d)(1) itself—violates the Fifth Amendment because "a meaningful opportunity to respond should happen *before* a temporary deprivation takes effect, not afterwards") (emphasis added); *see also ICON PI Order*, at 12 (enjoining the imposition of interim measures where CBP failed to provide notice or opportunity to respond).

The Supreme Court's seminal decision in *Mathews v. Eldridge* sets forth the test for determining what process is due under the Fifth Amendment, considering (1) the private interest

at stake, (2) the risk of erroneous deprivation, and (3) the public interest. *See* 424 U.S. 319, 335 (1976). Each factor supports a requirement that CBP afford importers like Bintelli notice and an opportunity to be heard before interim measures are imposed.

*First*, the private interest here is substantial. "The combination of cash deposits for AD/CVD duties with the live entry requirement requires the importer to suddenly deposit a large amount of cash with CBP before it can even complete the sale for which it is importing the goods." *Phoenix Metal Co. v. United States*, Court No. 23-00048, Slip Op. 24-68, at *9 (Ct. Int'l Trade June 10, 2024). "Live entries are so onerous that they have previously been compared to sanctions." *Id.* (citing *Ford Motor Co. v. United States*, 44 F. Supp. 3d 1330, 1339 n.16 (Ct. Int'l Trade 2015)). For a small company like Bintelli that relies on its ability to sell inventory quickly, live entry requirements place a chokehold on its cash flow that will cause the company to exhaust available liquidity in mere days.

It is not just future entries at issue here. As demonstrated above, CBP has indicated that interim measures may also reach back to past entries. Here, CBP has threatened to impose on Bintelli a potentially astounding sum of more than $150 million in duties that ensnare imports made from September 7, 2024 onward. Although unlawful cash exactions may sometimes be refunded, Bintelli has no practical ability "to ameliorate the interim loss." *Mathews*, 424 U.S. at 341. Once Bintelli is forced out of business, a later refund is not relief. Nor can a refund cure the separate problem that CBP's measures sweep beyond merchandise shown to fall within the Orders.

In the parallel *ICON* matter, this Court found the private interest "compelling" where the cash-deposit rate and live-entry requirements would cause bankruptcy before a final determination could issue. *See ICON PI Order*, at 12. The same logic applies here. CBP cannot act in haste and

leave Bintelli to seek vindication after the damage is complete. The consequences of the interim measures are immediate, concrete, and borne by Bintelli now.

*Second*, the risk of erroneous deprivation is also acute. CBP applies a reasonable-suspicion standard based on allegations submitted by interested parties, including competitors, rather than a preponderance-of-the-evidence standard. That low threshold makes pre-deprivation due process especially important. Had Bintelli been given the notice and opportunity this Court has held the Constitution requires, it could have shown CBP why Bintelli's merchandise is not subject to the Orders, why the interim measures exceed the lawful scope of EAPA, and why live entry and cash deposits are not justified. Without "some kind of a hearing ensuring an effective initial check against mistaken decisions," CBP's conduct violates the Fifth Amendment. *Brock v. Roadway Exp., Inc.*, 481 U.S. 252, 261 (1987) (quotation omitted).

CBP's Notice of Initiation solidifies this risk: It bases its "reasonable suspicion" on erroneous and misleading information while ignoring the evidence that disproves the allegations. Four examples—among many others—prove the point.

To start, CBP credits the Alleger's contentions that, based on Google Maps, Bintelli's Thai manufacturer's "facility is primarily used for assembly and distribution, not the manufacture of new vehicles from raw materials or component fabrication." ECF No. 4.6, Notice of Initiation, at 9. This is simply incorrect. RMA—one of the largest automotive manufacturers in the world—does much more. For Bintelli specifically, RMA bends, welds, and forms frames from non-Chinese sources. *See* Jackrel Decl. ¶¶ 21, 32; *see also* https://rmagroup.com/empowering-vehicles/, last visited Aug. 31, 2026 (discussing on its website that RMA has an entire division related to "Special Vehicles" in which it does "Modifications, ***Complex Manufacturing*** & Assembly, Engineering, Personalization services, and much more" (emphasis added)).

CBP also credits the Alleger's argument that Bintelli imported merchandise under incorrect HTSUS codes in order to evade the Orders. ECF No. 4.6, Notice of Initiation, at 6-7. CBP has yet to provide Bintelli or counsel a copy of the Allegation giving rise to these draconian interim measures. Whatever the source, the data on which the Alleger—and CBP—blindly rely is incorrect. Based on Bintelli's actual customs data, which CBP apparently failed to review before crediting this allegation, there is no evidence that it ever used HTSUS codes for golf balls and golf equipment when importing golf cart merchandise. Jackrel Decl. ¶ 39. As shown, the Alleger pounced immediately to trumpet this aspect, claiming legitimacy for false information emanating from CBP (following the Alleger's allegations). *See* Ex. 2.

In addition, CBP highlights that certain "Thai-origin entries include{d} *pro forma* invoices issued by {a company}," alluding to a company in China. ECF No. 4.6, Notice of Initiation, at 19. This is a red herring. As the Court knows well, it is the country of origin of the actual good that matters, not the nationality of the invoicing party. And Bintelli has Certificates of Origin confirming that its products are sourced from Vietnam and Thailand. Jackrel Decl. ¶¶ 27, 27, 31, 39.

And lastly, CBP repeatedly refers to a single entry, in December 2025, that it rejected and for which AD and CVD duties were imposed. *See* ECF No. 4.6, Notice of Initiation, at 16, 17, 19. CBP says this "demonstrates that . . . Bintelli entered Chinese-origin LSPTV components as non-AD/CVD merchandise even though CBP later determined that the merchandise was subject to the Orders." *Id.* at 17. CBP never provided Bintelli with the opportunity to present the actual facts—or it chose to ignore them. The entry at issue consisted of shocks, axles, engine, and steering parts and was not subject to the Orders because it was not imported with a rolling chassis. Jackrel Decl. ¶ 40. CBP had, seven months before, confirmed that ***identical parts were not subject to the Orders***.

*Id.* CBP flagged the December 2025 entry because an importer certification required under the scope was mistakenly omitted. *Id.* When CBP rejected the entry, Bintelli immediately refiled with the importer certification – as it had the right to do. *Id.*; *see* 19 C.F.R. 141.64. Yet CBP refused to accept it and instead threatened liquidated damages penalties. Jackrel Decl. ¶ 40. To avoid those penalties, Bintelli paid the AD/CVD deposits and indicated that it plans to protest CBP's determination upon liquidation. *Id.* More fundamentally, CBP's own data made clear that this entry was the only entry that was contained on this bill of lading. CBP cannot be heard to claim that a simple error, that Bintelli attempted to correct, somehow merits the draconian, business-ending interim measures imposed here.

The government's anticipated property-interest argument does not address reality. Bintelli does not assert a freestanding constitutional entitlement to import without duties, or to preserve any particular duty rate. The protected interest is narrower and more concrete—the proper assessment of duties on goods already imported or in transit before CBP imposes immediate, legally consequential, and irreparable cash demands. *See ICON PI Order*, at 12 n.16 (collecting cases holding that "'importers may have a protected interest in the proper assessment of duties on goods already imported'"); *Phoenix Metal Co.*, Slip Op. 24-68, at *9 (observing that the "combination of cash deposits for AD/CVD duties with the live entry requirement requires the importer to suddenly deposit a large amount of cash with CBP before it can even complete the sale for which it is importing the goods" and that "{l}ive entries are so onerous that they have previously been compared to sanctions"). That is the deprivation here—not a generalized "right to trade."

Nor can post-deprivation procedures cure the constitutional defect. The right Bintelli invokes is the right to be heard ***before*** the deprivation occurs. *See Superior Com. Sols.*, 811 F.

Supp. 3d at 1376–77 (holding that "a meaningful opportunity to respond should happen before a temporary deprivation takes effect, not afterwards" and that CBP's regulation permitting notice only after imposition of interim measures denies importers due process and is arbitrary, capricious, and not in accordance with law). Later opportunities to submit information during the EAPA investigation may inform CBP's final determination, but they do not restore the process that was due before CBP imposed measures that immediately changed Bintelli's legal and economic position.

Accordingly, Bintelli is likely to succeed on the merits of its due-process challenge to CBP's interim measures.

### D. Bintelli Will Suffer Irreparable Harm Absent Injunctive Relief.

Bintelli's harm is far from speculative and not merely monetary. CBP is effectively imposing a more than $150 million sanction on Bintelli's past imports dating back to September 7, 2024, and a forward-looking sanction of a 519.23 percent cash deposit rate for any future merchandise that Bintelli imports, which could result in more than [ ] in duties based on shipments Bintelli currently has en route. Jackrel Decl. at ¶ 53. These measures, if they remain, will sink Bintelli and cause it to shut down within weeks, after having been in business for more than 20 years. *Id.* at ¶¶ 44, 58.

"A party seeking a preliminary injunction must show it is likely to suffer irreparable harm if the injunction is not granted." *ICON PI Order*, at 14 (citing *Winter*, 555 U.S. at 20). "{I}rreparable harm consists of harm that could not be sufficiently compensated by money damages or avoided by a later decision on the merits." *Canon, Inc. v. GCC Int'l Ltd.*, 263 F. App'x 57, 62 (Fed. Cir. 2008); *see also ICON PI Order*, at 14 (same). Business extinction is sufficient to show irreparable harm, particularly where the company threatened with closure is long-standing and has accrued goodwill. *See, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th

Cir. 2022) ("{T}he loss of . . . an ongoing business representing many years of effort and the livelihood of its . . . owners, constitutes irreparable harm. . . . Thus, showing a threat of 'extinction' is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable." (cleaned up)); *Queen's Flowers de Colombia v. United States*, 947 F. Supp. 503, 507 (Ct. Int'l Trade 1996) (finding irreparable harm where imposition of cash deposit rate would "force each of the eight companies out of business within an extremely short time period, eliminating their opportunity for future corrective judicial relief").

Here, Bintelli faces business extinction under the weight of CBP's interim measures, supported by financial evidence, and the injury cannot be undone by a later refund. After more than 20 years of selling its award-winning golf cart brand, CBP's interim measures will force Bintelli to close its doors within a month. Jackrel Decl. at ¶¶ 42, 55. The tireless efforts of Bintelli's founder, who has grown the company from high school entrepreneurship to an internationally recognized entity that employs 146 people and operates 498,000 square feet of assembly facilities in Ladson, South Carolina and Jeffersonville, Indiana, will unravel in a matter of weeks. *Id.* ¶¶ 44, 48-49, 53. Bintelli may be required to pay more than $150 million in deposits and more than [ ] on incoming shipments to comply with the interim measures. *Id.* ¶ 53. Yet, Bintelli generally holds less than [ ] in cash in its bank accounts. *Id.* ¶ 48. Indeed, the amount demanded exceeds by orders of magnitude the sum of Bintelli's profits over the course of its over 20-year operation. *Id.* ¶¶ 48, 51. And external financing is not a realistic option—especially where more than $150 million is required. Bintelli is jointly owned by two individuals in their own capacities—there is no other company involved with Bintelli that could inject cash or provide the necessary financing to pay these staggering assessments. *Id.*¶¶ 49-50. Furthermore, the required payment is 23 times more than the largest line of credit that Bintelli ever obtained and, given the

reduced inventory precipitated by the interim measures, Bintelli's likelihood of obtaining the financing it needs to cover such payment is non-existent. *Id.* ¶ 49.

Bintelli cannot simply raise its prices or cut costs to offset the impact of the interim measures that impose sanctions effectively either. Even if the interim measures were an amount that did not shock the conscience, raising prices to cover these duties would have a devastating impact on the goodwill and strong reputation that Bintelli has spent years to build. As the Court recognized in *One World Technologies, Inc. v. United States*, "'{p}rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities' may also constitute irreparable harm." 380 F. Supp. 3d 1300, 1321 (Ct. Int'l Trade 2019); *see also Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.").

Bintelli's business model also relies on a nationwide network of more than 200 authorized dealers, who operate small and medium-sized companies. Jackrel Decl. ¶¶ 56-57. Through the years, Bintelli's founder has cultivated strong personal relationships with many of these dealers and their families. *Id.* Yet those dealers will not be immune from the cascading harm that will ripple through the network if the interim measures are permitted to stand. *See* Hegedus Decl. ¶¶ 8–9 (stating that BGC employs 81 people, that "all of BGC's locations will shut down if Bintelli is forced to stop importing for even as much as 30 to 60 days," and that BGC's "entire business would come to a screeching halt"); Card Decl. ¶ 12 (stating that Card and his wife "would probably be forced to close down East Valley Golf Carts soon after," affecting the livelihoods of 10 employees and "about seven families"). Beyond the dealers themselves, Bintelli's customers across the country who rely on this dealer network for replacement parts, warranty repairs,

maintenance support, and ongoing service will face delays in obtaining parts (if they can be obtained at all), repairs, and services for vehicles they own. Jackrel Decl. ¶ 56.

Nor can Bintelli cut costs to try and cover the duties the government has imposed. Jackrel Decl. ¶ 52. Even if Bintelli were able to cut its expenses to zero—a completely unrealistic proposition—Bintelli would be left with little or nothing with which to pay the more than $150 million in interim measures, not even counting the ongoing import duties. *Id.* at ¶ 48; Ex. C (2025 financials showing expenses). Even if CBP were to decline to impose retroactive duties on the full amount of Type 01 entries made during the EAPA period of investigation, the threat of the live entry and cash 519.23 percent deposit requirement for future entries alone (potentially more than [ ] for what is imminently arriving to the United States) would bankrupt the company well before Bintelli had the opportunity to clear its name during the course of the EAPA investigation.

Customs-related cash and bonding requirements can inflict irreparable harm through multiple channels, not simply through a temporary outlay of money. *See Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1328 (Ct. Int'l Trade 2014) (finding irreparable harm where inability to provide collateral left goods "in limbo, accruing demurrage charges," and caused plaintiff to "suffer{} loss of goodwill and damage to his reputation from his domestic customers due to his failure to deliver because of his inability to pay the fully collateralized bond amount"). Bintelli faces the same cascade of damaging events: blocked imports, disrupted deliveries, strained customer relationships, and reputational injury that cannot be repaired after the fact. Indeed, Bintelli currently has 70 containers that are on the water and other shipments that have been held up in port. Jackrel Decl. ¶ 53. Due to the interim measures, Bintelli will have to send the shipments on the water back to its manufacturers in Vietnam and Thailand or pay approximately $250 per

container per day in demurrage fees to hold the shipments in port. *Id.* These demurrage fees will significantly deplete Bintelli's financial resources and are not sustainable. *Id.* Bintelli is forced to pay them, however, because it cannot afford the 519.23 percent of their value that would be immediately due if those shipments were to be accepted. *Id.*

Moreover, a likely APA procedural violation may itself constitute irreparable harm because the movant "would thereby lose any opportunity for meaningful judicial review." *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1291 (Ct. Int'l Trade 2019). This Court recognized that lost business opportunities, cancelled or reduced projects, and reputational harm—none of which can be undone after an agency action takes effect—constitute irreparable harm even without an allegation of business extinction. *Id.* at 1291-92. "{T}he abrogation of effective judicial review" constitutes "sufficient irreparable injury" justifying injunctive relief. *Zenith Radio Corp. v. United States*, 710 F.2d 806, 810 (Fed. Cir. 1983).

That a refund would be available at the conclusion of an EAPA investigation does not render Bintelli's injuries reparable. "{T}he irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address." *Celsis in Vitro*, 664 F.3d at 930. A refund to an entity that no longer exists is no remedy at all. *See ICON PI Order*, at 14 (finding likelihood of irreparable harm where "ICON alleges a real threat of extinction—corroborated by financial data and detailed in concrete terms by its corporate representative—that will not be sufficiently compensated by money damages").

**E. The Balance Of Equities And Public Interest Favor An Injunction.**

The balance of equities and public interest (factors that merge when the government is the defendant) likewise favor Bintelli. "The public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). The public interest would be

undermined, however, if CBP were permitted to flout its constitutional obligations. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.").

The government's interest in enforcing the trade laws is real, but that interest does not allow it to disregard the Constitution. "The Constitution . . . does not permit {the government} to prioritize any policy goal over the Due Process Clause." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (internal citations and quotations omitted); *see also Queen's Flowers de Colombia*, 947 F. Supp. at 508 (finding "a public interest in meaningful judicial review of unlawful administrative action, particularly . . . where the potential unlawful application . . . threatens . . . immediate economic extinction"). The government has no legitimate interest in collecting duties through unlawful process.

The requested injunction is narrow. Bintelli does not ask the Court to halt the EAPA investigation or disturb the extension or suspension of liquidation. It asks the Court only to enjoin CBP from rejecting entries, requiring re-filing and live entry, and imposing AD/CVD cash-deposit or security requirements without first providing constitutionally adequate process. That relief preserves CBP's investigation and revenue protections while preventing the specific measures that threaten to destroy Bintelli before it can be heard. The balance of equities and the public interest favor Bintelli here.

**F. The Court Should Set Any Bond At Zero Or At A Nominal Amount.**

Under Rule 65(c), the Court may issue a TRO or preliminary injunction "only if the movant gives security in an amount that the court considers proper." Fed. R. Civ. P. 65(c). The proper amount here is $0 or, at most, a nominal bond. Requiring Bintelli to post security equal to the duties CBP claims are owed would replicate and impose the very burden the injunction is meant to prevent. *See ICON PI Order*, at 18 n.21 (setting bond at $0 because "{r}equiring ICON to post

a bond covering the over-500% duties would be no different from the live entry requirement which the court has just enjoined"). Because liquidation would remain suspended or extended, CBP's claim to any duties ultimately owed is preserved.

## CONCLUSION

For the foregoing reasons, Bintelli respectfully requests this Court to grant its motion for a temporary restraining order and preliminary injunction and immediately enjoin the interim measures, forestalling the application of the interim measures pending the completion of CBP's investigation and the conclusion of EAPA Case No. 8286.

Dated: September 8, 2026

Respectfully submitted,

*/s/ Daniel R. Wilson*

Daniel R. Wilson
Carolyn Bethea Connolly
Faegre Drinker Biddle & Reath LLP
1500 K Street, N.W., Ste. 1100
Washington, DC 20005
Phone: (202) 230-5000
Fax: (202) 842-8465
daniel.wilson@faegredrinker.com
carrie.connolly@faegredrinker.com

Lawrence G. Scarborough
Jovana Crncevic
Faegre Drinker Biddle & Reath LLP
1177 Avenue of the Americas, 43rd Floor
New York, New York 10036
Phone: (212) 248-3140
Fax: (212) 248-3141
lawrence.scarborough@faegredrinker.com
jovana.crncevic@faegredrinker.com

*Counsel for Plaintiff Bintelli, LLC*