**PUBLIC VERSION**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: HONORABLE JANE A. RESTANI, JUDGE**
**HONORABLE LEO M. GORDON, JUDGE**
**HONORABLE TIMOTHY C. STANCEU, JUDGE**

VEXAS CORP. d/b/a ATLAS,

*Plaintiff,*

BINTELLI, LLC,

*Consolidated Plaintiff,*

VENOM EV, LLC,

*Consolidated Plaintiff,*

v.

UNITED STATES; U.S. CUSTOMS AND BORDER PROTECTION; and ERIC CHOY, in his official capacity as Executive Director, Trade Remedy Law Enforcement Directorate, Office of Trade, U.S. Customs and Border Protection,

*Defendants.*

Consol. Court No. 26-03809
**PUBLIC VERSION**

**VENOM EV, LLC'S MOTION FOR SUMMARY JUDGMENT AND JUDGMENT ON THE AGENCY RECORD**

Dated: November 24, 2026

Faegre Drinker Biddle & Reath LLP
Daniel R. Wilson
Carolyn Bethea Connolly
Rachel A. Beck
1500 K Street, N.W., Ste. 1100
Washington, DC 20005
Phone: (202) 230-5000
Fax: (202) 842-8465
daniel.wilson@faegredrinker.com
carrie.connolly@faegredrinker.com
rachel.beck@faegredrinker.com

Lawrence G. Scarborough
Jovana Crncevic
Taylor Lynn Norton
1177 Avenue of the Americas, 43rd Floor
New York, New York 10036

**PUBLIC VERSION**

Phone: (212) 248-3140
Fax: (212) 248-3141
lawrence.scarborough@faegredrinker.com
jovana.crncevic@faegredrinker.com
taylor.norton@faegredrinker.com

Jesse Long Marks
Faegre Drinker Biddle & Reath LLP
1144 15th Street, Suite 3400
Denver, Colorado 80202
Phone: (303) 607-3500
Fax: (303) 607-3600
jesse.marks@faegredrinker.com

*Counsel for Plaintiff Venom EV, LLC*

**PUBLIC VERSION**

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| Table of Authorities | | iii |
| INTRODUCTION | | 1 |
| RULE 56.1 STATEMENT | | 2 |
| FACTUAL BACKGROUND | | 2 |
| I. | The Department of Commerce Issued AD/CVD Orders ON LSPTVs Covering, At A Minimum, Chinese-Origin Rolling Chassis Consisting Of A Frame With Suspension Installed And Powertrain Components Installed Or Ready For Installation | 2 |
| II. | Venom's Imported Merchandise Does Not Contain Chinese-Origin Rolling Chassis | 6 |
| III. | The Coalition Files An EAPA Allegation Against Venom That Misinterprets The LSPTV Orders And Relies On Inaccurate Evidence | 10 |
| IV. | CBP Initiates An Investigation Based On Predominantly On The Coalition's Assertions | 12 |
| V. | CBP Informs Venom Of The EAPA Investigation And Simultaneously Imposes The Interim Measures | 13 |
| VI. | [ ] The Withdrawal, Without Prejudice, Of Venom's Motion For A Temporary Restraining Order And Preliminary Injunction | 14 |
| SUMMARY OF ARGUMENT | | 16 |
| ARGUMENT | | 18 |
| I. | Standard Of Review | 18 |
| II. | CBP Violated The Fifth Amendment By Failing To Provide Venom With Pre-Deprivation Notice Or A Meaningful Opportunity To Be Heard | 19 |
| III. | The Reasonable Suspicion Standard, As Applied, Is Unconstitutional Against Business-Ending Interim Measures | 25 |

**Page**

A. A Statute Cannot Supply Less Due Process Than The Constitution Requires .......... 26

B. The Private Interest Is Grave And The Threatened Loss Is Permanent .......... 28

C. The Government's Interests Do Not Require Business-Ending Measures On Mere Suspicion .......... 29

D. Reasonable Suspicion May Suffice For Truly Temporary Measures, But Not For Measures That Are Final In Practical Effect .......... 32

IV. Even If The As-Applied Reasonable Suspicion Standard Were Constitutional, CBP Lacked The Requisite Suspicion To Impose Interim Measures .......... 33

A. Reasonable Suspicion Requires A Particularized And Objective Basis, Grounded In The Actual Scope Of The Orders, For Suspecting That Covered Merchandise Was Entered Through Evasion .......... 34

B. Venom's 2025 Entries Of Chinese Bare Frames And Parts Provided No Grounds For Reasonable Suspicion .......... 36

C. Venom's Shift To Thai Production After The Orders Issued Is Evidence Of Compliance, Not Evasion .......... 38

*1. The Thai Carts* .......... 39

*2. [ ] Commercial Role Does Not Make Thai Carts Chinese-Origin Rolling Chassis* .......... 41

*3. CBP Never Asked Venom To Resolve The Questions It Now Invokes* .......... 42

D. Even Considered In Their Totality, CBP's Stated Grounds Do Not Establish Reasonable Suspicion .......... 42

CONCLUSION .......... 43

CERTIFICATE OF COMPLIANCE

**PUBLIC VERSION**

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Addington v. Texas*,
441 U.S. 418 (1979) .................... 27

*AL Tech Specialty Steel Corp. v. United States*,
575 F. Supp. 1277 (Ct. Int'l Trade 1983) .................... *passim*

*Am. Pac. Plywood, Inc. v. United States*,
No. 20-03914, Slip Op. 23-93 (Ct. Int'l Trade June 22, 2023) .................... *passim*

*Am. Signature, Inc. v. United States*,
598 F.3d 816 (Fed. Cir. 2010) .................... 24

*Arnett v. Kennedy*,
416 U.S. 134 (1974) .................... 26

*Aspects Furniture Int'l, Inc. v. United States*,
607 F. Supp. 3d 1246 (Ct. Int'l Trade 2022) .................... 35, 43

*Barry v. Barchi*,
443 U.S. 55 (1979) .................... 28, 32

*Bell v. Burson*,
402 U.S. 535 (1971) .................... 27

*Brock v. Roadway Express, Inc.*,
481 U.S. 252 (1987) .................... 32

*Canadian Wheat Bd. v. United States*,
32 C.I.T. 1116 (Ct. Int'l Trade 2008),
*opinion clarified on denial of reconsideration*, 33 C.I.T. 1204 (Ct. Intl' Trade 2009),
*aff'd*, 641 F.3d 1344 (Fed. Cir. 2011) .................... 19

*CEK Grp. LLC v. United States*,
633 F. Supp. 3d 1369 (Ct. Int'l Trade 2023) .................... 29, 30, 35

*China Nat'l Mach. Imp. & Exp. Corp. v. United States*,
264 F. Supp. 2d 1229 (Ct. Int'l Trade 2003) .................... 34, 40

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) .................... 19, 26, 27

*Dunaway v. New York*,
442 U.S. 200 (1979) .................... 31

PUBLIC VERSION


Page(s)

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) .......... 19

*Florida v. Royer*,
460 U.S. 491 (1983) .......... 25-26

*Ford Motor Co. v. United States*,
44 F. Supp. 3d 1330 (Ct. Int'l Trade 2015) .......... 21

*FTC v. Standard Oil Co.*,
449 U.S. 232 (1980) .......... 33

*Gilbert v. Homar*,
520 U.S. 924 (1997) .......... 32

*Hangzhou Spring Washer Co. v. United States*,
387 F. Supp. 2d 1236 (Ct. Int'l Trade 2005) .......... 34

*ICON EV LLC v. United States*,
No. 26-02759, Slip Op. 26-88 (Ct. Int'l Trade Aug. 10, 2026)
("*ICON Intervention Order*") .......... 30, 34, 43

*ICON EV LLC v. United States*,
8365 F. Supp. 3d 1361 (Ct. Int'l Trade 2026)
("*ICON PI Order*") .......... *passim*

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004) .......... 27

*Kashem v. Barr*,
941 F.3d 358 (9th Cir. 2019) .......... 29

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 24

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......... *passim*

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) .......... 18

*Natl. Fisheries Inst., Inc. v. U.S. Bureau of Cust. And Border Protec.*,
33 C.I.T. 1137 (Ct. Int'l Trade 2009) .......... 18

**PUBLIC VERSION**

**Page(s)**

*Phoenix Metal Co. v. United States*,
No. 23-00048, Slip Op. 24-68 (Ct. Int'l Trade June 10, 2024) .................................. 20, 21

*Rodriguez v. Dep't of Veterans Affairs*,
8 F.4th 1290 (Fed. Cir. 2021) .................................................................................. 29

*Royal Brush Mfg., Inc. v. United States*,
75 F.4th 1250 (Fed. Cir. 2023) .................................................................................. 19, 26

*Santosky v. Kramer*,
455 U.S. 745 (1982) .................................................................................. 27, 28

*Superior Com. Sols., LLC v. United States*,
811 F. Supp. 3d 1363 (Ct. Int'l Trade 2025) ..........................................................19, 20, 24,

*Terry v. Ohio*,
392 U.S. 1 (1968) ..................................................................................30, 31, 35

*United States v. All Assets of Statewide Auto Parts, Inc.*,
971 F.2d 896 (2d Cir. 1992) .................................................................................. 20, 28

*United States v. Cortez*,
449 U.S. 411 (1981) .................................................................................. 34

*United States v. James Daniel Good Real Prop.*,
510 U.S. 43 (1993) .................................................................................. 28

*United States v. Place*,
462 U.S. 696 (1983) .................................................................................. 31

*Vitek v. Jones*,
445 U.S. 480 (1980) .................................................................................. 27

*Wirtgen Amer., Inc. v. United States*,
447 F. Supp. 3d 1359 (Ct. Int'l Trade 2020) .......................................................... 19

*Women's Med. Prof'l Corp. v. Baird*,
438 F.3d 595 (6th Cir. 2006) .................................................................................. 20, 28

*Zoetis Services LLC v. United States*,
No. 22-00056, Slip Op. 26-102 (Ct. Int'l Trade 2026) ............................................. 19

**PUBLIC VERSION**

**Statutes, Rules & Regulations:** **Page(s)**

19 C.F.R. § 165.24 .......... 26

5 U.S.C. § 706(2) .......... 18

5 U.S.C. § 706(2)(A) .......... 41

19 U.S.C. § 1517(a)(3) .......... 35

19 U.S.C. § 1517(b)(1) .......... 26, 30, 34

19 U.S.C. § 1571(b)(4) .......... 35, 36

19 U.S.C. § 1517(c)(1)(A) .......... 26

19 U.S.C. § 1517(e) .......... 26, 34

19 U.S.C. § 1517 (e)(3) .......... 26, 43

19 U.S.C. § 1677j .......... 36

28 U.S.C. § 1581(i)(1)(D) .......... 18

28 U.S.C. § 2640(e) .......... 18

90 Fed. Reg. 38,763 (Dep't Com. Aug. 12, 2025) .......... *passim*

90 Fed. Reg. 38,759 (Dep't Com. Aug. 12, 2025) .......... 2, 3, 36

PUBLIC VERSION

## INTRODUCTION

The undisputed facts and record evidence confirm that U.S. Customs and Border Protection ("CBP") violated both the United States Constitution and federal law in imposing interim measures against Plaintiff U.S. importer Venom EV, LLC ("Venom") pursuant to the Enforce and Protect Act ("EAPA") for imports of Thai golf carts and imports of bare frames and separately imported miscellaneous components that are out-of-scope under the applicable antidumping and countervailing duty ("AD/CVD") orders. CBP violated Venom's Fifth Amendment rights by imposing business-ending interim measures without providing Venom with constitutionally required notice of the investigation or any opportunity to respond. Moreover, EAPA's "reasonable suspicion" standard for imposing these interim measures sets an unconstitutionally low evidentiary bar in relation to the business-ending consequence of their imposition that will effectively destroy Venom before it has any opportunity to respond to the allegations.

Even if the reasonable suspicion standard were constitutional here, CBP's finding of reasonable suspicion against Venom does not satisfy the scope of the AD/CVD Orders. The U.S. Department of Commerce ("Commerce") built the Orders around a single minimum subassembly, the Chinese-origin "rolling chassis." None of the merchandise entered by Venom during the period of investigation ("POI") is covered by the scope. CBP lacked any particularized and objective basis for suspecting that covered merchandise was entered through evasion. As this Court has observed, "{t}he strength or weakness of the suspicion likely should affect" CBP's decision whether to impose interim measures at all. *ICON EV LLC v. United States*, 836 F. Supp. 3d 1361, 1374 (Ct. Int'l Trade 2026) ("*ICON PI Order*"). When it came to considering interim measures here, EAPA required CBP to use a scalpel; instead, it used an impermissible sledgehammer.

PUBLIC VERSION

## RULE 56.1 STATEMENT

1. The administrative determination to be reviewed is CBP's August 25, 2026 Notice of Investigation and Interim Measures (the "Notice of Initiation"). B.C.14, BC001285-310.

2. Venom incorporates by reference its statement of undisputed material facts that accompanies this submission. *See* Venom's Statement of Undisputed Material Facts.

## FACTUAL BACKGROUND

### I. The Department Of Commerce Issued AD/CVD Orders On LSPTVs Covering, At A Minimum, Chinese-Origin Rolling Chassis Consisting Of A Frame With Suspension Installed And Powertrain Components Installed Or Ready For Installation.

On August 12, 2025, Commerce published the operative AD/CVD orders on low-speed personal transportation vehicles ("LSPTVs") from the People's Republic of China. *See Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order; Amended Final Determination of Countervailing Duty Investigation and Countervailing Duty Order*, 90 Fed. Reg. 38,759 (Dep't Com. Aug. 12, 2025) (the "Orders").

The Orders cover finished LSPTVs of Chinese origin, as well as certain unfinished or unassembled LSPTVs of Chinese origin, as defined by the following scope:

> An unfinished and/or unassembled LSPTV subject to these orders covers **<u>at a minimum</u>** a subassembly, also known as a "rolling chassis," which is typically comprised of, but not limited to, a frame or body with front and/or rear suspension components (such as arms, springs, axles, spindles, and shafts) installed and powertrain components (including either an electric motor or a gas-powered internal combustion engine) installed or ready for installation.
>
> When imported together with a rolling chassis subject to these orders, other LSPTV components, such as batteries, bumpers, wheel and tire assemblies, cowlings, fenders, grills, kick plates, steering column and steering wheel assemblies, dash assembly, seat assemblies, pedal assemblies, brake assemblies, canopy or roof assemblies, temporary rain enclosures, windshields, mirrors, headlights, taillights, lighting systems, or storage—whether assembled or unassembled, whether as part of a kit or not, and whether or not accompanied by additional components—

> constitute part of an unfinished and/or unassembled LSPTV that is subject to these orders. The inclusion of other products, components, or assemblies not described here does not remove the product from the scope….
>
> LSPTVs and subassemblies subject to these orders include those that are produced in the subject country whether assembled with other components in the subject country or in a third country. Processing or completion of finished and unfinished LSPTVs and subassemblies either in the subject country or in a third country does not remove the product from the scope.

*Id.*, 90 Fed. Reg. at 38,763 (emphasis added). Critically, merchandise subject to the Orders must contain at least a Chinese-origin "subassembly, also known as a 'rolling chassis,' which is typically comprised of, but not limited to, a frame . . . with front and/or rear suspension components . . . installed and powertrain components . . . installed or ready for installation." *Id.* Absent any one of these elements, imports are not covered by the Orders.

The scope of the Orders is "precise and limited." *ICON PI Order*, at 1366. The Orders' coverage was not an accident of drafting; it was the product of a year-long scope proceeding in which Commerce repeatedly considered, and rejected, the very theory of coverage for separately imported parts on which the EAPA allegations of the American Personal Transportation Vehicle Manufacturers Coalition ("Coalition") here depend. The Coalition filed its Petition on June 20, 2024, defining an unfinished or unassembled LSPTV as covering "at a minimum a subassembly, also known as a 'rolling chassis,'" and providing that "{i}ndividual components that do not comprise a subject {LSPTV} or subassembly that are entered **and sold** by themselves are not subject to the order." Ex. 1, 6/20/24 Petition at 5-6 (emphasis added with respect to language not found in the final Orders). In response to Commerce's supplemental questionnaires, the Coalition confirmed that "individual {LSPTV} components or parts, such as axle components, do not comprise a subject {LSPTV} or rolling chassis subassembly if they are entered and sold by themselves," and that, "{f}or the individual parts or components that comprise the rolling chassis

subassembly to be considered subject merchandise, they must be imported together as the rolling chassis, whether assembled together or as part of a kit." Ex. 2, 6/28/24 Coalition Resp. at 9-10. The Coalition also represented to Commerce that "{a} chassis frame imported on its own, without any powertrain components is not covered by the scope," that "a chassis frame or body that is imported separately without suspension components installed and powertrain components installed or ready for installation is not considered subject merchandise," and that other components, "{w}hen imported separately, . . . are not subject merchandise." Ex. 3, 7/8/24 Coalition Resp. at 2-4.

On November 25, 2024, Commerce proposed deleting the words "and sold" from the individual-components sentence of the scope. *See* Ex. 4, 11/25/24 Preliminary Scope Modification at 8-9, 16. In its January 23, 2025 Preliminary Scope Decision Memorandum, Commerce, over the Coalition's objection, eliminated "and sold" because that language made "the scope unenforceable by CBP," and declined to impose an end-use certification. Ex. 5, 1/23/25 Preliminary Scope Decision. The resulting text provided that "{i}ndividual components that do not comprise a subject LSPTV or subassembly that are entered by themselves are not subject to the investigations." *Id.* at 13.

The Coalition proposed a similar "for use" proposal in its scope case brief. Ex. 6, 2/27/25 Coalition Scope Br. at 2-9. In its June 16, 2025 Final Scope Decision Memorandum, Commerce again declined to adopt the Coalition's end-use proposal. Instead, Commerce adopted a narrow certification scheme directed at a single scenario: the post-importation assembly of certain enumerated Chinese parts "with Chinese LSPTVs subassemblies/rolling chassis to produce LSPTVs." Ex. 7, 6/16/25 Final Scope Decision at 5-6, B.C.6, BC000816-34.

The certification applies only to five Chinese-origin components (seat assemblies, steering columns, suspension systems, plastic cowlings, and motors), and requires the importer to certify only that the parts are not on the same bill of lading as "subject subassemblies (i.e., rolling chassis)" and that neither it nor a related entity "will assemble these parts **with a subject subassembly** or a subject unfinished LSPTV to produce an LSPTV." BC000821, BC000831, BC000832-3 (emphasis added). A "subassembly (i.e., rolling chassis) is subject to the Order if it meets the definition of a rolling chassis as described by the scope of this order." BC000832-3. Commerce rejected the Coalition's broader proposals, including any requirement concerning "the ultimate disposition of components after they enter the United States{.}" BC000820. Commerce also left the rolling-chassis definition unchanged. BC000826-28. As a result, the scope thus never independently reached separately imported parts that, rather than being joined to a rolling chassis that was subject merchandise when it entered, are used to build a rolling chassis in the United States. That is the scope the Orders adopted, 90 Fed. Reg. at 38,763, and it is the scope this Court has described as "precise and limited." *ICON PI Order*, at 1366.

The same record forecloses any theory that the Orders cover third-country carts with non-Chinese rolling chassis. The Petition identified China as the only subject country, and the Coalition represented that it had no "evidence indicating that the subject merchandise is currently produced in a country other than that from which it is exported." Ex. 1, 6/20/24 Petition at 13. The scope reaches LSPTVs and subassemblies "produced in the subject country," including those later "assembled with other components . . . in a third country." *Id.* at 6; 90 Fed. Reg. at 38,763. It does not reach a cart that is produced from a rolling chassis fabricated outside China. Indeed, the Coalition itself described a rolling chassis as a frame "constructed from steel and/or aluminum sheet, tube, and other products that are cut, welded, bent, and formed into shape through the

fabrication process," with suspension and powertrain components installed. Ex. 2, 6/28/24 Coalition Resp. at 8, 11. Where that fabrication occurs in Thailand, the resulting rolling chassis is Thai, not Chinese.

## II. Venom's Imported Merchandise Does Not Contain Chinese-Origin Rolling Chassis.

Venom is a U.S.-based importer, manufacturer, and distributor of electric vehicles, including golf carts. *See Vexas Corp. v. United States et al.*, Ct. No. 26-3809 ("*Vexas*"), ECF No. 30-1, Declaration of James Haney ("Haney Decl.") ¶ 3.[1] During the POI, Venom initially imported parts and components from China that did not amount to a minimum covered subassembly pursuant to the scope. *See id.* ¶ 15. These parts and components, sourced from Yangzhou Whanlong Electric Vehicle Co. ("Whanlong"), consisted of bare metal frames and motors and suspension components that were not imported together on the same bill of lading. *Id.* Venom, in collaboration with Whanlong, then began sourcing its golf carts from a manufacturer in Thailand. *Id.* ¶ 16. While these carts may contain certain Chinese componentry, the rolling chassis of the cart is undeniably of Thai origin: the frames of these Thai carts are produced from non-Chinese raw materials that are bent, welded, and formed into frames at a Thai factory. *Id.* ¶¶ 17-19. In addition, all of the labor for the manufacturing and assembly occurs in Thailand, and a significant portion of all the components are Thai origin. *Id.* Venom communicated all of this information to CBP in response to CBP's requests for information issued prior to the imposition of the interim measures.

CBP issued a CF-28 to Venom on September 10, 2025, requesting country of origin information for LSPTVs produced by Venom's manufacturer in Thailand, RMA Automotive Company Limited ("RMA"), and imported under entry numbers E37-0239856-0 and E37-

---

[1] On September 1, 2026, the Court consolidated *Venom* with *Vexas Corp. v. United States et al.*, No. 26-3809 and *Bintelli, LLC v. United States et al.*, No. 26-3812, under the *Vexas* caption.

0241140-5. *See* B.C.27, BC003606-19; *Venom EV, LLC v. United States et al.*, Ct. No. 26-3824 ("*Venom*"), ECF No. 4-1; 12/1/2025 Letter to CBP Regarding CF-28 Response ("12/1/2025 Venom CF-28 Response").[2]

CBP's September 10, 2025 CF-28 requested "additional proof of country of origin Thailand for the golf carts imported under entry numbers E37-0239856-0 and E37-0241140-5." 12/1/2025 Venom CF-28 Response at 1 & Ex. 1; B.C.27, BC003606-19. The request was directed exclusively to the origin of finished carts produced by RMA; it did not reference any EAPA allegation or investigation. B.C.27, BC003606-19.

Venom provided a response on December 1, 2025, which, among other things, corroborated RMA's production processes in Thailand and its use of raw materials and components of Thai origin. *Id.* By December 12, 2025, CBP had determined that the LSPTVs imported from RMA were properly declared as Thai origin and liquidated them Type 01 as entered. Haney Decl. ¶ 18; *Venom*, ECF No. 4-2, 12/12/2025 CBP Posted Notice of Liquidation (listing "Entry Type 01" and "Action No Change"); B.C.27, BC003629-31.

Venom's December 1, 2025 response explained that the carts were Thai-origin because "the critical components of the golf cart, including the frame, were produced in Thailand, and the complex final assembly operations occurred in Thailand." B.C.27, BC003612-13. Venom described RMA's production process, which "begins in Thailand with fabrication of the frame or chassis—including extrusion, cutting, welding, phosphoric acid dipping for corrosion resistance, and powder-coating of the metal structures," followed by installation of the propulsion system, steering, braking, and front and rear suspension, electrical integration, and body assembly,

---

[2] Venom's complaint, and accompanying exhibits, were filed prior to the consolidation of this action. *See Venom EV, LLC v. United States et al.*, Ct. No. 26-3824.

involving more than 300 discrete components. BC003613-14. Venom identified the chassis and the power line assembly as Thai-origin components. *Id.* Venom also supplied the purchase order between Whanlong International (HK) Holdings Co. and RMA, RMA's raw material and component purchase orders and invoices, a full bill of materials listing countries of origin, RMA's production plan, employee timecards, machinery and tooling lists, a production flowchart and work instructions, Thai certificates of origin and export certificates, and proof of payment to RMA. BC003618-19 (citing Exs. 3-12). Venom further provided its inspection report from three factory visits to RMA in 2025, which verified that frame fabrication, body molding and finishing, wiring harness construction, chassis assembly, electrical integration, and final QC and testing all occurred in RMA's Thai factory. BC003618-19 (citing Ex. 10).

CBP then issued another round of CF-28s on June 16, 2026, requiring country of origin information related to Venom's LSPTVs from Thailand—the very merchandise that CBP itself had previously determined was ***beyond the scope of the Orders.*** *See* B.C.24; B.C.26; B.C.27; B.C.28. CBP also sent two additional CF-28s on June 16, 2026, addressing Venom's imports of Chinese parts and components. B.C.23; B.C.25; B.C.29; B.C.30.

CBP's June 16, 2026 CF-28s were issued after CBP had initiated its EAPA investigation on May 20, 2026, but none of them disclosed that investigation. *See* B.C.14; B.C.23-30. Two of the requests sought "additional proof of country of origin Thailand" for finished RMA carts entered under entries [ ]484-0 and [ ]227-2. B.C.26, BC003446-47; B.C.24, BC003420-21.[3] The other two requested information on LSPTV components imported from China

[3] The bracketing and designation of entry numbers and other confidential information in this brief corresponds to the submissions on the administrative record which were bracketed in accordance with CBP's instructions. Information referenced from CBP's Notice of Initiation and other documents on the administrative record remains bracketed pursuant to the terms of CBP's

under entries [ ]015-3 and [ ]300-6. B.C.23, BC003403; B.C.25, BC003429. According to CBP, the requests sought entry documentation, bills of lading, commercial invoices, packing lists, product descriptions, manufacturer information, production records, bills of materials, raw material sourcing documentation, purchase and payment records, and quality inspection records. B.C.14, BC001300.

Venom responded to each request on July 23, 2026, with voluminous records demonstrating the origins and composition of its Thai LSPTVs, in response to the first category of CF-28s, and photographic evidence supporting its argument that the Chinese parts and components did not fall under the Orders' scope, in response to the second category of CF-28s. *See generally* B.C.23-30.

As to the parts entries, Venom explained that it is a U.S. manufacturer based in Monroe, Wisconsin that, beginning in September 2024, "transitioned to producing its own rolling chassis from a combination of domestically sourced parts and imported frames and other componentry from China." B.C.23, BC003403. The U.S. International Trade Commission (the "Commission") had found in the underlying injury investigation that "Venom EV began processing LSPTVs in 2023 and then switched to producing its own rolling chassis in September 2024," and treated Venom as a domestic producer. BC003404 (quoting *Low Speed Personal Transportation Vehicles from China*, USITC Pub. No. 5652 (Aug. 2025), at 16 n.67).

Venom showed, with photographs, that the entries consisted of a cart frame, roof, seat parts, tag light, car body part, umbrella, subwoofer, floor mat, windshield, and plastic parts, and that the frames carried no suspension or powertrain components, installed or otherwise. BC003405-06. A

---

Administrative Protective Order. In an abundance of caution, Venom has bracketed such information when it is directly referenced from documents in the administrative record, even where Venom has otherwise publicly disclosed such information in other submissions before the Court.

bare frame of that kind "is not a 'rolling chassis,' but is instead used to produce a 'rolling chassis' domestically." BC003405; *accord* B.C.25, BC003429-32. As to the Thai carts, Venom again explained that production "begins in Thailand with fabrication of the frame or chassis," that the Thai-origin components "include the chassis assembly (the most expensive component)," and that CBP had already accepted the same supply chain as Thai-origin and liquidated the September 2025 entries as entered. B.C.24, BC003416-17; B.C.26, BC003442-43. Venom supplied RMA's production records, machinery lists, bills of materials, raw material purchase orders and payment records, Thai certificates of origin, its factory audit report, and photographs of RMA's facility. *See* B.C.24, BC003420-21; B.C.27; B.C.26, BC003446-47; B.C.28.

## III. The Coalition Files An EAPA Allegation Against Venom That Misinterprets The LSPTV Orders And Relies On Inaccurate Evidence.

On April 20, 2026, the Coalition filed an EAPA allegation against Venom (EAPA 8310), alleging that Venom: (1) was "importing subject rolling chassis directly from China in a slightly disassembled form, often with the axle or other suspension components detached"; (2) had misclassified LSPTVs under HTSUS codes for golf balls and golf equipment; and (3) was "transshipping Chinese-origin LSPTVs through Thailand." B.C.6, BC000743; B.C.14, BC001288.

To support the first theory, the Coalition told CBP that "Venom does not boast any manufacturing capacity" and that its "Wisconsin facility is a dealership, not suitable for any manufacturing." B.C.6, BC000757. The Coalition omitted that the Commission, in the very injury investigation the Coalition brought, found that Venom produced its own rolling chassis in Wisconsin beginning in September 2024 and was a domestic producer. B.C.23, BC003403-4.

The Coalition also argued that Commerce's Final Scope Decision Memorandum covered parts "intended to be used/sold/assembled" into LSPTVs, and that "any Venom 'golf cart part' entry made after the start of the critical circumstances period in September 2024 was subject to

AD/CVD duties." B.C.6, BC000753-755. That is the very unqualified "for use" language the Coalition proposed and Commerce rejected. *Compare* Ex. 8, 12/13/24 Coalition Comments at 7, and Ex. 6, 2/27/25 Coalition Scope Br. at 9, *with* Ex. 5, 1/23/25 Preliminary Scope Decision at 6-7, and Ex. 7, 6/16/25 Final Scope Decision at 5-6; B.C.6, BC000816-834. The certification Commerce adopted reaches only assembly "with a subject subassembly or a subject unfinished LSPTV," Ex. 7, Final Scope Decision Memorandum, App. II ¶ F(ii), not the assembly of non-subject parts into a rolling chassis in the United States. The allegation likewise omits the Coalition's own representation that "{a} chassis frame imported on its own, without any powertrain components is not covered by the scope." Ex. 3, 7/8/24 Coalition Resp. at 2.

The Coalition's second assertion was that Venom "misclassified its imported LSPTVs under various {HTSUS} codes—including HTSUS 9506.32, which refers to golf balls." B.C.6, BC000743, BC000759-762. The Coalition says it based this allegation on the [ ]. BC000759-60. Specifically, at Exhibit 10 of its allegation regarding Venom, the Coalition provided a summary list of eight shipments alleged to have contained this HTS code on the shipping manifests. BC000888.

The summary chart provided by the Coalition is problematic because it does not appear to accurately represent the manifest data reflected in the [ ] database. The Coalition did not provide a true and correct copy of the actual data kept in the [ ] system. Instead, it appears to have produced a purported summary of such data. And, as reflected in the [ ] data printouts and bill of lading summaries downloaded directly from [ ] provided in Exhibit A to the declaration of counsel, not one of the manifests included in the Coalition's list purportedly based on the [ ] database reflects the use of HTSUS 9506.32. *See* Declaration of Daniel R. Wilson ("Wilson Decl."), Ex. A. Moreover, and as the [ ]

website recognizes, [ ]. *See* Wilson Decl., Ex. B. Thus, even accepting the Coalition's summary chart of the [ ] data as true, it is largely understood that codes listed on third-party manifest data are not probative of the code actually used on entry summaries declared to CBP. *See* Wilson Decl., Exs. A-B. The Coalition's decision to rely on such sources for its allegations is highly suspect, to say the very least.

As to the transshipment assertion, the allegation rested on the absence of Thai entries under one HTSUS subheading before mid-2025 coupled with the assertion that RMA lacked "evidence of new manufacturing capacity," with reference to a Google Maps printout of one of RMA's buildings on its otherwise sprawling campus in Thailand. B.C.14, BC001296; B.C.6, BC000762-63. The Coalition further asserted, without any supporting evidence, that RMA had in fact imported golf cart models from China that looked similar to another importer's models. BC000763-64. This bald assertion means the Coalition provided no actual evidence of transshipment.

## IV. CBP Initiates An Investigation Based Predominantly On The Coalition's Assertions.

CBP acknowledged receipt of the Coalition's allegations on April 29, 2026, and initiated a consolidated investigation of Venom and two other LSPTV importers, Bintelli, LLC ("Bintelli") and Vexas Corp. d/b/a Atlas Carts ("Vexas") on May 20, 2026. B.C.14, BC001287-88, BC001299. CBP found that the allegations "reasonably suggest{ed}" evasion because the importers "appear to have followed a similar pattern of importing rolling chassis in a slightly disassembled form, along with other LSPTV parts and components, directly from China," that Venom's "import data likewise reflects a shift toward importation of component parts," and that the shipments from Thailand, together with similarities to Chinese models, "reasonably suggest that Chinese-origin

LSPTVs may have been routed through Thailand." B.C.14, BC001298-99; B.C.11, BC001254-58. CBP thus accepted the Coalition's characterizations at face value.

## V. CBP Informs Venom Of The EAPA Investigation And Simultaneously Imposes The Interim Measures.

On August 18, 2026, CBP emailed Venom and acknowledged, for the first time, the EAPA investigation of Venom, Bintelli, and Vexas that CBP had initiated on May 20, 2026. *Venom*, ECF No. 4-3; P.D.14a, PD001173-74. According to the email, CBP reviewed available information and determined that there was a reasonable suspicion that Venom evaded AD/CVD duties. PD001173. CBP contended that Venom engaged in evasion "by failing to declare entries of Chinese-origin covered LSPTV subassemblies and their component parts and by transshipment through Vietnam and/or Thailand." PD001173. As a result, CBP stated that it would be imposing interim measures on Venom, including extending and suspending liquidation of certain entries. PD001173. CBP also decided to impose discretionary interim measures pursuant to 19 U.S.C. § 1517(e)(3), specifically requiring "live entry" for "all imports of LSPTV from China and Vietnam and/or Thailand"; the rejection and re-filing of entry summaries within the rejection window; and the payment of cash deposits at the "all others rate ... on LSPTV and parts" (a combined rate of 519.23 percent *ad valorem*), unless a separate rate applied. PD001173.

A week later, on August 25, 2026, Venom received CBP's Notice of Initiation, which provided CBP's reasoning for its investigation and decision to impose interim measures. B.C.14, BC001285-310. In the Notice, CBP explained that, after initiation, it issued CF-28s to the importers between June 3 and June 18, 2026, and reviewed entry data in its systems. B.C.14, BC001300. CBP acknowledged Venom's position that the parts entries "did not constitute covered rolling chassis," but responded only that they were "similar" to the January 2026 entries because both were invoiced by the same supplier, included various items "together on the same invoices,"

and were declared Type 01. BC001305. As to the Thai carts, CBP acknowledged that Venom's bill of materials showed the "chassis assembly" was purchased from a local Thai supplier, but found that the record did not "adequately document what materials, components, or subassemblies" that supplier "incorporated into the chassis assembly" or "where {it} obtained those inputs." BC001306-7. CBP did not address the scope's treatment of separately shipped components, the Commission's finding that Venom manufactured rolling chassis domestically, or CBP's own December 2025 acceptance of the same RMA supply chain. BC001304-7.

**VI. [ ] The Withdrawal, Without Prejudice, Of Venom's Motion For A Temporary Restraining Order And Preliminary Injunction.**

On August 31, 2026, less than a week after CBP issued its Notice of Initiation, Venom filed its complaint followed by a motion for a temporary restraining order and preliminary injunction (the "TRO/PI Motion") on September 1, 2026, seeking to enjoin enforcement of the interim measures while CBP completed its investigation. *See Venom*, ECF No. 4; *see Vexas*, ECF No. 30. The complaint states three causes of action: first, CBP violated Venom's Fifth Amendment due process rights by failing to provide notice and a meaningful opportunity to be heard before imposing the interim measures (Count One); second, CBP also violated Venom's Fifth Amendment due process rights by imposing its business-ending interim measures under an impermissibly low "reasonable suspicion" evidentiary standard (Count Two); and third, CBP lacked a sufficient basis for concluding that there was reasonable suspicion that Venom's merchandise evaded the LSPTV Orders (Count Three). *See Venom*, ECF No. 4. In its TRO/PI Motion, Venom argued, with the support of declarations and corroborating financial statements, that CBP's draconian interim measures—imposed without notice or opportunity to respond—would require Venom to pay millions of dollars in upfront cash deposits for both goods already

imported and future entries, and would force Venom to close its doors within a month's time. *See generally Vexas*, ECF No. 30.

On September 18, 2026, CBP opposed Venom's TRO/PI Motion and moved to dismiss for lack of subject-matter jurisdiction. *See Vexas*, ECF No. 35. In its opposition, CBP stated, for the first time, that the agency had no intention of "subject{ing} plaintiffs' past entries to the live entry and cash deposit requirements announced on August 18, 2026." *Id.* at 31. Instead, the live entry and cash deposit requirements would only apply to merchandise imported on or after August 18, 2026. *Id.* Venom filed a reply further substantiating its arguments for temporary emergency relief and establishing the Court's jurisdictional basis pursuant to 28 U.S.C. § 1581(i). *Id.*, ECF No. 45. Venom also acknowledged CBP's about-face regarding the live entry and cash deposit requirements and emphasized that no mechanism exists by which to hold CBP to this changed position. *Id.* at 8 n.3, 13.

Also on September 1, 2026, the same day as Venom's TRO/PI Motion filing, the Coalition filed a motion to intervene as of right or, in the alternative, for permissive intervention (the "Motion to Intervene"). *Id.*, ECF No. 13. On September 29, 2026, the Court granted in part and denied in part the Coalition's request for permissive intervention, joining the Coalition as a defendant-intervenor only for Count Three of Venom's complaint. *Id.*, ECF No. 52.[4]

The Court heard argument on the pending motions on October 6, 2026. *Id.*, ECF No. 65. During the morning session, the parties provided the Court with an overview of the Orders and the impact on the various businesses, as well as argument on the jurisdictional issue that Defendants raised in their motions to dismiss. During the closed afternoon session, each plaintiff offered

---

[4] The Coalition has appealed this decision to the United States Court of Appeals for the Federal Circuit. *See Vexas*, ECF No. 75. That appeal was docketed on November 5, 2026, as Appeal Number 2027-1110. *Id.*, ECF No. 81.

**PUBLIC VERSION**

testimony in support of its respective irreparable harm contentions. [

]

The parties conferred [

] On October 30, 2026, CBP filed a joint status report with the parties' agreed-upon briefing schedule and target date for decision. *See Vexas*, ECF No. 76.

On November 3, 2026, the Court reassigned this action to a three-judge panel (the "Panel"), to adjudicate this action together with *STAR EV Corp. v. United States*, Ct. No. 26-3645 and *ICON EV LLC v. United States*, Ct. No. 26-2759. *Id.*, ECF Nos. 79-80. The Panel directed the parties to submit a joint status report with an updated briefing schedule by November 17, 2026. *Id.*, ECF No. 80. The parties did so and, on November 20, 2026, the Court so-ordered the parties' proposed briefing schedule, *id.*, ECF No. 87—Vexas, Bintelli, and Venom to file their dispositive motions by November 24, 2026, with ICON EV LLC ("ICON") having the option to file a revised dispositive motion on the same day; CBP and the Coalition to file their responses to the dispositive motions by December 21, 2026; and Vexas, Bintelli, and Venom to file their replies in support of the dispositive motions by January 15, 2027. *Id.*, ECF No. 83. The Court has scheduled oral argument for February 16 and, if necessary, February 17, 2027. ECF No. 87.

## SUMMARY OF ARGUMENT

The Court should grant Venom's motion for summary judgment and judgment on the agency record and permanently enjoin the enforcement of CBP's interim measures for three independent reasons.

*First*, CBP violated Venom's Fifth Amendment due process rights by imposing interim measures without first providing Venom with notice or a meaningful opportunity to be heard. The three-factor balancing test outlined in the seminal Supreme Court decision *Mathews v. Eldridge*, 424 U.S. 319 (1976), establishes that Venom was entitled to due process in this context. Moreover, this Court already concluded in *ICON* that the failure to provide notice or a meaningful opportunity to be heard prior to imposing the same interim measures at issue here constitutes a due process deprivation. *ICON PI Order*, at 1370-71 (holding that ICON "did not receive due process before interim measures were imposed" where ICON had no notice or opportunity to respond prior to the imposition of those measures). Here, the administrative record confirms that Venom was provided with neither notice nor any opportunity to respond before the interim measures were imposed.

*Second*, EAPA's reasonable suspicion standard also violates Venom's Fifth Amendment due process rights. Reasonable suspicion is a minimal standard that was designed to justify brief and noninvasive investigative steps. A standard built for a momentary encounter in another context cannot govern a proceeding that will permanently destroy the business Venom built from the ground up. Before CBP can impose such invasive measures, due process requires, at a minimum, proof by preponderance of the evidence in the circumstances presented here.

*Third*, CBP lacked reasonable suspicion because the evidentiary record demonstrates Venom did not import covered merchandise. The Orders reach, at a minimum, a Chinese-origin rolling chassis. Commerce deliberately excluded separately imported parts unless they enter on the same bill of lading as, or are assembled with, a rolling chassis that was subject merchandise at importation. Consistent with what the Coalition had represented to Commerce regarding the Orders' contours, Venom's bare frame and parts entries were not covered merchandise. Moreover, Venom's imports of Thai carts belie CBP's transshipment theory inasmuch as the record shows

frames fabricated from non-Chinese steel and carts assembled in Thailand, which CBP itself had accepted as Thai-origin in December 2025. Suspicion that does not "reflect the actual scope of the orders" is not reasonable. *ICON PI Order*, at 1374.

## ARGUMENT

### I. Standard Of Review.

Venom seeks review of an agency determination under 28 U.S.C. § 1581(i)(1)(D). Thus, the applicable standard, as prescribed by 28 U.S.C. § 2640(e), is set forth in Section 706 of Title 5. *See Natl. Fisheries Inst., Inc. v. U.S. Bureau of Cust. and Border Protec.*, 33 C.I.T. 1137, 1148 (Ct. Int'l Trade 2009) ("In exercising jurisdiction in such cases under 28 U.S.C. § 1581(i), the court is to review the matter as provided in the APA, 5 U.S.C. § 706."). Section 706 of Title 5 provides that the Court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "contrary to constitutional right{.}" 5 U.S.C. § 706(2); *see Natl. Fisheries*, 33 C.I.T. at 1148.

"To uphold an agency action under this standard, the court must conclude that Customs articulated *a rational connection* between the facts found and the choice made." *Natl. Fisheries,* 33 C.I.T. at 1153 (emphasis added, internal quotations and citations omitted). "Agency actions are held to be arbitrary and capricious if the agency, *inter alia,* 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or {offered an explanation that} is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* at 1153 (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).

The Court will grant summary judgment where "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Zoetis Services LLC v. United States*, No. 22-00056, Slip Op. 26-102, at *3 (Ct. Int'l Trade 2026) (citing CIT Rule 56). When a case "hinges on pure questions of law, resolution by summary judgment is appropriate." *Canadian Wheat Bd. v. United States*, 32 C.I.T. 1116, 1121 (Ct. Int'l Trade 2008), *opinion clarified on denial of reconsideration*, 33 C.I.T. 1204 (Ct. Int'l Trade 2009), and *aff'd*, 641 F.3d 1344 (Fed. Cir. 2011) (citation omitted).

The Court considers four factors in deciding whether to grant a permanent injunction: (1) whether the movant has suffered an irreparable injury; (2) whether legal remedies, including monetary damages, are insufficient compensation for such injury; (3) whether the balance of the parties' hardships warrants equitable relief; and (4) whether a permanent injunction is in the public interest. *Wirtgen Amer., Inc. v. United States*, 447 F. Supp. 3d 1359, 1371 (Ct. Int'l Trade 2020) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

## II. CBP Violated The Fifth Amendment By Failing To Provide Venom With Pre-Deprivation Notice Or A Meaningful Opportunity To Be Heard.

CBP's decision to impose business-ending interim measures without pre-deprivation notice and a meaningful opportunity to be heard violated Venom's due process rights guaranteed by the Fifth Amendment. Both this Court and the Federal Circuit have recognized that "'in the EAPA context … an importer participating in an administrative proceeding has a procedural due process right to notice and a meaningful opportunity to be heard.'" *ICON PI Order*, at 1369 (quoting *Superior Com. Sols., LLC v. United States,* 811 F. Supp. 3d 1363, 1376 (Ct. Int'l Trade 2025)); *Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1257 (Fed. Cir. 2023). Moreover, the Government must provide such procedural safeguards *before* a deprivation occurs, not after. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *see also Superior Com. Sols.*,

811 F. Supp. 3d at 1376 ("{A} meaningful opportunity to respond should happen before a temporary deprivation takes effect, not afterwards."). To determine what process is due under the Fifth Amendment, courts consider: (1) the private interest at stake, (2) the risk of erroneous deprivation, and (3) the public interest. *See Mathews*, 424 U.S. at 335; *see also ICON PI Order*, at 1370. Each of these factors supports Venom's due process right to notice and a meaningful opportunity to be heard before the imposition of the interim measures.

*First*, the private interest here is both concrete and significant. This Court has recognized that there is "a legitimate property interest in the proper assessment of imports." *ICON PI Order*, at 1370; *id.* at 1370 n.16 ("{C}ourts are generally in agreement that 'importers may have a protected interest in the proper assessment of duties on goods already imported.'") (quoting *Phoenix Metal Co. v. United States*, No. 23-00048, Slip Op. 24-68, at *9 (Ct. Int'l Trade June 10, 2024) (collecting cases)). Beyond the imports themselves, Venom has a property interest in the ownership, possession, and operation of its business. *See United States v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 902 (2d Cir. 1992) ("Here, the property interest which has been affected by the government's actions is the ownership, possession, and operation of an ongoing business."); *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) ("{W}e conclude that {plaintiff} did have a property interest in the continued operation of its business and that {the State} denied it procedural due process when {it} failed to offer a pre-deprivation hearing before ordering the clinic closed.").

Here, the interim measures would upend both of these interests, even considering CBP's pivot with respect to the period for which AD/CVD duties are to be imposed. As this Court observed in *Phoenix Metal Co. Ltd. v. United States*, "{t}he combination of cash deposits for AD/CVD duties with the live entry requirement requires the importer to suddenly deposit a large

amount of cash with CBP before it can even complete the sale for which it is importing the goods." Court No. 23-00048, at *9. The live entry requirement, in particular, was identified as an onerous obligation akin to a sanction. *Id.* (citing *Ford Motor Co. v. United States*, 44 F. Supp. 3d 1330, 1339 n.16 (Ct. Int'l Trade 2015)). For a small company like Venom that relies on its ability to sell inventory quickly, live entry requirements place a chokehold on its cash flow that is likely to have business-ending consequences. And although unlawful cash exactions may sometimes be refunded, Venom has no practical ability "to ameliorate the interim loss." *Mathews*, 424 U.S. at 341. Once Venom is forced out of business, a later refund is not relief. As in *ICON*, the private interest is significant where the interim measures will likely result in a permanent deprivation. *See ICON PI Order*, at 1371 (finding ICON's private interest "compelling" given that the interim measures were "not just temporary deprivations" but "of such immediacy and magnitude that they will cause ICON to declare bankruptcy before it can contest the determination").

*Second*, the high risk of erroneous deprivation here underscores the necessity of notice and a meaningful opportunity to be heard *before* the imposition of interim measures. Similar to *ICON*, CBP based its reasonable suspicion in part on information requests sent before it initiated its investigation. *Compare* B.C.14, BC001304 (finding "unresolved issues in certain of Venom EV's CF-28 responses concerning the origin of the merchandise imported from Thailand"); *id.* at BC001306 ("CBP finds the CF-28 responses for these entries raise unresolved questions regarding the claimed Thai production and sourcing"); *with ICON PI Order*, at 1371 ("In finding a reasonable suspicion of evasion, Customs relied primarily on ICON's responses to information requests that it sent before initiating its investigation. It provided no opportunity for ICON to supplement or explain its responses before deriving reasonable suspicion therefrom. Its conclusions, premised upon ICON's incomplete evidentiary responses, may well have been premature or mistaken."

PUBLIC VERSION

(internal citations omitted)). Notably, despite notice of its inadequacies on this very issue in *ICON*, CBP proceeded on the same grounds with respect to Venom—had Venom been provided with an opportunity to respond, it could have corrected the purported inaccuracies and misinterpretations that prompted CBP's decision to impose interim measures.

Taking the inaccuracies first, Venom could have quickly dismantled CBP's acceptance of the Coalition's argument that Venom imported merchandise under incorrect HTSUS codes in order to evade the Orders. B.C.14, BC001295-96. The data on which the Coalition—and CBP—blindly rely is incorrect. Based on Venom's actual customs data, to which CBP has complete access yet, apparently failed to review before crediting this allegation, there is no evidence that Venom ever used HTSUS codes for golf balls and golf equipment when importing golf cart merchandise. Haney Decl. ¶ 26; *see also Vexas*, ECF No. 67, October 6, 2026 Hearing Transcript ("Transcript") at 51:6-15 ("{Mr. Wilson}: {I}f the Government or CBP thought that Bintelli or any other importer had imported golf carts under golf balls, they could have asked questions about that, or they could have looked at their own automated commercial environment data and found that none of these importers have used that HTS code.... This is the kind of stuff that could be easily remedied by looking just a little bit further than the face of the allegation that the {C}oalition has made.").

A similar conclusion could have been reached regarding CBP's doubts about RMA's manufacturing capabilities based on the Coalition's assertion "that there is no evidence that RMA Automotive directly manufactures vehicles, nor is there any indication that RMA Automotive possesses the capacity to produce LSPTVs at a scale sufficient to supply Venom EV and other U.S. importers{.}" B.C.14, BC001296. A simple online search would have revealed to CBP that RMA is a sophisticated contract manufacturer that partners with many well-known brands in the automotive industry. *See* Transcript at 55:17-21 ("{MR. WILSON}: If CBP truly had an issue with

the state of the manufacturing in Thailand, they could have gone online and realized that RMA was one of the largest contract manufacturers in Southeast Asia. That's publicly available information. It's not a secret to anyone."). Venom could have easily pointed CBP in the direction of this information. CBP's doubts regarding RMA's capabilities are also disingenuous since CBP previously analyzed RMA's sourcing and manufacturing processes as part of Venom's December 2025 CF-28 response and made a determination from that information that Venom's imported LSPTVs were not subject to the Orders. B.C.27, BC003612-19; *Venom*, ECF No. 4-1, 12/1/2025 Venom CF-28 Response; *see also* Haney Decl. ¶ 25.

With notice and a meaningful opportunity to be heard, Venom also could have urged CBP to correct its misreading of the LSPTV Orders. As this Court observed in *ICON*, "the LSPTV Orders quite clearly state that a rolling chassis, at a minimum, consists of a frame with suspension and powertrain components." *ICON PI Order*, at 1371 (emphasis in original). Further, the LSPTV Orders do not cover "'suspension systems' and other components shipped on a separate bill of lading from a rolling chassis." *Id.* In its Notice of Initiation, CBP points to the fact that the agency in January 2026 reclassified certain Chinese parts as subject to the Orders. B.C.14, BC001305. Yet, those reclassifications directly contravene the clear language of the LSPTV Orders and this Court's own analysis. Photographs included in Venom's Complaint and its July 2026 CF-28 responses show that Venom's entries consisted only of bare frames devoid of the suspension or powertrain components that would bring the merchandise within the Orders' ambit. *See Venom*, ECF No. 4 ¶ 42; B.C.23; B.C.25; B.C.29; B.C.30.

*Third*, the public interest supports requiring notice and an opportunity to be heard before interim measures are imposed. "The public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." *Am. Signature,*

*Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). The public interest would be undermined, however, if CBP were permitted to flout its constitutional obligations. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). Providing these procedural safeguards also would not impair CBP's investigation. As previously discussed, Venom's engagement would have improved the accuracy and legitimacy of the investigation. In addition, given that more than four months elapsed between CBP's receipt of the EAPA allegation in April 2026 and CBP's communications imposing the interim measures in August 2026, there was time for CBP to provide Venom with notice and a meaningful opportunity to be heard. At a minimum, CBP could have given Venom an opportunity to supplement its CF-28 responses or produce any additional information that would assist CBP's investigation.

The *Mathews* factors, as well as this Court's prior decisions, *see ICON PI Order*, at 1370-71; *Superior Com. Sols.*, 811 F. Supp. 3d at 1376-77, establish that Venom was entitled to due process in the form of notice and a reasonable opportunity to be heard before the interim measures were imposed. Yet the record confirms that no such pre-deprivation process was provided. *See* Transcript at 41:11-13 ("MS. JANTZEN: {W}e're not notifying an importer that's the target of an EAPA investigation that they might be a target of an EAPA investigation."); *see also id.* at 53:12-14, 19-20 ("THE COURT: But there were two separate CF-28s… MR. WILSON: Yes…. And neither one of them provided any notice or opportunity to address any concerns about evasion.").

To the extent CBP contends that the CF-28s provided Venom with notice and an opportunity to be heard with respect to the interim measures, that argument falls flat. For one, the September 10, 2025 CF-28 was issued more than six months before the Coalition's EAPA allegations were filed on April 20, 2026. Moreover, as the Court observed at the October 6, 2026

Hearing, CF-28s are not unique to the EAPA process and, consequently, would not necessarily inform a responding importer that it was subject to an EAPA investigation or that its responsive commentary, if any, was to be included to address an investigation of unknown content. *See* Transcript at 100:12-15 (MR. EERNISSE: "No, no, {the CF-28} served as an opportunity for the Plaintiffs to answer an inquiry with respect to specific questions that Customs had about the entry of the merchandise and the origin of the merchandise{.}"); *id.* at 100:18-22 ("{THE COURT}: And so, the CF-28 is not specific to an EAPA investigation. It is a tool used by Customs in the context of an EAPA investigation, but it's used as a tool by Customs in lots of other circumstances to garner information."); *id.* at 101:10-15 ("{THE COURT}: How is the importer supposed to de{v}ine what the purpose of the CF-28 -- what is going on behind the scenes with respect to why Customs wants the information it's asking for on the CF-28? How is it supposed to de{v}ine that there's an EAPA investigation going on, which is {} to quote Ms. Jantzen, 'Confidential.'").

Accordingly, CBP violated Venom's due process rights by failing to provide Venom with notice and a meaningful opportunity to be heard before imposing the interim measures; consequently, the Court should grant judgment in Venom's favor on Count One.

## III. The Reasonable Suspicion Standard, As Applied, Is Unconstitutional Against Business-Ending Interim Measures.

CBP also violated Venom's Fifth Amendment due process rights by applying an evidentiary threshold too weak to support, let alone justify, the deprivation that its interim measures were sure to engender. Venom does not argue that reasonable suspicion can never support EAPA interim measures, including suspension or extension of liquidation. The constitutional problem is narrower: CBP cannot use mere suspicion to impose live entry, refiling, and cash-deposit demands that will put an importer out of business before a final evasion determination and before judicial review can provide any meaningful remedy. *See also Florida v.*

*Royer*, 460 U.S. 491, 502 (1983) (determining that when a state actor's investigative actions become a "serious intrusion" on "personal liberty," "mere suspicion" is not enough). For measures that are final in practical effect, due process requires a reliable evidentiary basis: at a minimum, CBP must find evasion likely under a preponderance standard after giving the importer notice of the substance of the evidence and a meaningful opportunity to respond.

### A. A Statute Cannot Supply Less Due Process Than The Constitution Requires.

Before imposing interim measures, EAPA directs CBP to "decide based on the investigation if there is a reasonable suspicion that such covered merchandise was entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(e). Neither EAPA nor CBP's regulations defines "reasonable suspicion." *Am. Pac. Plywood, Inc. v. United States*, No. 20-03914, Slip Op. 23-93, at *8 (Ct. Int'l Trade June 22, 2023) (confirming that 19 C.F.R. § 165.24 uses the term "multiple times without defining it"). The statute does, however, establish a deliberate progression of standards: an allegation that "reasonably suggests" evasion triggers an investigation, 19 U.S.C. § 1517(b)(1); "reasonable suspicion" is required for interim measures, *id.* § 1517(e); and "substantial evidence" is required for a final determination, *id.* § 1517(c)(1)(A).

As an initial matter, it is of no moment that 19 U.S.C. § 1517(e)(3) purports to authorize CBP to require "a single transaction bond or additional security or the posting of a cash deposit" where CBP claims a reasonable suspicion of evasion. The right to due process is "conferred, not by legislative grace, but by constitutional guarantee." *Cleveland Bd. of Educ.*, 470 U.S. at 541 (quoting *Arnett v. Kennedy*, 416 U.S. 134, 167 (1974) (Powell, J., concurring in part and concurring in the result in part)). Put differently, the right to due process "does not depend on whether statutes and regulations provide what is required by the constitution." *Royal Brush Mfg., Inc.*, 75 F.4th at 1260. Thus, Section 1517(e)(3) "neither removes {Venom's} interest from due

process protection nor answers the question of what process is due under the Constitution." *See Vitek v. Jones*, 445 U.S. 480, 491 (1980) (explaining, in a different context, that state procedures deemed "adequate for determining the preconditions to adverse official action" did not override constitutional due process protections).

*Mathews,* again, controls as numerous, subsequent reviewing courts have made clear. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 529-33 (2004) (applying *Mathews* factors); *Addington v. Texas*, 441 U.S. 418, 425 (1979) (discussing *Mathews* in determining standard of proof in civil commitment proceeding); *Santosky v. Kramer*, 455 U.S. 745, 757-70 (1982) (applying *Mathews* factors to analyze evidentiary standard in parental rights termination proceedings). In the interim-deprivation context, the question is whether the pre-deprivation procedure supplies a meaningful check against erroneous action. *See Cleveland Bd. of Educ.*, 470 U.S. at 545-46 (pre-deprivation hearing "should be an initial check against mistaken decisions") (citing *Bell v. Burson*, 402 U.S. 535, 540 (1971)). For Count Two, the standard of proof must reflect the confidence the Constitution requires before CBP may impose measures that are final, in this case a death knell, in practical effect.

A suspicion-level screen fails that constitutional function here. "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Addington*, 441 U.S. at 423 (internal quotation marks and citation omitted). The standard allocates the risk of error, and the allocation changes with the nature and consequences of the deprivation. *Id.* at 423, 427; *Santosky*, 455 U.S. at 755 ("{I}n any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests

PUBLIC VERSION

affected, but also a societal judgment about how the risk of error should be distributed between the litigants.”).

The Constitution does not permit CBP to impose a practically irreversible deprivation on an evidentiary threshold tolerated only when the intrusion is temporary, limited, and subject to meaningful correction. *See Barry v. Barchi*, 443 U.S. 55, 66 (1979) (pointing to severity of temporary suspension, holding that once suspension is imposed, the plaintiff's “interest in a speedy resolution of the controversy becomes paramount”); *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 56 (1993) (emphasizing “the availability of a postseizure hearing may be no recompense for losses caused by erroneous seizure,” especially when adversary hearing occurs “many months after the seizure”).

**B. The Private Interest Is Grave And The Threatened Loss Is Permanent.**

“The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be condemned to suffer grievous loss,” and whether a loss warrants “more than average certainty” turns on “both the nature of the private interest threatened and the permanency of the threatened loss.” *Santosky*, 455 U.S. at 758 (quotations omitted). Importers have “a legitimate property interest in the proper assessment of imports{.}” *ICON PI Order*, at 1370. And Venom maintains a property interest in the ownership, possession, and operation of its business. *See All Assets of Statewide Auto Parts, Inc.*, 971 F.2d at 902 (“Here, the property interest which has been affected by the government's actions is the ownership, possession, and operation of an ongoing business.”); *Women's Med. Prof'l Corp.*, 438 F.3d at 611 (“{W}e conclude that {plaintiff} did have a property interest in the continued operation of its business and that {the State} denied it procedural due process when {it} failed to offer a pre-deprivation hearing before ordering the clinic closed.”).

The loss threatened by CBP's interim measures is severe and permanent. The interim measures require Venom to post millions in cash deposits on past entries and a 519.23 percent deposit on future entries; Venom's total net income over four years is a fraction of that, and it will not survive more than a month. ECF No. 30 at 2, 11, 23-24; Haney Decl. ¶¶ 28-29, 32. A later refund is no remedy for a company that no longer exists. The importer has no realistic ability "to ameliorate the interim loss." *Mathews*, 424 U.S. at 341. A business-ending deprivation requires a correspondingly reliable evidentiary check: CBP must find evasion likely under a preponderance standard, not merely possible under a suspicion-level screen designed for temporary investigative steps. A preponderance standard of review would be appropriate here, as it is for most civil administrative proceedings. *See Rodriguez v. Dep't of Veterans Affairs*, 8 F.4th 1290, 1299 (Fed. Cir. 2021) ("Preponderance of the evidence has long been recognized as the traditional burden of proof in civil administrative proceedings"). In this respect, Venom, concurs with the analysis articulated in ICON's brief. *See ICON EV LLC v. United States*, Ct. No. 02759, ECF No. 66.

### C. The Government's Interests Do Not Require Business-Ending Measures On Mere Suspicion.

The Government has legitimate interests in protecting the revenue and enforcing AD/CVD Orders. *See CEK Grp. LLC v. United States*, 633 F. Supp. 3d 1369, 1374 n.1 (Ct. Int'l Trade 2023) (granting deference to CBP's goal of enforcing AD/CVD laws). But those interests do not require putting an importer out of business on supposition. Reasonable suspicion already lets CBP investigate and suspend or extend liquidation, which preserves its ability to collect whatever duties are ultimately owed without threatening the company's existence in the meantime. *See ICON PI Order*, at 1374 n.21.

Nor does this context involve the grave, imminent dangers that have justified relaxed burdens elsewhere. *See, e.g.*, *Kashem v. Barr*, 941 F.3d 358, 381 (9th Cir. 2019) (terrorism and

aviation safety). As this Court has explained, there are no "significant factors of health and human safety present" in EAPA; CBP's task is "enforcing U.S. {AD/CVD} laws to protect U.S. industry{.}" *CEK Grp.*, 633 F. Supp. 3d at 1374 n.1.

There was no exigency here. The Coalition's allegations were filed on April 20, 2026; CBP initiated the investigation on May 20, 2026; and CBP waited three more months, until August 18, 2026, to impose interim measures. B.C.14, BC001285-310; Haney Decl. ¶ 21. Requiring CBP to find evasion likely before imposing business-ending measures would not imperil any government interest.

Moreover, CBP initiates investigations on allegations, usually filed by competitors, that "reasonably suggest{}" evasion. 19 U.S.C. § 1517(b)(1). This Court has observed that "how the standard for the imposition of interim measures under section 1517(e) is different {from the standard under section 1517(b)} is unclear." *ICON EV LLC v. United States*, No. 26-02759, Slip Op. 26-88, at *5 n.9 (Ct. Int'l Trade Aug. 10, 2026) ("*ICON Intervention Order*"). And at least one decision has described reasonable suspicion as requiring only "slight evidence" or a "very small amount." *Am. Pac. Plywood, Inc. v. United States*, No. 20-03914, Slip Op. 23-93, at *9 (Ct. Int'l Trade June 22, 2023). That low threshold may suffice to begin an investigation. It cannot suffice to adjudicate, in practical effect, whether a company survives before the agency has tested the evidence and before the importer has had a meaningful chance to respond.

*Terry v. Ohio*, 392 U.S. 1 (1968), illustrates the distinction. *Terry* did not adopt reasonable suspicion as a general-purpose evidentiary standard for consequential government action. It approved a narrow exception for "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat," where an officer confronting a rapidly developing street encounter reasonably believed the suspect was armed and presently dangerous. *Terry*, 392 U.S. 1

at 20, 24. Even then, the officer had to identify specific and articulable facts, and the search had to be strictly confined to the protective purpose that justified it. *Id.* at 21, 26.

The Supreme Court has repeatedly confirmed the narrowness of the exception. In *Dunaway v. New York*, 442 U.S. 200 (1979), the Court refused to extend reasonable suspicion to a detention that resembled an arrest, warning that any broader exception would swallow the general rule requiring probable cause for serious seizures. *Id.* at 212-14. In *United States v. Place*, 462 U.S. 696 (1983), the Court allowed that reasonable suspicion might support only a brief and properly limited detention of luggage, but held that a 90-minute detention exceeded *Terry*'s narrow scope because the officers had time to minimize the intrusion and failed to do so. *Id.* at 707-10.

CBP's interim measures are a world away from those present in *Terry*. CBP was not forced to make an immediate officer-safety judgment; it was administering a months-long trade investigation on a paper record, with time to request clarification, weigh both sides' evidence, weigh contrary evidence directly available to it, tailor any interim measures, and preserve liquidation while the investigation proceeded. Nor were the challenged measures brief, limited, or self-expiring. Live entry, refiling, and 519.23 percent cash deposits operate as a shutdown order before the importer can obtain meaningful post-deprivation review.

CBP should not be permitted to impose a shutdown-level remedy unless the evidence made evasion likely after CBP accounted for Venom's contrary showing. CBP's Notice of Initiation rests on findings that a preponderance standard could not support on this record:

- CBP called Venom's Thai-origin claim into question over "unresolved questions regarding Thai chassis raw material sourcing," B.C.14, BC001307, even though CBP had reviewed the same RMA supply chain in December 2025 and liquidated those carts as Thai-origin Type 01 entries. *Vexas*, ECF No. 30, at 5-6, 9; Haney Decl. ¶ 18; *Venom*, ECF Nos. 4-1, 4-2.
- CBP relied on parts entries that, by its own description, contained bare frames with no installed suspension or powertrain components—merchandise the Coalition itself told

Commerce is "not covered by the scope." *Vexas*, ECF No. 30, at 8-9; *Venom*, ECF No. 4-5, Ex. 3, 7/8/24 Coalition Resp. at 2-3.

- CBP imposed the interim measures without asking a single follow-up question about the CF-28 responses it now calls deficient—less than four weeks after Venom's July 23, 2026 responses. Haney Decl. ¶¶ 19, 21.

A standard requiring CBP to find evasion likely—and to test that conclusion against the importer's contrary evidence before imposing business-ending measures—would have forced CBP to confront this serious lack of evidence before demanding millions from Venom, even under its about-face, revised assessment.

### D. Reasonable Suspicion May Suffice For Truly Temporary Measures, But Not For Measures That Are Final In Practical Effect.

Reasonable suspicion can be an appropriate standard in some settings. The Supreme Court has upheld interim administrative deprivations only when other safeguards made the initial action reliable: objective evidence or an independent probable-cause determination, notice of the basis for the action, an opportunity to respond, and prompt review before the interim loss became final in practical effect. *See Barry*, 443 U.S. at 64-66 (1979) (holding pre-hearing interim suspension, pending prompt judicial or administrative hearing, whenever State established probable cause, but emphasizing need for prompt post-suspension hearing); *Gilbert v. Homar*, 520 U.S. 924, 932-36 (1997) (State was permitted to suspend respondent based on felony charges filed against him without pre-suspension hearing but post-suspension hearing must be prompt); *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 263-66 (1987) (where agency ordered temporary reinstatement of employee based on reasonable cause finding of unlawful discharge, employer was sufficiently protected without an evidentiary hearing where it received notice of allegations and supporting evidence, and an opportunity to respond in writing). That framework fits actions that do not completely destroy a business while an EAPA investigation runs: investigating, suspending

liquidation, and extending liquidation. *Cf. FTC v. Standard Oil Co.*, 449 U.S. 232, 241-43 (1980) (distinguishing between agency issuance of complaint that serves only to initiate administrative proceedings and "final agency action" that has tangible legal or practical effect on respondent). It does not fit cash deposits at 519.23 percent, live entry, and refiling when those measures will extinguish the company before review can matter. Post-deprivation process is meaningless to Venom if it ceases to exist. CBP cannot realistically provide a meaningful hearing in the weeks between imposition and Venom's destruction.

As this Court has observed, "{CBP} has discretion not to impose all interim measures.... The strength or weakness of the suspicion likely should affect that decision." *ICON PI Order*, at 1374. Where interim measures are final in practical effect, due process requires a reliable initial check that includes, at minimum, a preponderance finding made after notice of the substance of CBP's evidence and a meaningful opportunity to respond. CBP did not make that finding before imposing measures that would result in Venom's imminent demise. In the undisputed circumstances here, the interim measures violate due process as applied, and Venom is entitled to judgment on Count Two.

## IV. Even If The As-Applied Reasonable Suspicion Standard Were Constitutional, CBP Lacked The Requisite Reasonable Suspicion To Impose Interim Measures.

Even if the Court were to find that EAPA's reasonable suspicion standard is constitutional, CBP's interim measures against Venom cannot stand. There is no rational connection between such as facts as were recited in the Notice of Initiation and CBP's imposition of interim measures based on a claim of a reasonable suspicion that Venom entered covered merchandise through evasion. CBP's reasonable suspicion finding rests on five stated grounds: (1) a January 2026 determination that certain Venom entries of Chinese-origin parts were covered; (2) "similar" July 2025 entries addressed in Venom's CF-28 responses; (3) Venom's shift from Chinese suppliers to

[ ] in Thailand after the Orders issued; (4) pro forma invoices reflecting a commercial role for [ ]; and (5) "unresolved questions" regarding the raw-material sourcing of the Thai chassis. B.C.14, BC001307. None of these findings, alone or together, supports CBP's reasonable suspicion determinations.

### A. Reasonable Suspicion Requires A Particularized And Objective Basis, Grounded In The Actual Scope Of The Orders, For Suspecting That Covered Merchandise Was Entered Through Evasion.

After triggering an investigation based on allegations that "reasonably suggests" evasion, 19 U.S.C. § 1517(b)(1), but before imposing interim measures, CBP must make a finding of reasonable suspicion. *Id.* § 1517(e). As this Court has explained, "it is reasonable to conclude that Congress meant each ensuing standard to require something more than is needed at the earlier stage(s)—that is, 'reasonably suggests' is less demanding than 'reasonable suspicion.'" *Am. Pac. Plywood*, No. 20-03914, at *8 n.10. While the precise line between initiation and interim measures may be "unclear," "investigating and imposing interim measures create very different burdens." *ICON Intervention Order*, at *5 n.9.

In examining analogous "reasonable suspicion" standards in the AD/CVD laws, this Court has explained that, "in order for reasonable suspicion to exist there must be 'a particularized and objective basis for suspecting' the existence of certain proscribed behavior, taking into account the totality of the circumstances—the whole picture." *AL Tech Specialty Steel Corp. v. United States*, 575 F. Supp. 1277, 1280 (Ct. Int'l Trade 1983) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "In both the administrative and criminal law contexts specific, particularized evidence is the touchstone." *Id.* at 1280 n.3. Such a standard "must be predicated on particular, specific, and objective evidence," and "{c}onjectures are not facts." *China Nat'l Mach. Imp. & Exp. Corp. v. United States*, 264 F. Supp. 2d 1229, 1239-40 (Ct. Int'l Trade 2003); *accord Hangzhou Spring*

*Washer Co. v. United States*, 387 F. Supp. 2d 1236, 1248 (Ct. Int'l Trade 2005). An "inchoate and unparticularized suspicion or 'hunch'" can never "ripen{} into one that {is} 'reasonable,'" and a finding that requires "straying into the realm of surmise" cannot stand. *AL Tech*, 575 F. Supp. at 1282 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Whether the evidence suffices to establish reasonable grounds to suspect "is a question of law which this court must ultimately resolve." *Id.* at 1280 n.4.

Venom recognizes that *American Pacific Plywood* read the particularized-and-objective-basis case law "as not imposing a difficult burden on the agency," and described the threshold as "slight evidence" or a "very small amount." No. 20-03914, at *9. But even a low threshold requires evidence of the right thing: a basis for suspecting that covered merchandise, *i.e.*, "merchandise that is subject to" an AD/CVD order, 19 U.S.C. § 1517(a)(3), was entered through evasion. As this Court has already held in the LSPTV context, "Customs' 'suspicion' must reflect the actual scope of the orders alleged to be unlawfully evaded." *ICON PI Order*, at 1374. EAPA "does not permit Customs to include merchandise that is not covered by the scope of the Order," and Commerce, "not Customs, is the appropriate administering authority" to decide whether merchandise is covered. *Aspects Furniture Int'l, Inc. v. United States*, 607 F. Supp. 3d 1246, 1268 (Ct. Int'l Trade 2022); *see* 19 U.S.C. § 1517(b)(4). Evidence that, correctly understood, shows only the importation of non-covered merchandise is not "slight evidence" of evasion; it is no evidence of evasion at all.

What makes suspicion "reasonable" is context dependent. As this Court has explained, the "Supreme Court has long held that the reasonable suspicion needed to initiate investigations . . . varies from statute to statute." *CEK Grp. LLC v. United States*, 633 F. Supp. 3d 1369, 1374 n.1 (Ct. Int'l Trade 2023). Here, the Government's interest in enforcing the AD/CVD Orders, not preventing violent crime, *cf. Terry*, 392 U.S. at 22-24, pales in comparison to the consequence of

interim measures that would require Venom to deposit duties at a combined 519.23 percent *ad valorem* rate and put it out of business within a month. Haney Decl. ¶¶ 28-29, 35. Moreover, the predicate legal questions are ones Congress committed to Commerce: EAPA directs CBP to refer scope questions to Commerce, 19 U.S.C. § 1517(b)(4), and whether supply-chain changes affect scope is addressed through a separate Commerce procedure, 19 U.S.C. § 1677j. CBP cannot generate "reasonable" suspicion by misreading the scope of the Orders; it must apply the Orders as written.

**B. Venom's 2025 Entries Of Chinese Bare Frames And Parts Provided No Grounds For Reasonable Suspicion.**

The LSPTV Orders cover certain Chinese-origin LSPTVs and "subassemblies thereof." 90 Fed. Reg. 38,759, 38,763 (Dep't Com. Aug. 12, 2025). An unfinished or unassembled LSPTV "covers at a minimum a subassembly, also known as a 'rolling chassis,' which is typically comprised of, but not limited to, a frame or body with front and/or rear suspension components . . . installed and powertrain components . . . installed or ready for installation." *Id.* Other components are covered only "{w}hen imported together with a rolling chassis subject to these orders." *Id.* This Court already has held that the Orders "have a precise and limited scope," and that they "quite clearly state that a rolling chassis, at a minimum, consists of a frame with suspension and powertrain components." *ICON PI Order*, at 1366, 1371. The Coalition—the alleger here—told Commerce the same thing: "{a} chassis frame imported on its own, without any powertrain components is not covered by the scope." *Venom*, ECF No. 4-5, Ex. 3, 7/8/24 Coalition Resp. at 2-3.

CBP's first two grounds—its January 2026 review of certain Venom entries and the "similar" July 2025 entries addressed in Venom's CF-28 responses—share a common defect: by CBP's own description, none of these entries contained a rolling chassis. B.C.14, BC001305-307.

CBP describes the January 2026 entries as containing "[ ], and related components appearing together on the same invoices." BC001305. It describes the July 2025 CF-28 entries ([ ]015-3 and [ ]300-6) as containing "[ ]." BC001305. Absent from both lists are any installed suspension components or any powertrain components. 90 Fed. Reg. at 38,763. In fact, CBP acknowledges in the Notice of Initiation Venom's showing that "the imported [ ], and therefore, did not constitute covered rolling chassis." BC001305.

CBP's Notice also ignores Venom's evidence. Venom's CF-28 responses included photographs confirming that the frames were bare, with no suspension or powertrain components installed or ready for installation. Haney Decl. ¶ 19 & Ex. A. And during this period, Venom sourced bare metal frames from China and imported motors and suspension components in separate shipments on separate bills of lading. *Id.* ¶ 15. Rather than engage with the scope, CBP reasons that the July 2025 entries are "similar" to the January 2026 entries because both were "invoiced by [ ], included [ ] together on the same invoices, and were declared as Type 01 on entry." B.C.14, BC001305. But the identity of the invoicing party is irrelevant to whether merchandise is a rolling chassis. That frames and other components appeared on the same invoice is likewise irrelevant: the Orders reach other components only "{w}hen imported together with a rolling chassis subject to these orders," 90 Fed. Reg. at 38,763, and a bare frame is not one of those components. A Type 01 declaration for non-subject merchandise in such circumstances was and is entirely correct.

CBP's January 2026 determination, in turn, is only as sound as its premise. A determination that bare frames and miscellaneous parts are "subject to the Orders" reflects the same misreading of the scope this Court rejected in *ICON*, and CBP cannot bootstrap itself into reasonable suspicion of evasion. Nor can CBP fault the absence of certifications: the certification requirement applies only to the five enumerated components, and frames, roofs, tag lights, body parts, and the like are not among them.

**C. Venom's Shift To Thai Production After The Orders Issued Is Evidence Of Compliance, Not Evasion.**

CBP treats Venom's "shift from Chinese suppliers to [ ] after the imposition of the Orders" as a basis for suspicion. B.C.14, BC001305-307. But there is nothing suspicious about moving production out of the subject country. This is precisely why AD/CVD orders are country-specific, and it is precisely the response such orders are expected to induce. If a post-order sourcing change were itself suspicious, every importer that responded lawfully to the Orders would be subject to business-ending interim measures. And here, Venom was transparent about the change: it worked with [ ] to confirm that the Thai carts' frames were produced from non-Chinese steel bent, welded, and assembled in Thailand, Haney Decl. ¶¶ 17-19, and its principals visited [ ] factory on three occasions in 2025 and provided CBP with inspection reports, *id.* ¶ 25.

Nor does *American Pacific Plywood* hold otherwise. The importers there argued that a post-order shift in production was "normal," and the Court declined to treat that argument as dispositive only because Customs had paired the shift with particularized, first-hand evidence—a site visit, species of wood that could not have been grown in Cambodia, and an affidavit from the producer's own personnel—pointing to Chinese-origin merchandise. No. 20-03914, at *2, *9. Here, the shift stands alongside evidence that, properly read, shows non-covered merchandise. A

sourcing change that an AD/CVD order is designed to induce is not a "particularized and objective basis for suspecting" evasion. *AL Tech*, 575 F. Supp. at 1280.

CBP concluded, without any supporting evidence that Chinese-origin merchandise passed through Thailand, that Venom "entered Chinese-origin merchandise transshipped through Thailand as Thai-origin merchandise." B.C.14, BC001307. But the "unresolved questions" CBP identified are not evidence of transshipment. They concern the sourcing of raw materials.

***1. The Thai Carts.***

For the [ ] carts, CBP rested its findings on "unresolved questions regarding Thai chassis raw material sourcing." BC001307. CBP acknowledged that Venom's bill of materials shows payment for the "chassis assembly" to a local Thai supplier, [ ], but faulted the record for not "adequately document{ing} what materials, components, or subassemblies [ ] incorporated into the chassis assembly, {and} where [ ] obtained those inputs." BC001306-7. That is, at most, a documentation question about upstream inputs. CBP identified no evidence that the chassis was produced in China.

Even assuming *arguendo* that the origin of every raw input could not be fully traced, that gap would not make it reasonable to suspect transshipment. Transshipment is a theory that merchandise produced in China passes through a third country with little or no processing and is relabeled with a false country of origin. Raw steel is not an LSPTV or a rolling chassis, and the Orders do not reach a frame fabricated in Thailand merely because some of the steel used to make it might have come from elsewhere. 90 Fed. Reg. at 38,763. CBP points to no evidence that any Chinese-origin frame with installed suspension and installed or installation-ready powertrain components entered Thailand, much less any evidence that links in any way to Venom's carts.

Speculation about the origin of raw inputs is "conjecture{}," not fact. *China Nat'l*, 264 F. Supp. 2d at 1240.

Moreover, the record before CBP contained overwhelming evidence that [ ] Thai operations are far more than transshipment:

- Venom's July 23, 2026 CF-28 responses explained that [ ] fabricates the chassis in Thailand from Thai inputs and performs final assembly there—facts the Notice of Initiation recites. B.C.14, BC001305-6.
- The CF-28 responses supplied raw-material purchase orders and invoices, production records, work instructions, production process flowcharts, and Certificates of Origin. Haney Decl. ¶ 19 & Ex. A.
- The frame assemblies are produced from non-Chinese steel that is bent, welded, and assembled into frames in Thailand, and a significant portion of the remaining componentry is Thai-origin. Haney Decl. ¶ 17.
- Venom's principals personally inspected [ ] factory on three occasions in 2025 and provided CBP with inspection reports documenting the manufacturing operations performed there. *Id.* ¶ 25; *Venom*, ECF No. 4-1, at 8.
- Venom's December 1, 2025 CF-28 response already documented [ ] Thai production processes and its use of Thai-origin raw materials and components. Haney Decl. ¶ 18; *Venom*, ECF No. 4-1.

Indeed, CBP's Notice identifies the chassis assembly as purchased from a Thai supplier, B.C.14, BC001306, and frames the open question as whether the Thai operations "consisted of assembly of Chinese-origin components or subassemblies," B.C.14, BC001307—not whether any manufacturing occurred in Thailand at all. Fabricating frames, building chassis, and assembling complete carts in a Thai factory is the antithesis of transshipment. CBP, for its part, did not visit [ ] or identify any evidence that it lacks the capability to produce what it ships. Unlike *American Pacific Plywood*, where a site visit revealed foreign-grown materials and factories lacking the sophistication to produce the merchandise, No. 20-03914, at *9, nothing here suggests transshipment. A reasonable-suspicion finding cannot rest on ignoring the substantial,

uncontradicted evidence of foreign production that the importer placed before the agency. *See ICON PI Order*, at 1366 n.6, 1371.

Notably, CBP previously inquired into precisely the question it now claims is "unresolved"—the origin of the Thai carts—and answered it in Venom's favor. On September 10, 2025, CBP issued a CF-28 asking Venom to substantiate the Thai origin of its carts produced by [ ]. Haney Decl. ¶ 18. Venom responded on December 1, 2025, with extensive documentation of [ ] Thai manufacturing processes and its use of Thai-origin raw materials and components. *Id.*; *Venom*, ECF No. 4-1. Having reviewed that response, CBP liquidated the entries on December 12, 2025, as Type 01, "No Change"—that is, as Thai-origin merchandise not subject to the Orders. Haney Decl. ¶ 18; *Venom*, ECF No. 4-2; B.C.27, BC003629-31. Venom's current imports come from the same manufacturer, through the same supply chain, for the same merchandise. Haney Decl. ¶¶ 24, 30. CBP cannot reasonably treat [ ] as a transshipment conduit for Venom's carts when it accepted [ ] Thai production months earlier, and such unexplained inconsistency is the hallmark of arbitrary and capricious action. 5 U.S.C. § 706(2)(A).

### *2. [ ] Commercial Role Does Not Make Thai Carts Chinese-Origin Rolling Chassis.*

CBP also relies on the role of [ ] in the transaction documents, including pro forma invoices. B.C.14, BC001306-7. But the involvement of a Chinese company in ordering, pricing, or payment says nothing about where a cart or its chassis was made. Rather, the Orders turn on the origin of the merchandise, 90 Fed. Reg. at 38,763, not on the nationality of a commercial counterparty. Venom has been transparent about the arrangement, explaining that it "sources Thai-origin carts produced by [ ] for [ ]." BC001306. And pro forma invoices describing the specifications of a finished cart are what one would expect of an order for a finished cart; they are not evidence that the cart was produced in

China. A disclosed commercial relationship is not a "particularized and objective basis for suspecting" transshipment. *AL Tech*, 575 F. Supp. at 1280.

#### *3. CBP Never Asked Venom To Resolve The Questions It Now Invokes.*

Finally, the record does not reflect that CBP requested follow-up information about [ ] or the chassis raw materials, or advised Venom that its July 23, 2026 CF-28 responses were deficient, before imposing interim measures less than four weeks later. *See* Haney Decl. ¶¶ 19-21, 31. CBP cannot generate its own reasonable suspicion by declaring documentation inadequate rather than asking the importer to clarify or supplement it. *See ICON PI Order*, at 1371 (where Customs relied on CF-28 responses without providing an "opportunity for ICON to supplement or explain" them, its "conclusions . . . may well have been premature or mistaken"); *id.* at 1374 n.21 ("without additional investigation from Customs, there cannot be a reasonable suspicion of evasion"). Unlike the importers in *American Pacific Plywood*, moreover, Venom did not withhold requested information. *Cf.* No. 20-03914, at *9 (recounting that one importer "did not provide all the information requested by Customs nor explain its failure to do so").

### D. Even Considered In Their Totality, CBP's Stated Grounds Do Not Establish Reasonable Suspicion.

Viewing CBP's grounds together does not change the result. Imports of bare frames and parts that are not rolling chassis, a lawful post-order shift to Thai production, a disclosed commercial relationship with a Chinese company, and raw-material documentation questions that CBP never asked Venom to answer do not add up to reasonable suspicion of transshipment. Zero plus zero still equals zero.

Venom is aware of the Court's admonition that "it is inappropriate to flyspeck the evidence piece-by-piece." *Am. Pac. Plywood*, No. 20-03914, at *9. Venom does not ask the Court to reweigh evidence. Its point is a legal one: each of CBP's grounds depends on a misreading of the scope of

the Orders, or on facts CBP itself previously reviewed and accepted, and thus none supplies a particularized and objective basis for reasonably suspecting the entry of covered merchandise. Whether that showing suffices is "a question of law." *AL Tech*, 575 F. Supp. at 1280 n.4. Because reasonable suspicion must "reflect the actual scope of the orders," *ICON PI Order*, at 1374, evidence that falls outside that scope cannot be aggregated into a "totality" that does. *See Aspects Furniture*, 607 F. Supp. 3d at 1268-69. Nor can these grounds satisfy a standard that demands more than the "reasonably suggests" showing needed merely to open an investigation. *Am. Pac. Plywood*, No. 20-03914, at *8 n.10; *ICON Intervention Order*, at *5 n.9.

Finally, the Notice of Initiation credited the Coalition's assertion that Venom misclassified merchandise under HTSUS codes for golf balls or golf accessories. B.C.14, BC001289, BC001295-296, BC001299. Venom's actual customs data reflect no such entries, Haney Decl. ¶ 26, and the Notice of Initiation does not list misclassification among the grounds supporting its finding, BC001307. To the extent the Government relies on it, that allegation cannot support reasonable suspicion either.

In sum, none of these facts rise to a cognizable basis for CBP to determine a reasonable suspicion of evasion. Venom is entitled to judgment on Count Three.

## CONCLUSION

For the foregoing reasons, Venom respectfully asks this Court to grant its motion for summary judgment and judgment on the agency record, declaring CBP's imposition of interim measures under 19 U.S.C. § 1517(e)(3) unlawful and permanently enjoining CBP from enforcing the interim measures against Venom.

**PUBLIC VERSION**

Dated: November 24, 2026

Respectfully submitted,

*/s/ Daniel R. Wilson*

Daniel R. Wilson
Carolyn Bethea Connolly
Rachel Anne Beck
Faegre Drinker Biddle & Reath LLP
1500 K Street, N.W., Ste. 1100
Washington, DC 20005
Phone: (202) 230-5000
Fax: (202) 842-8465
daniel.wilson@faegredrinker.com
carrie.connolly@faegredrinker.com
rachel.beck@faegredrinker.com

Lawrence G. Scarborough
Jovana Crncevic
Faegre Drinker Biddle & Reath LLP
1177 Avenue of the Americas, 43rd Floor
New York, New York 10036
Phone: (212) 248-3140
Fax: (212) 248-3141
lawrence.scarborough@faegredrinker.com
jovana.crncevic@faegredrinker.com
taylor.norton@faegredrinker.com

Jesse Long Marks
Faegre Drinker Biddle & Reath LLP
1144 15th Street, Suite 3400
Denver, Colorado 80202
Phone: (303) 607-3500
Fax: (303) 607-3600
jesse.marks@faegredrinker.com

*Counsel for Plaintiff Venom EV, LLC*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Motion For Summary Judgment And Judgment On The Agency Record complies with the word limitation set forth in the Standard Chambers Procedure 2(B)(1) and contains 13,584 words.

Dated: November 24, 2026

Respectfully submitted,

*/s/ Daniel R. Wilson*

Daniel R. Wilson