**PUBLIC VERSION**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: HONORABLE JANE A. RESTANI, JUDGE**
**HONORABLE LEO M. GORDON, JUDGE**
**HONORABLE TIMOTHY C. STANCEU, JUDGE**

VEXAS CORP. d/b/a ATLAS,

*Plaintiff,*

BINTELLI, LLC,

*Consolidated Plaintiff,*

VENOM EV, LLC,

*Consolidated Plaintiff,*

v.

UNITED STATES; U.S. CUSTOMS AND BORDER PROTECTION; and ERIC CHOY, in his official capacity as Executive Director, Trade Remedy Law Enforcement Directorate, Office of Trade, U.S. Customs and Border Protection,

*Defendants.*

Consol. Court No. 26-03809-3JP
**PUBLIC VERSION**

**BINTELLI, LLC'S MOTION FOR SUMMARY JUDGMENT AND JUDGMENT ON THE AGENCY RECORD**

Dated: November 24, 2026

Faegre Drinker Biddle & Reath LLP

Daniel R. Wilson
Carolyn Bethea Connolly
Rachel Anna Beck
1500 K Street, N.W., Ste. 1100
Washington, DC 20005
Phone: (202) 230-5000
Fax: (202) 842-8465
daniel.wilson@faegredrinker.com
carrie.connolly@faegredrinker.com
rachel.beck@faegredrinker.com

Lawrence G. Scarborough
Jovana Crncevic
Taylor Lynn Norton

Faegre Drinker Biddle & Reath LLP
1177 Avenue of the Americas, 43rd Floor
New York, New York 10036
Phone: (212) 248-3140
Fax: (212) 248-3141
lawrence.scarborough@faegredrinker.com
jovana.crncevic@faegredrinker.com
taylor.norton@faegredrinker.com

Jesse Long Marks
Faegre Drinker Biddle & Reath LLP
1144 15th Street, Suite 3400
Denver, Colorado 80202
Phone: (303) 607-3500
Fax: (303) 607-3600
jesse.marks@faegredrinker.com

*Counsel for Plaintiff Bintelli, LLC*

# TABLE OF CONTENTS

Page

Table of Authorities .......... iii

INTRODUCTION .......... 1

RULE 56.1 STATEMENT .......... 2

FACTUAL BACKGROUND .......... 2

I. The Department of Commerce Issued AD/CVD Orders ON LSPTVs Covering, At A Minimum, Chinese-Origin Rolling Chassis Consisting Of A Frame With Suspension Installed And Powertrain Components Installed Or Ready For Installation .......... 2

II. Bintelli's Imported Merchandise Does Not Contain Chinese-Origin Rolling Chassis .......... 6

III. The Coalition Files An EAPA Allegation Against Bintelli That Misinterprets The LSPTV Orders And Relies On Inaccurate Evidence .......... 9

IV. CBP Initiates An Investigation Based On Predominantly On The Coalition's Assertions .......... 12

V. CBP Informs Bintelli Of The EAPA Investigation And Simultaneously Imposes The Interim Measures .......... 12

VI. [ ] The Withdrawal, Without Prejudice, Of Bintelli's Motion For A Temporary Restraining Order And Preliminary Injunction .......... 13

SUMMARY OF ARGUMENT .......... 15

ARGUMENT .......... 17

I. Standard Of Review .......... 17

II. CBP Violated The Fifth Amendment By Failing To Provide Bintelli With Pre-Deprivation Notice Or A Meaningful Opportunity To Be Heard .......... 18

III. The Reasonable Suspicion Standard, As Applied, Is Unconstitutional Against Business-Ending Interim Measures .......... 25

| | Page |
|---|---|
| A. A Statute Cannot Supply Less Due Process Than The Constitution Requires | 25 |
| B. The Private Interest Is Grave And The Threatened Loss Is Permanent | 27 |
| C. The Government's Interests Do Not Require Business-Ending Measures On Mere Suspicion | 29 |
| D. Reasonable Suspicion May Suffice For Truly Temporary Measures, But Not For Measures That Are Final In Practical Effect | 31 |
| IV. Even If The As-Applied Reasonable Suspicion Standard Were Constitutional, CBP Lacked The Requisite Suspicion To Impose Interim Measures | 33 |
| A. Reasonable Suspicion Requires A Particularized And Objective Basis, Grounded In The Actual Scope Of The Orders, For Suspecting That Covered Merchandise Was Entered Through Evasion | 33 |
| B. Bintelli's Entry Of Parts Used To Construct LSPTVs In The United States Provided No Grounds For Reasonable Suspicion | 35 |
| C. Bintelli's Shift To Vietnamese And Thai Production After The Orders Issued Is Evidence Of Compliance, Not Evasion | 38 |
| *1. The Vietnamese Carts* | 39 |
| *2. The Thai Carts* | 40 |
| *3. [ ] Commercial Role Does Not Make Vietnamese Or Thai Carts Chinese-Origin Rolling Chassis* | 42 |
| *4. CBP Never Asked Bintelli To Resolve The Questions It Now Invokes* | 42 |
| D. Even Considered In Their Totality, CBP's Stated Grounds Do Not Establish Reasonable Suspicion | 43 |
| CONCLUSION | 44 |
| CERTIFICATE OF COMPLIANCE | |

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Addington v. Texas*,
441 U.S. 418 (1979) .......... 26, 27

*AL Tech Specialty Steel Corp. v. United States*,
575 F. Supp. 1277 (Ct. Int'l Trade 1983) .......... 34, 42, 43

*Am. Pac. Plywood, Inc. v. United States*,
No. 20-03914, Slip Op. 23-93 (Ct. Int'l Trade June 22, 2023) .......... *passim*

*Am. Signature, Inc. v. United States*,
598 F.3d 816 (Fed. Cir. 2010) .......... 23

*Arnett v. Kennedy*,
416 U.S. 134 (1974) .......... 26

*Aspects Furniture Int'l, Inc. v. United States*,
607 F. Supp. 3d 1246 (Ct. Int'l Trade 2022) .......... 35, 43

*Barry v. Barchi*,
443 U.S. 55 (1979) .......... 27, 32

*Bell v. Burson*,
402 U.S. 535 (1971) .......... 26

*Brock v. Roadway Express, Inc.*,
481 U.S. 252 (1987) .......... 32

*Canadian Wheat Bd. v. United States*,
32 C.I.T. 1116 (Ct. Int'l Trade 2008),
*opinion clarified on denial of reconsideration*, 33 C.I.T. 1204 (Ct. Int'l Trade 2009),
*aff'd*, 641 F.3d 1344 (Fed. Cir. 2011) .......... 17-18

*CEK Grp. LLC v. United States*,
633 F. Supp. 3d 1369 (Ct. Int'l Trade 2023) .......... 29, 35

*China Nat'l Mach. Imp. & Exp. Corp. v. United States*,
264 F. Supp. 2d 1229 (Ct. Int'l Trade 2003) .......... 34, 39

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) .......... 18, 26

Page(s)

*Dunaway v. New York*,
442 U.S. 200 (1979) .................... 30

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) .................... 18

*Florida v. Royer*,
460 U.S. 491 (1983) .................... 25

*Ford Motor Co. v. United States*,
44 F. Supp. 3d 1330 (Ct. Int'l Trade 2015) .................... 19

*FTC v. Standard Oil Co.*,
449 U.S. 232 (1980) .................... 32

*Gilbert v. Homar*,
520 U.S. 924 (1997) .................... 32

*Hamdi v. Rumsfeld*,
542 U.S. 507 (2004) .................... 26

*Hangzhou Spring Washer Co. v. United States*,
387 F. Supp. 2d 1236 (Ct. Int'l Trade 2005) .................... 34

*ICON EV LLC v. United States*,
No. 26-02759, Slip Op. 26-88 (Ct. Int'l Trade Aug. 10, 2026)
("*ICON Intervention Order*") .................... 30, 34, 44

*ICON EV LLC v. United States*,
836 F. Supp. 3d 1361 (Ct. Int'l Trade 2026)
("*ICON PI Order*") .................... *passim*

*Kashem v. Barr*,
941 F.3d 358 (9th Cir. 2019) .................... 29

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .................... 23

*Mathews v. Eldridge*,
24 U.S. 319 (1976) .................... *passim*

*Motor Vehicle Mfrs. Ass'n of the United States, Inc.
v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) .................... 17

**Page(s)**

*Natl. Fisheries Inst., Inc. v. U.S. Bureau of Cust. And Border Protec.*,
33 C.I.T. 1137 (Ct. Int'l Trade 2009) .......... 17

*Phoenix Metal Co. v. United States*,
No. 23-00048, Slip Op. 24-68 (Ct. Int'l Trade June 10, 2024) .......... 19

*Rodriguez v. Dep't of Veterans Affairs*,
8 F.4th 1290 (Fed. Cir. 2021) .......... 28

*Royal Brush Mfg., Inc. v. United States*,
75 F.4th 1250 (Fed. Cir. 2023) .......... 18, 26

*Santosky v. Kramer*,
455 U.S. 745 (1982) .......... 26, 27

*Superior Com. Sols., LLC v. United States*,
811 F. Supp. 3d 1363 (Ct. Int'l Trade 2025) .......... 18, 23

*Terry v. Ohio*,
392 U.S. 1 (1968) .......... 30, 34, 35

*United States v. All Assets of Statewide Auto Parts, Inc.*,
971 F.2d 896 (2d Cir. 1992) .......... 19, 28

*United States v. Cortez*,
449 U.S. 411 (1981) .......... 34

*United States v. James Daniel Good Real Prop.*,
510 U.S. 43 (1993) .......... 27

*United States v. Place*,
462 U.S. 696 (1983) .......... 30

*Vitek v. Jones*,
445 U.S. 480 (1980) .......... 26

*Wirtgen Amer., Inc. v. United States*,
447 F. Supp. 3d 1359 (Ct. Int'l Trade 2020) .......... 18

*Women's Med. Prof'l Corp. v. Baird*,
438 F.3d 595 (6th Cir. 2006) .......... 19, 28

*Zoetis Services LLC v. United States*,
No. 22-00056, Slip Op. 26-102 (Ct. Int'l Trade 2026) .......... 17

**Statutes, Rules & Regulations:** **Page(s)**

19 C.F.R. § 141.64 .......... 22, 37

19 C.F.R. § 165.24 .......... 25

5 U.S.C. § 706(2) .......... 17

19 U.S.C. § 1517(a)(3) .......... 35

19 U.S.C. § 1517(a)(5)(A) .......... 37

19 U.S.C. § 1517(a)(5)(B) .......... 37

19 U.S.C. § 1517(b)(1) .......... 25, 29, 33

19 U.S.C. § 1517(b)(4) .......... 35

19 U.S.C. § 1517(c)(1)(A) .......... 25

19 U.S.C. § 1517(e) .......... 25, 29, 33

19 U.S.C. § 1517(e)(3) .......... 26, 44

28 U.S.C. § 1581(i) .......... 14, 17

28 U.S.C. § 1581(i)(1)(D) .......... 17

28 U.S.C. § 2640(e) .......... 17

90 Fed. Reg. 38,759 (Dep't Com. Aug. 12, 2025) .......... 2, 35

90 Fed. Reg. 38,763 (Dep't Com. Aug. 12, 2025) .......... *passim*

## INTRODUCTION

The undisputed facts and record evidence confirm that U.S. Customs and Border Protection ("CBP") violated both the United States Constitution and federal law in imposing certain interim measures against Plaintiff U.S. importer Bintelli, LLC ("Bintelli") pursuant to the Enforce and Protect Act ("EAPA") for imports of Vietnamese and Thai golf carts, and imports of bare frames and separately imported miscellaneous components that are out-of-scope under the applicable antidumping and countervailing duty ("AD/CVD") orders. CBP violated Bintelli's Fifth Amendment rights by imposing business-ending interim measures without providing Bintelli with constitutionally required notice of the investigation or any opportunity to respond. Moreover, EAPA's "reasonable suspicion" standard for imposing interim measures sets an unconstitutionally low evidentiary bar in relation to the business-ending consequences of their imposition that will effectively destroy Bintelli before it has any opportunity to respond to the allegations.

Even if the reasonable suspicion standard were constitutional here, CBP's finding of reasonable suspicion against Bintelli does not satisfy the scope of the AD/CVD Orders. The U.S. Department of Commerce ("Commerce") built the Orders around a single minimum subassembly, the Chinese-origin "rolling chassis." None of the merchandise entered by Bintelli during the period of investigation ("POI") is covered by the scope. CBP lacked any particularized and objective basis for suspecting that covered merchandise was entered through evasion. As this Court has observed, "{t}he strength or weakness of the suspicion likely should affect" CBP's decision whether to impose interim measures at all. *ICON EV LLC v. United States*, 836 F. Supp. 3d 1361, 1374 (Ct. Int'l Trade 2026) ("*ICON PI Order*"). When it came to considering interim measures here, EAPA required CBP to use a scalpel; instead, it used an impermissible sledgehammer.

## RULE 56.1 STATEMENT

1. The administrative determination to be reviewed is CBP's August 25, 2026 Notice of Investigation and Interim Measures (the "Notice of Initiation"). B.C.14, BC001285-310.

2. Bintelli incorporates by reference its statement of undisputed material facts that accompanies this submission. *See* Bintelli's Statement of Undisputed Materials Facts.

## FACTUAL BACKGROUND

### I. The Department Of Commerce Issued AD/CVD Orders On LSPTVs Covering, At A Minimum, Chinese-Origin Rolling Chassis Consisting Of A Frame With Suspension Installed And Powertrain Components Installed Or Ready For Installation.

On August 12, 2025, Commerce published the operative AD/CVD orders on low-speed personal transportation vehicles ("LSPTVs") from the People's Republic of China. *See Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order; Amended Final Determination of Countervailing Duty Investigation and Countervailing Duty Order*, 90 Fed. Reg. 38,759 (Dep't Com. Aug. 12, 2025) (the "Orders").

The Orders cover finished LSPTVs of Chinese origin, as well as certain unfinished or unassembled LSPTVs of Chinese origin, as defined by the following scope:

> An unfinished and/or unassembled LSPTV subject to these orders covers **at a minimum** a subassembly, also known as a "rolling chassis," which is typically comprised of, but not limited to, a frame or body with front and/or rear suspension components (such as arms, springs, axles, spindles, and shafts) installed and powertrain components (including either an electric motor or a gas-powered internal combustion engine) installed or ready for installation.
>
> When imported together with a rolling chassis subject to these orders, other LSPTV components, such as batteries, bumpers, wheel and tire assemblies, cowlings, fenders, grills, kick plates, steering column and steering wheel assemblies, dash assembly, seat assemblies, pedal assemblies, brake assemblies, canopy or roof assemblies, temporary rain enclosures, windshields, mirrors, headlights, taillights, lighting systems, or storage—whether assembled or unassembled, whether as part of a kit or not, and whether or not accompanied by additional components—constitute part of an unfinished and/or unassembled LSPTV that is subject to these

> orders. The inclusion of other products, components, or assemblies not described here does not remove the product from the scope….
>
> LSPTVs and subassemblies subject to these orders include those that are produced in the subject country whether assembled with other components in the subject country or in a third country. Processing or completion of finished and unfinished LSPTVs and subassemblies either in the subject country or in a third country does not remove the product from the scope.

*Id.*, 90 Fed. Reg. at 38,763 (emphasis added). Critically, merchandise subject to the Orders must contain at least a Chinese-origin "subassembly, also known as a 'rolling chassis,' which is typically comprised of, but not limited to, a frame . . . with front and/or rear suspension components . . . installed and powertrain components . . . installed or ready for installation." *Id.* Absent any one of these elements, imports are not covered by the Orders.

The scope of the Orders is "precise and limited." *ICON PI Order*, at 1366. The Orders' coverage was not an accident of drafting; it was the product of a year-long scope proceeding in which Commerce repeatedly considered, and rejected, the very theory of coverage for separately imported parts on which the EAPA allegations of the American Personal Transportation Vehicle Manufacturers Coalition ("Coalition") here depends. The Coalition filed its Petition on June 20, 2024, defining an unfinished or unassembled LSPTV as covering "at a minimum a subassembly, also known as a 'rolling chassis,'" and providing that "{i}ndividual components that do not comprise a subject {LSPTV} or subassembly that are entered **and sold** by themselves are not subject to the order." Ex. 1, 6/20/24 Petition at 5-6 (emphasis added with respect to language not found in the final Orders). In response to Commerce's supplemental questionnaires, the Coalition confirmed that "individual {LSPTV} components or parts, such as axle components, do not comprise a subject {LSPTV} or rolling chassis subassembly if they are entered and sold by themselves," and that, "{f}or the individual parts or components that comprise the rolling chassis subassembly to be considered subject merchandise, they must be imported together as the rolling

chassis, whether assembled together or as part of a kit." Ex. 2, 6/28/24 Coalition Resp. at 9-10. The Coalition also represented to Commerce that "{a} chassis frame imported on its own, without any powertrain components is not covered by the scope," that "a chassis frame or body that is imported separately without suspension components installed and powertrain components installed or ready for installation is not considered subject merchandise," and that other components, "{w}hen imported separately, . . . are not subject merchandise." Ex. 3, 7/8/24 Coalition Resp. at 2-4.

On November 25, 2024, Commerce proposed deleting the words "and sold" from the scope sentence relating to individual components. *See* Ex. 4, 11/25/24 Preliminary Scope Modification at 8-9, 16. In its January 23, 2025 Preliminary Scope Decision Memorandum, Commerce, over the Coalition's objection, eliminated "and sold" because that language made "the scope unenforceable by CBP," and declined to impose an end-use certification. Ex. 5, 1/23/25 Preliminary Scope Decision. The resulting text provided that "{i}ndividual components that do not comprise a subject LSPTV or subassembly that are entered by themselves are not subject to the investigations." *Id.* at 13.

The Coalition proposed a similar "for use" proposal in its scope case brief. Ex. 6, 2/27/25 Coalition Scope Br. at 2-9. In its June 16, 2025 Final Scope Decision Memorandum, Commerce again declined to adopt the Coalition's end-use proposal. Instead, Commerce adopted a narrow certification scheme directed at a single scenario: the post-importation assembly of certain enumerated Chinese parts "with Chinese LSPTVs subassemblies/rolling chassis to produce LSPTVs." Ex. 7, 6/16/25 Final Scope Decision at 5-6, B.C.1, BC000457-75.

The certification applies only to five Chinese-origin components (seat assemblies, steering columns, suspension systems, plastic cowlings, and motors), and requires the importer to certify

only that the parts are not on the same bill of lading as "subject subassemblies (i.e., rolling chassis)" and that neither it nor a related entity "will assemble these parts **with a subject subassembly** or a subject unfinished LSPTV to produce an LSPTV." B.C.1, BC000462, BC000472, BC000473-74 (emphasis added). A "subassembly (i.e., rolling chassis) is subject to the Order if it meets the definition of a rolling chassis as described by the scope of this order." BC000473-74. Commerce rejected the Coalition's broader proposals, including any requirement concerning "the ultimate disposition of components after they enter the United States{.}" BC000461. Commerce also left the rolling-chassis definition unchanged. BC000467-68. As a result, the scope never reached separately imported parts that, rather than being joined to a rolling chassis that was subject merchandise when it entered, are used to build a rolling chassis in the United States. That is the scope the Orders adopted, 90 Fed. Reg. at 38,763, and it is the scope this Court has described as "precise and limited." *ICON PI Order*, at 1366.

The same record forecloses any theory that the Orders cover third-country carts with non-Chinese rolling chassis. The Petition identified China as the only subject country, and the Coalition represented that it had no "evidence indicating that the subject merchandise is currently produced in a country other than that from which it is exported." Ex. 1, 6/20/24 Petition at 13. The scope reaches LSPTVs and subassemblies "produced in the subject country," including those later "assembled with other components . . . in a third country." *Id.* at 6; 90 Fed. Reg. at 38,763. It does not reach a cart produced from a rolling chassis fabricated outside China. Indeed, the Coalition itself described a rolling chassis as a frame "constructed from steel and/or aluminum sheet, tube, and other products that are cut, welded, bent, and formed into shape through the fabrication process," with suspension and powertrain components installed. Ex. 2, 6/28/24 Coalition Resp. at

8, 11. Where that fabrication occurs in Thailand or Vietnam, the resulting rolling chassis is Thai and Vietnamese, not Chinese.

## II. Bintelli's Imported Merchandise Does Not Contain Chinese-Origin Rolling Chassis.

Bintelli is a long-standing U.S.-based importer and distributor of electric vehicles, specializing in manufacturing and distributing power sport products, with a major focus on golf carts, related components, and other electric vehicles. *See Vexas Corp. v. United States et al.*, Ct. No. 26-3809 ("*Vexas*"), ECF No. 27-1, Declaration of Justin Jackrel ("Jackrel Decl.") ¶¶ 3, 9.[1] During the POI, Bintelli initially imported parts and components from China that did not amount to a minimum covered subassembly pursuant to the scope. *Id.* ¶ 17. These parts and components, sourced from Yangzhou Whanlong Electric Vehicle Co. ("Whanlong") and Dongguan Excar Electric Vehicle Co., Ltd ("Excar"), were either used for replacement parts or to produce LSPTVs/golf carts in the United States at Bintelli's U.S. assembly facilities. *Id.* Specifically, Bintelli imported Chinese LSPTV frames without any powertrain or suspension components installed or ready to install and, separately, other components, including motors, suspension, and additional parts, in different shipments on separate bills of lading and customs entries. *Id.*

Following the imposition of preliminary duties at the end of 2024, Bintelli proactively began transitioning its supply chain to manufacturers in both Thailand and Vietnam. *Id.* ¶¶ 16, 21, 23. For Bintelli's carts sourced from both Thailand and Vietnam, the frames are produced from non-Chinese raw materials that is bent, welded, and formed into frames at the Thai and Vietnamese factories. *Id.* ¶ 21. Although the carts may contain certain Chinese componentry, the rolling chassis component of the cart is undeniably Vietnamese or Thai origin, and each one is shipped with a

[1] On September 1, 2026, the Court consolidated *Bintelli* with *Vexas Corp. v. United States et al.*, No. 26-3809 and *Bintelli, LLC v. United States et al.*, No. 26-3812, under the *Vexas* caption.

Certificate of Origin from its respective country. *Id.* ¶¶ 23, 31. With respect to the Thai shipments, all of the labor for the manufacturing and assembly occurs in Thailand, and more than 50 percent of all the components are Thai origin. *Id.* ¶ 32. The same is true for the Vietnamese shipments: all of the labor for the manufacturing and assembly occurs in Vietnam, and more than 50 percent of all the components are Vietnamese origin. *Id.* In fact, the Vietnamese government confirmed the Certificate of Origin for Bintelli's assemblies and components following a thorough investigation that included container inspections and site visits to the plant in June and July 2026. *Id.* ¶¶ 30-31.

From May 2025 through February 2026, CBP examined a broad range of Bintelli's imported parts and subassemblies. *Id.* ¶¶ 18-20; *see also Bintelli, LLC v. United States et al.*, Ct. No. 03812 ("*Bintelli*"), ECF No. 4-1, 6/3/2025 Letter to CBP Regarding CF-29 Response (exhibits omitted); *id.*, ECF No. 4-2, 2/4/2026 CBP Emails Regarding CF-29 Response.[2] CBP determined that Bintelli had appropriately entered the merchandise when it arrived in the Charleston port, and confirmed that the shipments were ***beyond the scope of the Orders.*** *See id.*, ECF No. 4-2, at 1 (noting that entry "was reverted {or allowed to enter} without the AD/CVD").

CBP continued its inquiries into Bintelli's merchandise throughout the summer of 2026 and issued two different CF-28s requesting information. Jackrel Decl. ¶ 33. CBP's requests were issued after CBP had initiated its EAPA investigation on May 20, 2026, but none of them disclosed that investigation. *See* B.C.14; B.C.16-22. The first CF-28s, issued on June 3, 2026, requested information related to: golf carts entered under entries [ ]905-9, [ ]837-3, [ ]246-8, and [ ]581-1; parts entered under entry [ ]023-1; and golf carts and

2 Bintelli's complaint, and accompanying exhibits, were filed prior to the consolidation of this action. *See Bintelli, LLC v. United States et al.*, Ct. No. 03812.

parts entered under entry [ ]448-5. B.C.17, BC001340-42.[3] Bintelli requested, and CBP confirmed, that Bintelli could respond to golf cart entry [ ]905-9 in full as the "Lead Entry," and provide entry summary packages in response to the remaining five entries. BC001340; *see also* B.C.18, BC001370-75. The CF-28 for the Lead Entry sought "additional proof of country of origin Thailand" for the finished carts imported from Bintelli's Thai manufacturing partner, RMA Automotive Company Limited ("RMA"). B.C.17, BC001340, BC001349-50.

The second CF-28s, issued on June 18, 2026, covered: golf carts entered under entries [ ]311-3 and [ ]036-8; golf cart parts entered under entries [ ]154-2 and [ ]271-5; and wheel and tire assembly entered under entry [ ]718-6. B.C.16, BC001325. Again, CBP permitted Bintelli to respond to one request in full as the "Lead Entry"—[ ]036-8—and submit entry summary packages for the other four entries. BC001323. The CF-28 for the Lead Entry sought "additional proof of country of origin Vietnam" for the finished carts imported from Bintelli's Vietnamese manufacturing partner, Feiteng Electric Vehicle Company Limited ("Feiteng" or "Feiteng EV"). B.C.16, BC001323; BC001331-32. According to CBP, the requests sought entry documentation, bills of lading, commercial invoices, packing lists, product descriptions, manufacturer information, production records, bills of materials, raw material sourcing documentation, purchase and payment records, and quality inspection records. B.C.14, BC001300.

---

[3] The bracketing and designation of entry numbers and other confidential information in this brief corresponds to the submissions on the administrative record which were bracketed in accordance with CBP's instructions. Information referenced from CBP's Notice of Initiation and other documents on the administrative record remains bracketed pursuant to the terms of CBP's Administrative Protective Order. In an abundance of caution, Bintelli has bracketed such information when it is directly referenced from documents in the administrative record, even where Bintelli has otherwise publicly disclosed such information in other submissions before the Court.

Bintelli responded to each CF-28 on August 3, 2026, with voluminous records demonstrating the origins and composition of its Thai and Vietnamese LSPTVs in response to the CF-28s for each Lead Entry and, as previously agreed-upon, provided summary packages for the additional requested entries. *See generally* B.C.16-22.

For the Thai carts, Bintelli explained that the rolling chassis "is produced in Thailand from Thai steel (for the frame){,}" and "the Thai-origin components include the chassis assembly (the most expensive component), as well as various powertrain and electrical components." B.C.17, BC001343, BC001346. Bintelli also supplied photographs of RMA's facility and equipment, machinery lists, RMA's production records, bills of materials, raw material purchase orders and payment records, and Thai certificates of origin. BC001349-50 (citing Exs. 2-4, 11-23). Similarly, for the Vietnamese carts, Bintelli explained that "the Vietnamese-origin components include the frame assembly, which is produced by [ ] in Vietnam." B.C.16, BC001327. In support of the Lead Entry from Feiteng EV, Bintelli provided photographs of Feiteng EV's facility and equipment, machinery lists, Feiteng EV's production records, bills of materials, raw material purchase orders and payment records, and Vietnamese certificates of origin. BC001331-32 (citing Exs. 2, 5-6, 9-18).

## III. The Coalition Files An EAPA Allegation Against Bintelli That Misinterprets The LSPTV Orders And Relies On Inaccurate Evidence.

On April 20, 2026, the Coalition filed two separate EAPA allegations against Bintelli. B.C.1, BC000003; B.C.3, BC000321. Allegation 8286 concerned alleged transshipment, while Allegation 8289 addressed alleged misclassification, undervaluation, and importation of partially disassembled chassis. B.C.11, BC001246 n.2.

In Allegation 8286, the Coalition asserted that Feiteng EV "does not produce LSPTVs but rather imports LSPTVs produced by Excar for re-export to the United States." B.C.1, BC000010.

The allegation rested on: (1) the timing of Feiteng EV's formation in March 2025 and its first shipment to Bintelli in August 2025; (2) Google Maps images of Feiteng EV's warehouse; (3) the observation that Feiteng EV's legal representative represents another importer of electric vehicles from China; and (4) import statistics showing growth in Vietnamese exports. BC000007, BC000010-12, BC000015-16. The Coalition speculated that "{m}ore likely, Feiteng EV is importing LSTPVs {sic} produced by Excar and repackaging or relabeling already complete LSTPVs {sic}." BC000012. The Coalition provided no actual evidence that any Bintelli entry from Vietnam was of Chinese origin.

For Thailand, the allegation rested on the absence of any Thai entries under HTSUS 8703.10.5030 from September 2024 through June 2025, followed by Bintelli's imports from RMA beginning in August 2025, and the assertion that RMA "does not advertise vehicle manufacturing," with reference to Google Maps and other open-source images of RMA's facility. BC000016-17. The Coalition further speculated, without any supporting evidence, that RMA's "Model J" golf cart, which it described as "remarkably similar" to another importer's model, was supplied by the same Chinese manufacturers that supply that importer. BC000018.

In Allegation 8289, regarding alleged misdeclaration of parts as non-subject merchandise, the Coalition relied almost entirely on a change in bill of lading descriptions that would logically have been consistent with Bintelli's switch from importing complete golf carts to manufacturing rolling chassis in the United States from imported parts. B.C.3, BC000341-43. The Coalition also told CBP that Bintelli's Ladson facility is classified as a "specialty warehouse," and speculated that "only minor final assembly of imported parts is occurring" in the United States. BC000336, BC000340. The Coalition offered no evidence that any specific Bintelli entry contained a subject rolling chassis or subassembly.

The Coalition also asserted in Allegation 8289 that Bintelli was evading the Orders by misclassifying and undervaluing subject merchandise. BC000321, BC000328. Specifically, the Coalition alleged that "in 2024 Bintelli began importing goods under HTSUS codes 9506.32 and 9506.39 covering 'golf balls' and 'golf equipment except clubs and balls.'" BC000344. The Coalition says it based this allegation on [ ] bill of lading data. BC000344 & Ex. 12, BC000534. Significantly, the Coalition provided only a summary of the [ ] data rather than a true and correct copy of the raw data.

The Coalition provided no basis for CBP or other parties to compare the raw data against the summary chart included in the allegation. *See* B.C.3, Ex. 12, BC000534. However, as the [ ] service explains on its website, HTS codes listed in its data feeds are not probative of the code, if any, actually declared to CBP on the entry summary. Wilson Decl., Ex. C. In fact, as the [ ] service explains, [ ] *Id.* The Coalition did not acknowledge this data limitation in Allegation 8289. Thus, while it is true that the [ ] data appear to reflect Bintelli shipments where the [ ] service populated the HS field with a code in heading 9506, this provided no evidence that Bintelli's bills of lading actually reflected such numbers.[4] The Coalition's reliance on the [ ] manifest data provided no evidence of evasion, as CBP easily could have corroborated prior to initiation of the investigation with reference to Bintelli's entry data in the CBP Automated Commercial Environment ("ACE"). The Coalition's decision to rely on such sources for its allegations is highly suspect, to say the very least.

---

[4] Bintelli's actual bills of lading for shipments listed in the [ ] data with heading 9506 reflect no HTS codes at all. *See* Wilson Decl., Ex. B. However, Exhibit A, the bill of lading available through the [ ] system, lists [ ] for no articulable reason.

## IV. CBP Initiates An Investigation Based Predominantly On The Coalition's Assertions.

CBP acknowledged receipt of the Coalition's allegations on April 29, 2026, and initiated a consolidated investigation of Bintelli and two other LSPTV importers, Venom EV, LLC ("Venom") and Vexas Corp. d/b/a Atlas Carts ("Vexas") on May 20, 2026. B.C.14, BC001287-88, BC001299. CBP found that the allegations "reasonably suggest{ed}" evasion because the importers "appear to have followed a similar pattern of importing rolling chassis in a slightly disassembled form, along with other LSPTV parts and components, directly from China," that Bintelli's evidence "indicates a significant change toward importing parts from Chinese suppliers," as well as "domestic operations {that} are centered on assembly rather than manufacturing," and that the shipments from Thailand and Vietnam, together with similarities to Chinese models, "reasonably suggest that Chinese-origin LSPTVs may have been routed through Thailand and/or Vietnam{.}" BC001298-99; B.C.11, BC001248-53. CBP thus accepted the Coalition's characterizations at face value.

## V. CBP Informs Bintelli Of The EAPA Investigation And Simultaneously Imposes The Interim Measures.

On August 18, 2026, CBP emailed Bintelli and acknowledged, for the first time, the EAPA investigation of Bintelli, Venom , and Vexas that CBP had initiated on May 20, 2026. *Bintelli*, ECF No. 4-5; P.D.14a, PD001173-74. According to the email, CBP reviewed available information and determined that there was a reasonable suspicion that Bintelli had evaded AD/CVD duties. PD001173. CBP contended that Bintelli engaged in evasion "by failing to declare entries of Chinese-origin covered LSPTV subassemblies and their component parts and by transshipment through Vietnam and/or Thailand." PD001173. As a result, CBP stated that it would be imposing interim measures on Bintelli, including extending and suspending liquidation of certain entries. PD001173. CBP also decided to impose discretionary interim measures pursuant

to 19 USC § 1517(e)(3), specifically requiring "live entry" for "all imports of LSPTV from China and Vietnam and/or Thailand"; the rejection and re-filing of entry summaries within the rejection window; and the payment of cash deposits at the "all others rate … on LSPTV and parts" (a combined rate of 519.23 percent *ad valorem*), unless a separate rate applied. PD001173.

A week later, on August 25, 2026, Bintelli received CBP's Notice of Initiation, which provided CBP's reasoning for its investigation and decision to impose interim measures. B.C.14, BC001285-310.

## VI. [ ] The Withdrawal, Without Prejudice, Of Bintelli's Motion For A Temporary Restraining Order And Preliminary Injunction.

On August 31, 2026, less than a week after CBP issued its Notice of Initiation, Bintelli filed its complaint followed by a motion for a temporary restraining order and preliminary injunction (the "TRO/PI Motion"), seeking to enjoin enforcement of the interim measures while CBP completed its investigation. *See Bintelli,* ECF No. 4; *see Vexas* , ECF No. 28. The complaint states three causes of action: first, CBP violated Bintelli's Fifth Amendment due process rights by failing to provide notice and a meaningful opportunity to be heard before imposing the interim measures (Count One); second, CBP also violated Bintelli's Fifth Amendment due process rights by imposing its business-ending interim measures under an impermissibly low "reasonable suspicion" evidentiary standard (Count Two); and third, CBP lacked a sufficient basis for concluding that there was reasonable suspicion that Bintelli's merchandise evaded the LSPTV Orders (Count Three). *Bintelli,* ECF No. 4. Bintelli argued, with the support of declarations and corroborating financial statements, that CBP's draconian interim measures—imposed without notice or opportunity to respond—would require Bintelli to pay millions of dollars in upfront cash deposits for both goods already imported and future entries, and would force Bintelli to close its doors within a month's time. *See generally Vexas,* ECF No. 28.

On September 18, 2026, CBP opposed Bintelli's TRO/PI Motion and moved to dismiss for lack of subject-matter jurisdiction. *See Vexas,* ECF No. 35. In its opposition, CBP stated, for the first time, that the agency had no intention of "subject{ing} plaintiffs' past entries to the live entry and cash deposit requirements announced on August 18, 2026." *Id.* at 31. Instead, the live entry and cash deposit requirements would only apply to merchandise imported on or after August 18, 2026. *Id.* Bintelli filed a reply further substantiating its arguments for temporary emergency relief and establishing the Court's jurisdictional basis pursuant to 28 U.S.C. 1581(i). *Id.*, ECF No. 43. Bintelli also acknowledged CBP's about-face regarding the live entry and cash deposit requirements and emphasized that no mechanism exists by which to hold CBP to this changed position. *Id.* at 8 n.3, 13.

On September 1, 2026, the day after Bintelli filed its TRO/PI Motion, the Coalition filed a motion to intervene as of right or, in the alternative, for permissive intervention (the "Motion to Intervene"). *Id.*, ECF No. 13. On September 29, 2026, the Court granted in part and denied in part the Coalition's request for permissive intervention, joining the Coalition as a defendant-intervenor only for Count Three of Bintelli's complaint. *Id.,* ECF No. 52.[5]

The Court heard argument on the pending motions on October 6, 2026. *Id.,* ECF No. 65. During the morning session, the parties provided the Court with an overview of the Orders and the impact on the various businesses, as well as argument on the jurisdictional issue that Defendants raised in their motions to dismiss. During the closed afternoon session, each plaintiff offered testimony in support of its respective irreparable harm contentions. [ ]

---

[5] The Coalition has appealed this decision to the United States Court of Appeals for the Federal Circuit. *See Vexas*, ECF No. 75. That appeal was docketed on November 5, 2026, as Appeal Number 2027-1110. *Id.*, ECF No. 81.

[

]

The parties conferred [

] On October 30, 2026, CBP filed a joint status report with the parties' agreed-upon briefing schedule and target date for decision. *Id.,* ECF No. 76.

On November 3, 2026, the Court reassigned this action to a three-judge panel (the "Panel"), to adjudicate this action together with *STAR EV Corp. v. United States*, Ct. No. 26-3645 and *ICON EV LLC v. United States*, Ct. No. 26-2759. *Id.*, ECF Nos. 79-80. The Panel directed the parties to submit a joint status report with an updated briefing schedule by November 17, 2026. *Id.*, ECF No. 80. The parties did so and, on November 20, 2026, the Court so-ordered the parties' proposed briefing schedule, *id.*, ECF No. 87— Vexas, Bintelli, and Venom to file their dispositive motions by November 24, 2026, with ICON EV LLC ("ICON") having the option to file a revised dispositive motion on the same day; CBP and the Coalition to file their responses to the dispositive motions by December 21, 2026; and Vexas, Bintelli, and Venom to file their replies in support of the dispositive motions by January 15, 2027. *Id.,* ECF No. 83. The Court has scheduled oral argument for February 16, 2027 and, if necessary, February 17, 2027. *Id.,* ECF No. 87.

## SUMMARY OF ARGUMENT

The Court should grant Bintelli's motion for summary judgment and judgment on the agency record and permanently enjoin the enforcement of CBP's interim measures for three independent reasons.

*First*, CBP violated Bintelli's Fifth Amendment due process rights by imposing interim measures without first providing Bintelli with notice or a meaningful opportunity to be heard. The three-factor balancing test outlined in the seminal Supreme Court decision *Mathews v. Eldridge*, 24 U.S. 319 (1976), establishes that Bintelli was entitled to due process in this context. Moreover, this Court already concluded in *ICON* that the failure to provide notice or a meaningful opportunity to be heard prior to imposing the same interim measures at issue here constitutes a due process deprivation. *ICON PI Order*, at 1370-71 (holding that ICON "did not receive due process before interim measures were imposed" where ICON had no notice or opportunity to respond prior to the imposition of those measures). Here, the administrative record confirms that Bintelli was provided with neither notice nor any opportunity to respond before the interim measures were imposed.

*Second*, EAPA's reasonable suspicion standard also violates Bintelli's Fifth Amendment due process rights. Reasonable suspicion is a minimal standard that was designed to justify brief and noninvasive investigative steps. A standard built for a momentary encounter in another context cannot govern a proceeding that will permanently destroy the business Bintelli built from the ground up. Before CBP can impose such invasive measures, due process requires, at a minimum, proof by preponderance of the evidence in the circumstances presented here.

*Third*, CBP lacked reasonable suspicion because the evidentiary record demonstrates Bintelli did not import covered merchandise. The Orders reach, at a minimum, a Chinese-origin rolling chassis. Commerce deliberately excluded separately imported parts unless they enter on the same bill of lading as, or are assembled with, a rolling chassis that was subject merchandise at importation. Suspicion that does not "reflect the actual scope of the orders" is not reasonable. *ICON PI Order*, at 1374.

## ARGUMENT

### I. Standard Of Review.

Bintelli seeks review of an agency determination under 28 U.S.C. § 1581(i)(1)(D). Thus, the applicable standard, as prescribed by 28 U.S.C. § 2640(e), is set forth in Section 706 of Title 5. *See Natl. Fisheries Inst., Inc. v. U.S. Bureau of Cust. and Border Protec.*, 33 C.I.T. 1137, 1148 (Ct. Int'l Trade 2009) ("In exercising jurisdiction in such cases under 28 U.S.C. § 1581(i), the court is to review the matter as provided in the APA, 5 U.S.C. § 706."). Section 706 of Title 5 provides that the Court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "contrary to constitutional right{.}" 5 U.S.C. § 706(2); *see Natl. Fisheries*, 33 C.I.T. at 1148.

"To uphold an agency action under this standard, the court must conclude that Customs articulated a *rational connection* between the facts found and the choice made." *Natl. Fisheries,* 33 C.I.T. at 1153 (emphasis added, internal quotations and citations omitted). "Agency actions are held to be arbitrary and capricious if the agency, *inter alia,* 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or {offered an explanation that} is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* at 1153 (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).

The Court will grant summary judgment where "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Zoetis Services LLC v. United States*, No. 22-00056, Slip Op. 26-102, at *3 (Ct. Int'l Trade 2026) (citing CIT Rule 56). When a case "hinges on pure questions of law, resolution by summary judgment is appropriate." *Canadian Wheat Bd. v. United States*, 32 C.I.T. 1116, 1121 (Ct. Int'l Trade 2008), *opinion clarified*

*on denial of reconsideration*, 33 C.I.T. 1204 (Ct. Int'l Trade 2009), and *aff'd,* 641 F.3d 1344 (Fed. Cir. 2011) (citation omitted).

The Court considers four factors in deciding whether to grant a permanent injunction: (1) whether the movant has suffered an irreparable injury; (2) whether legal remedies, including monetary damages, are insufficient compensation for such injury; (3) whether the balance of the parties' hardships warrants equitable relief; and (4) whether a permanent injunction is in the public interest. *Wirtgen Amer., Inc. v. United States*, 447 F. Supp. 3d 1359, 1371 (Ct. Int'l Trade 2020) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

## II. CBP Violated The Fifth Amendment By Failing To Provide Bintelli With Pre-Deprivation Notice Or A Meaningful Opportunity To Be Heard.

CBP's decision to impose business-ending interim measures without pre-deprivation notice and a meaningful opportunity to be heard violated Bintelli's due process rights guaranteed by the Fifth Amendment. Both this Court and the Federal Circuit have recognized that "'in the EAPA context … an importer participating in an administrative proceeding has a procedural due process right to notice and a meaningful opportunity to be heard.'" *ICON PI Order*, at 1369 (quoting *Superior Com. Sols., LLC v. United States,* 811 F. Supp. 3d 1363, 1376 (Ct. Int'l Trade 2025)); *Royal Brush Mfg., Inc. v. United States*, 75 F.4th 1250, 1257 (Fed. Cir. 2023). Moreover, the Government must provide such procedural safeguards *before* a deprivation occurs, not after. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *see also Superior Com. Sols.*, 811 F. Supp. 3d at 1376 ("{A} meaningful opportunity to respond should happen before a temporary deprivation takes effect, not afterwards.").

To determine what process is due under the Fifth Amendment, courts consider: (1) the private interest at stake, (2) the risk of erroneous deprivation, and (3) the public interest. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see also ICON PI Order*, at 1370. Each of these

factors supports Bintelli's due process right to notice and a meaningful opportunity to be heard before the imposition of the interim measures.

*First*, the private interest here is both concrete and significant. This Court has recognized that there is "a legitimate property interest in the proper assessment of imports." *ICON PI Order*, at 1370; *id.* at 1370 n.16 ("{C}ourts are generally in agreement that 'importers may have a protected interest in the proper assessment of duties on goods already imported.'") (quoting *Phoenix Metal Co. v. United States*, No. 23-00048, Slip Op. 24-68, at *9 (Ct. Int'l Trade June 10, 2024) (collecting cases). Beyond the imports themselves, Bintelli has a property interest in the ownership, possession, and operation of its business. *See United States v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 902 (2d Cir. 1992) ("Here, the property interest which has been affected by the government's actions is the ownership, possession, and operation of an ongoing business."); *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) ("{W}e conclude that {plaintiff} did have a property interest in the continued operation of its business and that {the State} denied it procedural due process when {it} failed to offer a pre-deprivation hearing before ordering the clinic closed.").

Here, the interim measures would upend both of these interests, even considering CBP's pivot with respect to the period for which AD/CVD duties are to be imposed. As this Court observed in *Phoenix Metal Co. Ltd. v. United States*, "{t}he combination of cash deposits for AD/CVD duties with the live entry requirement requires the importer to suddenly deposit a large amount of cash with CBP before it can even complete the sale for which it is importing the goods." Court No. 23-00048, at *9. The live entry requirement, in particular, was identified as an onerous obligation akin to a sanction. *Id.* (citing *Ford Motor Co. v. United States*, 44 F. Supp. 3d 1330, 1339 n.16 (Ct. Int'l Trade 2015)). For a small company like Bintelli that relies on its ability to sell

inventory quickly, live entry requirements place a chokehold on its cash flow that is likely to have business-ending consequences. And although unlawful cash exactions may sometimes be refunded, Bintelli has no practical ability "to ameliorate the interim loss." *Mathews*, 424 U.S. at 341. Once Bintelli is forced out of business, a later refund is not relief. As in *ICON*, the private interest is significant where the interim measures will likely result in a permanent deprivation. *See ICON PI Order*, at 1371 (finding ICON's private interest "compelling" given that the interim measures were "not just temporary deprivations" but "of such immediacy and magnitude that they will cause ICON to declare bankruptcy before it can contest the determination").

*Second*, the high risk of erroneous deprivation here underscores the necessity of notice and a meaningful opportunity to be heard *before* the imposition of the interim measures. Similar to *ICON*, CBP based its reasonable suspicion in part on information requests sent before it initiated its investigation. *Compare* B.C.14, BC001301 (finding "unresolved issues in Bintelli's CF-28 responses concerning the origin of the merchandise imported from Vietnam and Thailand"); *id.* at BC001302 ("Bintelli's CF-28 responses continue to … pose unresolved questions regarding the source of raw materials used in the claimed Vietnamese and Thai production"), *with ICON PI Order*, at 1371 ("In finding a reasonable suspicion of evasion, Customs relied primarily on ICON's responses to information requests that it sent before initiating its investigation. It provided no opportunity for ICON to supplement or explain its responses before deriving reasonable suspicion therefrom. Its conclusions, premised upon ICON's incomplete evidentiary responses, may well have been premature or mistaken." (internal citations omitted)). Notably, despite notice of its inadequacies on this very issue in *ICON*, CBP proceeded on the same grounds with respect to Bintelli—had Bintelli been provided with an opportunity to respond, it could have corrected the

purported inaccuracies and misinterpretations that prompted CBP's decision to impose interim measures.

Taking the inaccuracies first, Bintelli could have quickly dismantled CBP's acceptance of the Coalition's argument that Bintelli imported merchandise under incorrect HTSUS codes in order to evade the Orders. B.C.14, BC001291-92. The data on which the Coalition—and CBP—blindly rely is incorrect. Based on Bintelli's actual customs data, to which CBP has complete access yet, apparently failed to review before crediting this allegation, there is no evidence that Bintelli ever used HTSUS codes for golf balls and golf equipment when importing golf cart merchandise. Jackrel Decl. ¶ 39; *see also Vexas*, ECF No. 67, October 6, 2026 Hearing Transcript ("Transcript") at 51:6-15 ("{Mr. Wilson}: {I}f the Government or CBP thought that Bintelli or any other importer had imported golf carts under golf balls, they could have asked questions about that, or they could have looked at their own automated commercial environment data and found that none of these importers have used that HTS code.... This is the kind of stuff that could be easily remedied by looking just a little bit further than the face of the allegation that the {C}oalition has made.").

A similar conclusion could have been reached regarding CBP's doubts about RMA's manufacturing capabilities. Specifically, CBP credits the Coalition's contentions that, based on Google Maps, Bintelli's Thai manufacturer's "facility is primarily used for assembly and distribution, not for the manufacture of new vehicles from raw materials or component fabrication." B.C.14, BC001294. For Bintelli specifically, RMA bends, welds, and forms frames from non-Chinese sources. *See* Jackrel Decl. ¶¶ 21, 32. Moreover, a simple online search would have revealed to CBP that RMA—one of the largest automotive manufacturers in the world—is a sophisticated contract manufacturer that partners with many well-known brands in the automotive

industry. *See* Transcript at 55:17-21 ("{MR. WILSON}: If CBP truly had an issue with the state of the manufacturing in Thailand, they could have gone online and realized that RMA was one of the largest contract manufacturers in Southeast Asia. That's publicly available information. It's not a secret to anyone."). Bintelli could have easily pointed CBP in the direction of this information.

With notice and a meaningful opportunity to be heard, Bintelli also could have urged CBP to correct its misreading of the LSPTV Orders. As this Court observed in *ICON*, "the LSPTV Orders quite clearly state that a rolling chassis, at a minimum, consists of a frame with suspension and powertrain components." *ICON PI Order*, at 1371 (emphasis in original). Further, the LSPTV Orders do not cover "'suspension systems' and other components shipped on a separate bill of lading from a rolling chassis." *Id.* CBP extrapolates from a single entry that it rejected in December 2025 and to which it applied AD/CVD duties that "Bintelli entered Chinese-origin LSPTV components as non-AD/CVD merchandise even though CBP later determined that the merchandise was subject to the *Orders*." B.C.14, BC001302 (emphasis in original). That entry was not subject to the Orders, however, because it consisted of shocks, axles, engine, and steering parts that were not imported with a rolling chassis. *See* Jackrel Decl. ¶ 40. Indeed, CBP itself had confirmed in May 2025 that an entry of ***identical parts was not subject to the Orders***. *Id.* CBP's own data also showed that this entry was the only entry that was contained on this bill of lading. This specific entry was flagged because the requisite importer certification was inadvertently omitted. *Id.* Bintelli immediately attempted to rectify the error, pursuant to its statutory right under 19 C.F.R. 141.64, but CBP refused to accept the refiled certification and instead threatened liquidated damages penalties. *Id.* Bintelli ultimately chose to pay the AD/CVD deposits to avoid the penalties and indicated that it plans to protest CBP's determination upon liquidation. *Id.*

CBP also highlights that certain "Thai-origin entries include{d} *pro forma* invoices issued by [ ] for carts supplied through [ ] in Thailand." B.C.14, BC001304. The nationality of an invoicing party is irrelevant, however; only the country of origin of the actual good matters, and all shipments Bintelli receives from RMA include a Thai certificate of origin. *See* Jackrel Decl. ¶¶ 23, 27.

*Third*, the public interest supports requiring notice and an opportunity to be heard before interim measures are imposed. "The public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). The public interest would be undermined, however, if CBP were permitted to flout its constitutional obligations. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."). Providing these procedural safeguards also would not impair CBP's investigation. As previously discussed, Bintelli's engagement would have improved the accuracy and legitimacy of the investigation. In addition, given that more than four months elapsed between CBP's receipt of the EAPA allegation in April 2026 and CBP's communications imposing the interim measures in August 2026, there was time for CBP to provide Bintelli with notice and a meaningful opportunity to be heard. At a minimum, CBP could have given Bintelli an opportunity to supplement its CF-28 responses or produce any additional information that would assist CBP's investigation.

The *Mathews* factors, as well as this Court's prior decisions, *see ICON PI Order*, at 1370-71; *Superior Com. Sols.*, 811 F. Supp. 3d at 1376-77, establish that Bintelli was entitled to due process in the form of notice and a reasonable opportunity to be heard before the interim measures were imposed. Yet the record confirms that no such pre-deprivation process was provided. *See*

Transcript at 41:11-13 ("MS. JANTZEN: {W}e're not notifying an importer that's the target of an EAPA investigation that they might be a target of an EAPA investigation."); *see also id.* at 53:12-14, 19-20 ("THE COURT: But there were two separate CF-28s… MR. WILSON: Yes…. And neither one of them provided any notice or opportunity to address any concerns about evasion.").

To the extent CBP contends that the CF-28s provided Bintelli with notice and an opportunity to be heard with respect to the interim measures, that argument falls flat. As the Court observed at the October 6, 2026 Hearing, CF-28s are not unique to the EAPA process and, consequently, would not necessarily inform a responding importer that it was subject to an EAPA investigation or that its responsive commentary, if any, was to be included to address an investigation of unknown content. *See* Transcript at 100:12-15 ("THE COURT: No, no, {the CF-28} served as an opportunity for the Plaintiffs to answer an inquiry with respect to specific questions that Customs had about the entry of the merchandise and the origin of the merchandise{.}"); *id.* at 100:18-22 ("{THE COURT}: And so, the CF-28 is not specific to an EAPA investigation. It is a tool used by Customs in the context of an EAPA investigation, but it's used as a tool by Customs in lots of other circumstances to garner information."); *id.* at 101:10-15 ("{THE COURT}: How is the importer supposed to de{v}ine what the purpose of the CF-28 -- what is going on behind the scenes with respect to why Customs wants the information it's asking for on the CF-28? How is it supposed to de{v}ine that there's an EAPA investigation going on, which is {} to quote Ms. Jantzen, 'Confidential.'").

Accordingly, CBP violated Bintelli's due process rights by failing to provide Bintelli with notice and a meaningful opportunity to be heard before imposing the interim measures; consequently, the Court should grant judgment in Bintelli's favor on Count One.

## III. The Reasonable Suspicion Standard, As Applied, Is Unconstitutional Against Business-Ending Interim Measures.

CBP also violated Bintelli's Fifth Amendment due process rights by applying an evidentiary threshold too weak to support, let alone justify, the deprivation that its interim measures were sure to engender. Bintelli does not argue that reasonable suspicion can never support EAPA interim measures, including suspension or extension of liquidation. The constitutional problem is narrower: CBP cannot use mere suspicion to impose live entry, refiling, and cash-deposit demands that will put an importer out of business before a final evasion determination and before judicial review can provide any meaningful remedy. *See also Florida v. Royer*, 460 U.S. 491, 502 (1983) (determining that when a state actor's investigative actions become a "serious intrusion" on "personal liberty," "mere suspicion" is not enough). For measures that are final in practical effect, due process requires a reliable evidentiary basis: at a minimum, CBP must find evasion likely under a preponderance standard after giving the importer notice of the substance of the evidence and a meaningful opportunity to respond.

### A. A Statute Cannot Supply Less Due Process Than The Constitution Requires.

Before imposing interim measures, EAPA directs CBP to "decide based on the investigation if there is a reasonable suspicion that such covered merchandise was entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(e). Neither EAPA nor CBP's regulations defines "reasonable suspicion." *Am. Pac. Plywood, Inc. v. United States*, Slip Op. 23-93, Slip Op. 23-93, at *8 (Ct. Int'l Trade June 22, 2023) (confirming that 19 C.F.R. § 165.24 uses the term "multiple times without defining it"). The statute does, however, establish a deliberate progression of standards: an allegation that "reasonably suggests" evasion triggers an investigation, 19 U.S.C. § 1517(b)(1); "reasonable suspicion" is required for interim measures, *id.* § 1517(e); and "substantial evidence" is required for a final determination, *id.* § 1517(c)(1)(A).

As an initial matter, it is of no moment that 19 U.S.C. § 1517(e)(3) purports to authorize CBP to require "a single transaction bond or additional security or the posting of a cash deposit" where CBP claims a reasonable suspicion of evasion. The right to due process is "conferred, not by legislative grace, but by constitutional guarantee." *Cleveland Bd. of Educ.*, 470 U.S. at 541 (quoting *Arnett v. Kennedy*, 416 U.S. 134, 167 (1974) (Powell, J., concurring in part and concurring in the result in part)). Put differently, the right to due process "does not depend on whether statutes and regulations provide what is required by the constitution." *Royal Brush Mfg., Inc.,* 75 F.4th at 1260. Thus, Section 1517(e)(3) "neither removes {Bintelli's} interest from due process protection nor answers the question of what process is due under the Constitution." *See Vitek v. Jones*, 445 U.S. 480, 491 (1980) (explaining, in a different context, that state procedures deemed "adequate for determining the preconditions to adverse official action" did not override constitutional due process protections).

*Mathews*, again, controls, 424 U.S. 319, 335 (1976), as numerous subsequent reviewing courts have made clear. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 529-33 (2004) (applying *Mathews* factors); *Addington v. Texas*, 441 U.S. 418, 425 (1979) (discussing *Mathews* in determining standard of proof in civil commitment proceeding); *Santosky v. Kramer*, 455 U.S. 745, 757-70 (1982) (applying *Mathews* factors to analyze evidentiary standard in parental rights termination proceedings). In the interim-deprivation context, the question is whether the pre-deprivation procedure supplies a meaningful check against erroneous action. *See Cleveland Bd. of Educ.*, 470 U.S. at 545-46 (1985) (pre-deprivation hearing "should be an initial check against mistaken decisions") (citing *Bell v. Burson*, 402 U.S. 535, 540 (1971). For Count Two, the standard of proof must reflect the confidence the Constitution requires before CBP may impose measures that are final, in this case a death knell, in practical effect.

A suspicion-level screen fails that constitutional function here. "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Addington*, 441 U.S. at 423 (internal quotation marks and citation omitted). The standard allocates the risk of error, and the allocation changes with the nature and consequences of the deprivation. *Id.* at 423, 427; *Santosky*, 455 U.S. at 755 ("{I}n any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants.").

The Constitution does not permit CBP to impose a practically irreversible deprivation on an evidentiary threshold tolerated only when the intrusion is temporary, limited, and subject to meaningful correction. *See Barry v. Barchi*, 443 U.S. 55, 66 (1979) (pointing to severity of temporary suspension, holding that once suspension is imposed, the plaintiff's "interest in a speedy resolution of the controversy becomes paramount"); *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 56 (1993) (emphasizing "the availability of a postseizure hearing may be no recompense for losses caused by erroneous seizure," especially when adversary hearing occurs "many months after the seizure").

**B. The Private Interest Is Grave And The Threatened Loss Is Permanent.**

"The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be condemned to suffer grievous loss," and whether a loss warrants "more than average certainty" turns on "both the nature of the private interest threatened and the permanency of the threatened loss." *Santosky*, 455 U.S. at 758 (internal quotations and citations

omitted). Importers have "a legitimate property interest in the proper assessment of imports{.}" *ICON PI Order*, at 1370. And Bintelli maintains a property interest in the ownership, possession, and operation of its business. *See United States v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 902 (2d Cir. 1992) ("Here, the property interest which has been affected by the government's actions is the ownership, possession, and operation of an ongoing business."); *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006) ("{W}e conclude that {plaintiff} did have a property interest in the continued operation of its business and that {the State} denied it procedural due process when {it} failed to offer a pre-deprivation hearing before ordering the clinic closed.").

The loss threatened by CBP's interim measures is severe and permanent. The interim measures may require Bintelli to post tens of millions in cash deposits on past entries and millions in future duties on shipments already en route, with a 519.23 percent deposit on future entries; this amount exceeds by orders of magnitude the sum of Bintelli's profits over the course of its over 20-year operation and would force Bintelli to close its doors within a month. Jackrel Decl. ¶ 42, 48, 51. A later refund is no remedy for a company that no longer exists. The importer has no realistic ability "to ameliorate the interim loss." *Mathews*, 424 U.S. at 341. A business-ending deprivation requires a correspondingly reliable evidentiary check: CBP must find evasion likely under a preponderance standard, not merely possible under a suspicion-level screen designed for temporary investigative steps. A preponderance standard of review would be appropriate here, as it is for most civil administrative proceedings. *See Rodriguez v. Dep't of Veterans Affairs*, 8 F.4th 1290, 1299 (Fed. Cir. 2021) ("Preponderance of the evidence has long been recognized as the traditional burden of proof in civil administrative proceedings"). In this respect, Bintelli concurs

with the analysis articulated in ICON's brief. *See ICON EV LLC v. United States*, Ct. No. 02759, ECF No. 66.

### C. The Government's Interests Do Not Require Business-Ending Measures On Mere Suspicion.

The Government has legitimate interests in protecting the revenue and enforcing AD/CVD Orders. *See CEK Grp. LLC v. United States*, 633 F. Supp. 3d 1369, 1374 n.1 (Ct. Int'l Trade 2023) (granting deference to CBP's goal of enforcing AD/CVD laws). But those interests do not require putting an importer out of business on supposition. Reasonable suspicion already lets CBP investigate and suspend or extend liquidation, which preserves its ability to collect whatever duties are ultimately owed without threatening the company's existence in the meantime. *See ICON PI Order*, at 1374 n.21.

Nor does this context involve the grave, imminent dangers that have justified relaxed burdens elsewhere. *See, e.g.*, *Kashem v. Barr*, 941 F.3d 358, 381 (9th Cir. 2019) (terrorism and aviation safety). As this Court has explained, there are no "significant factors of health and human safety present" in EAPA; CBP's task is "enforcing U.S.{AD/CVD} laws to protect U.S. industry." *CEK Grp.*, 633 F. Supp. 3d at 1374 n.1.

There was no exigency here. The Coalition's allegations were filed on April 20, 2026; CBP initiated the investigation on May 20, 2026; and CBP waited three more months, until August 18, 2026, to impose interim measures. B.C.14, BC001285-310; Jackrel Decl. ¶ 35. Requiring CBP to find evasion likely before imposing business-ending measures would not imperil any government interest.

Moreover, CBP initiates investigations on allegations, usually filed by competitors, that "reasonably suggest{}" evasion. 19 U.S.C. § 1517(b)(1). This Court has observed that "how the standard for the imposition of interim measures under section 1517(e) is different {from the

standard under section 1517(b)} is unclear." *ICON EV LLC v. United States*, No. 26-02759, Slip Op. 26-88, at *5 n.9 (Ct. Int'l Trade Aug. 10, 2026) ("*ICON Intervention Order*"). And at least one decision has described reasonable suspicion as requiring only "slight evidence" or a "very small amount." *Am. Pac. Plywood, Inc. v. United States*, No. 20-03914, Slip Op. 23-93, at *9 (Ct. Int'l Trade June 22, 2023). That low threshold may suffice to begin an investigation. It cannot suffice to adjudicate, in practical effect, whether a company survives before the agency has tested the evidence and before the importer has had a meaningful chance to respond.

*Terry v. Ohio*, 392 U.S. 1 (1968), illustrates the distinction. *Terry* did not adopt reasonable suspicion as a general-purpose evidentiary standard for consequential government action. It approved a narrow exception for "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat," where an officer confronting a rapidly developing street encounter reasonably believed the suspect was armed and presently dangerous. *Terry*, 392 U.S. 1 at 20, 24. Even then, the officer had to identify specific and articulable facts, and the search had to be strictly confined to the protective purpose that justified it. *Id.* at 21, 26.

The Supreme Court has repeatedly confirmed the narrowness of the exception. In *Dunaway v. New York*, 442 U.S. 200 (1979), the Court refused to extend reasonable suspicion to a detention that resembled an arrest, warning that any broader exception would swallow the general rule requiring probable cause for serious seizures. *Id.* at 212-14. In *United States v. Place*, 462 U.S. 696 (1983), the Court allowed that reasonable suspicion might support only a brief and properly limited detention of luggage, but held that a 90-minute detention exceeded *Terry*'s narrow scope because the officers had time to minimize the intrusion and failed to do so. *Id.* at 707-10.

CBP's interim measures are a world away from those present in *Terry*. CBP was not forced to make an immediate officer-safety judgment; it was administering a months-long trade

investigation on a paper record, with time to request clarification, weigh both sides' evidence, tailor any interim measures, and preserve liquidation while the investigation proceeded. Nor were the challenged measures brief, limited, or self-expiring. Live entry, refiling, and 519.23 percent cash deposits operate as a shutdown order before the importer can obtain meaningful post-deprivation review.

CBP should not be permitted to impose a shutdown-level remedy unless the evidence made evasion likely after CBP accounted for Bintelli's contrary showing. CBP's Notice of Initiation rests on findings that a preponderance standard could not support on this record:

- CBP called Bintelli's Thai-origin claim into question because the record purportedly lacked "production records, fabrication records, supplier invoices, input documentation, or other evidence establishing that [ ] produced the chassis assembly in Thailand," B.C.14, BC001303, even though CBP had reviewed the same RMA supply chain in December 2025 and liquidated those carts as Thai-origin Type 01 entries. *See Vexas*, ECF No. 30-1, Declaration of James Haney ("Haney Decl.") ¶ 18.

- CBP relied on an August 2025 parts entry, invoiced by [ ], that by CBP's own description consisted of loose "golf cart parts and LSPTV components," including "[ ]," B.C.14, BC001302, not an assembled rolling chassis.

- CBP imposed interim measures without asking a single follow-up question about the CF-28 responses it now calls deficient. BC001302 n.147.

A standard requiring CBP to find evasion likely—and to test that conclusion against the importer's contrary evidence before imposing business-ending measures—would have forced CBP to confront this evidence before demanding tens of millions from Bintelli, even under its about-face, revised assessment.

### D. Reasonable Suspicion May Suffice For Truly Temporary Measures, But Not For Measures That Are Final In Practical Effect.

Reasonable suspicion can be an appropriate standard in some settings. The Supreme Court has upheld interim administrative deprivations when other safeguards made the initial action reliable such as: objective evidence or an independent probable-cause determination, notice of the

basis for the action, an opportunity to respond, and prompt review before the interim loss became final in practical effect. *See Barry*, 443 U.S. at 64-66 (holding pre-hearing interim suspension, pending prompt judicial or administrative hearing, whenever State established probable cause, but emphasizing need for prompt post-suspension hearing); *Gilbert v. Homar*, 520 U.S. 924, 932-36 (1997) (State was permitted to suspend respondent based on felony charges filed against him without pre-suspension hearing but post-suspension hearing must be prompt); *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 263-66 (1987) (where agency ordered temporary reinstatement of employee based on reasonable cause finding of unlawful discharge, employer was sufficiently protected without an evidentiary hearing where it received notice of allegations and supporting evidence, and an opportunity to respond in writing). That framework fits actions that do not completely destroy a business while an EAPA investigation runs: investigating, suspending liquidation, and extending liquidation. *Cf. FTC v. Standard Oil Co.*, 449 U.S. 232, 241-43 (1980) (distinguishing between agency issuance of complaint that serves only to initiate administrative proceedings and "final agency action" that has tangible legal or practical effect on respondent). It does not fit cash deposits at 519.23 percent, live entry, and refiling when those measures will extinguish the company before review can matter. Post-deprivation process is meaningless to Bintelli if it ceases to exist. CBP cannot realistically provide a meaningful hearing in the weeks between imposition and Bintelli's destruction.

As this Court has observed, "{CBP} has discretion not to impose all interim measures…. The strength or weakness of the suspicion likely should affect that decision." *ICON PI Order*, at 1374. Where interim measures are final in practical effect, due process requires a reliable initial check that includes, at a minimum, a preponderance finding made after notice of the substance of CBP's evidence and a meaningful opportunity to respond. CBP did not make that finding before

imposing measures that would result in Bintelli's imminent demise. In the undisputed circumstances here, the interim measures violate due process as applied, and Bintelli is entitled to judgment on Count Two.

## IV. Even If The As-Applied Reasonable Suspicion Standard Were Constitutional, CBP Lacked The Requisite Reasonable Suspicion To Impose Interim Measures.

Even if the Court were to find that EAPA's reasonable suspicion standard is constitutional, CBP's interim measures against Bintelli cannot stand. There is no rational connection between such facts as were recited in the Notice of Initiation and CBP's imposition of interim measures based on a claim of a reasonable suspicion that Bintelli entered covered merchandise through evasion. CBP's reasonable suspicion finding rests on six stated grounds: (1) a December 2025 determination that a single August 2025 entry of Chinese parts was covered; (2) Bintelli's shift from Chinese suppliers to [ ] in Vietnam and [ ] in Thailand after the Orders issued; (3) "unresolved questions regarding Vietnamese and Thai frame or chassis production"; (4) documents showing Chinese-origin [ ] in [ ]'s supply chain; (5) "insufficient tracing of raw material inputs for the chassis supplied through [ ]"; and (6) pro forma invoices reflecting a commercial role for [ ], a trading company. B.C.14, BC001304. None of these findings, alone or together, supports CBP's reasonable suspicion determinations.

### A. Reasonable Suspicion Requires A Particularized And Objective Basis, Grounded In The Actual Scope Of The Orders, For Suspecting That Covered Merchandise Was Entered Through Evasion.

After triggering an investigation based on allegations that "reasonably suggests" evasion, 19 U.S.C. § 1517(b)(1), but before imposing interim measures, CBP must make a finding of reasonable suspicion. *Id.* § 1517(e). As this Court has explained, "it is reasonable to conclude that Congress meant each ensuing standard to require something more than is needed at the earlier

stage(s)—that is, 'reasonably suggests' is less demanding than 'reasonable suspicion.'" *Am. Pac. Plywood*, No. 20-03914, at *8 n.10. While the precise line between initiation and interim measures may be "unclear," "investigating and imposing interim measures create very different burdens." *ICON Intervention Order*, at *5 n.9.

In examining analogous "reasonable suspicion" standards in the AD/CVD laws, this Court has explained that, "in order for reasonable suspicion to exist there must be 'a particularized and objective basis for suspecting' the existence of certain proscribed behavior, taking into account the totality of the circumstances—the whole picture." *AL Tech Specialty Steel Corp. v. United States*, 575 F. Supp. 1277, 1280 (Ct. Int'l Trade 1983) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "In both the administrative and criminal law contexts specific, particularized evidence is the touchstone." *Id.* at 1280 n.3. Such a standard "must be predicated on particular, specific, and objective evidence," and "{c}onjectures are not facts." *China Nat'l Mach. Imp. & Exp. Corp. v. United States*, 264 F. Supp. 2d 1229, 1239-40 (Ct. Int'l Trade 2003); *accord Hangzhou Spring Washer Co. v. United States*, 387 F. Supp. 2d 1236, 1248 (Ct. Int'l Trade 2005). An "inchoate and unparticularized suspicion or 'hunch'" can never "ripen{} into one that {is} 'reasonable,'" and a finding that requires "straying into the realm of surmise" cannot stand. *AL Tech*, 575 F. Supp. at 1282 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Whether the evidence suffices to establish reasonable grounds to suspect "is a question of law which this court must ultimately resolve." *Id.* at 1280 n.4.

Bintelli recognizes that *American Pacific Plywood* read the particularized-and-objective-basis case law "as not imposing a difficult burden on the agency," and described the threshold as "slight evidence" or a "very small amount." No. 20-03914, at *9. But even a low threshold requires evidence of the right thing: a basis for suspecting that *covered merchandise* i.e., "merchandise that

is subject to" an AD/CVD order, 19 U.S.C. § 1517(a)(3), was entered through evasion. As this Court has already held in the LSPTV context, "Customs' 'suspicion' must reflect the actual scope of the orders alleged to be unlawfully evaded." *ICON PI Order,* at 1374. EAPA "does not permit Customs to include merchandise that is not covered by the scope of the Order," and Commerce, "not Customs, is the appropriate administering authority" to decide whether merchandise is covered. *Aspects Furniture Int'l, Inc. v. United States*, 607 F. Supp. 3d 1246, 1268 (Ct. Int'l Trade 2022); *see* 19 U.S.C. § 1517(b)(4). Evidence that, correctly understood, shows only the importation of non-covered merchandise is not "slight evidence" of evasion; it is no evidence of evasion at all.

What makes suspicion "reasonable" is context-dependent. As this Court has explained, the "Supreme Court has long held that the reasonable suspicion needed to initiate investigations . . . varies from statute to statute." *CEK Grp. LLC v. United States*, 633 F. Supp. 3d 1369, 1374 n.1 (Ct. Int'l Trade 2023). Here, the Government's interest in enforcing AD/CVD orders, not preventing violent crime, *cf. Terry v. Ohio*, 392 U.S. 1, 22-24 (1968), pales in comparison with the consequence of interim measures that would shut Bintelli down within weeks. Jackrel Decl. ¶ 53. CBP cannot generate "reasonable" suspicion by misreading the scope of the Orders; it must apply the Orders as written.

**B. Bintelli's Entry Of Parts Used To Construct LSPTVs In The United States Provided No Grounds For Reasonable Suspicion.**

The LSPTV Orders cover certain Chinese-origin LSPTVs and "subassemblies thereof." 90 Fed. Reg. 38,759, 38,763 (Dep't Com. Aug. 12, 2025). An unfinished or unassembled LSPTV "covers at a minimum a subassembly, also known as a 'rolling chassis,' which is typically comprised of, but not limited to, a frame or body with front and/or rear suspension components. . . installed and powertrain components . . . installed or ready for installation." *Id.* Other components are covered only "{w}hen imported together with a rolling chassis subject to these orders." *Id.*

This Court already has held that the Orders "have a precise and limited scope," and that they "quite clearly state that a rolling chassis, at a minimum, consists of a frame with suspension and powertrain components." *ICON PI Order*, at 1366, 1371. The Coalition—the alleger here—told Commerce the same thing: "{a} chassis frame imported on its own, without any powertrain components is not covered by the scope." Ex. 3, 7/8/24 Coalition Resp. at 2-3.

CBP's first ground is its December 2025 determination that entry [ ]245-0, imported in August 2025, was covered by the Orders. B.C.14, BC001302, BC001304. By CBP's own description, that entry consisted of "Chinese-origin golf cart parts and LSPTV components, including [ ]." BC001302. Absent from that list is any frame or body—the foundation of a rolling chassis. 90 Fed. Reg. at 38,763. Parts are covered only "{w}hen imported together with a rolling chassis subject to these orders," *id.*, and this entry was the only entry on its bill of lading. Jackrel Decl. ¶ 40.

CBP's Notice of Initiation also ignores Bintelli's affirmative evidence. From May 2025 through February 2026, CBP examined a broad range of Bintelli's imported Chinese parts and subassemblies through requests for information, concluded that they were not rolling chassis, and liquidated them as Type 01; CBP had confirmed in May 2025 that identical parts were not subject to the Orders, and in January 2026 it again accepted a challenged entry without AD/CVD duties. Jackrel Decl. ¶¶ 18-20, 40; *Bintelli*, ECF Nos. 4-1, 4-2.

CBP inquired about entry [ ]245-0 only because the importer certification for separately shipped components was mistakenly omitted. Jackrel Decl. ¶ 40. The omitted certification does not satisfy the statutory definition of evasion. An omission is "evasion" only if it is "material" and "results in any cash deposit or other security or any amount of applicable

antidumping or countervailing duties being reduced or not being applied." 19 U.S.C. § 1517(a)(5)(A). The inadvertent initial omission of the certification here meets neither element, particularly considering Bintelli's attempts to cure this omission. CBP's refusal to permit its correction cannot fill the gap. *See* Jackrel Decl. ¶ 40.

As an initial matter, the inadvertent omission of the certification for this entry told CBP nothing it did not already know. Through Bintelli's counsel, CBP had been informed since June 2025 that Bintelli's separately shipped Chinese parts were used to build rolling chassis out of non-subject parts and subassemblies in the United States, and CBP accepted that explanation in 2025 and again in January 2026. Jackrel Decl. ¶¶ 17-20; *Bintelli*, Compl. ¶ 35 & Exs. A-B; ECF Nos. 4, 4-1, 4-2. Given that knowledge, while the entry was initially missing the certification form itself, CBP had actual, or at least constructive, knowledge that Bintelli met the certification requirements.

Nor did the inadvertent omission result in any duty or deposit "being reduced or not being applied." 19 U.S.C. § 1517(a)(5)(A). Given CBP's unreasonable decision to refuse to accept the certification, Bintelli paid the AD/CVD deposits of more than $300,000 on the entry and has reserved its right to protest CBP's unlawful refusal to allow Bintelli to correct the entry upon liquidation. Jackrel Decl. ¶ 40. In any event, an entry on which the duty deposits were paid is not an entry through which duties were evaded. Moreover, when CBP rejected the entry, Bintelli immediately refiled with the certification, as it was entitled to do; CBP refused to accept it and threatened liquidated damages. *See id.* ¶ 40; *see* 19 C.F.R. § 141.64. That refusal was contrary to law, and CBP cannot treat a defect it prevented Bintelli from curing as evidence of evasion. At most, the omission was a clerical error, which EAPA excludes from "evasion" absent a pattern of negligent conduct, 19 U.S.C. § 1517(a)(5)(B). Here, there is no pattern, as CBP accepted every

other Bintelli parts entry it examined between May 2025 and February 2026. Jackrel Decl. ¶¶ 18-20.

### C. Bintelli's Shift To Vietnamese And Thai Production After The Orders Issued Is Evidence Of Compliance, Not Evasion.

In CBP's second through fifth grounds, CBP treats Bintelli's "shift from established Chinese suppliers to [ ] and [ ] after the imposition of the Orders" as a basis for suspicion. B.C.14, BC001304. But there is nothing suspicious about moving production out of the subject country. This is precisely why AD/CVD orders are country-specific. Here, the shift was the product of more than a year of work: Bintelli's principals made multiple week-long trips to Vietnam and Thailand to identify and qualify suppliers, including factories that produce metal frames from non-Chinese steel and aluminum, and engineered and completed small-batch production with each new supplier. Jackrel Decl. ¶¶ 21-23. In Vietnam, [ ] facility was renovated to add manufacturing space, and [ ] rented four additional buildings to handle frame and chassis bending and welding, painting, packing, and storage. *Id.* ¶ 28.

CBP concluded, without any supporting evidence whatsoever, that Chinese-origin merchandise "*may* have been routed through [ ] and entered as Vietnamese-origin merchandise," B.C. 14, BC001303 (emphasis added), and that Bintelli "entered such merchandise through Vietnam or Thailand as non-Chinese-origin merchandise," BC001304; *see also* BC001309 (finding that Importers "transshipped covered LSPTVs through intermediaries in Thailand and/or Vietnam"). CBP's conjecture and alleged "unresolved questions" here are all the more unreasonable given the particularized evidence in its possession of the actual Vietnamese and Thai production of Bintelli's imports.

***1. The Vietnamese Carts.***

For the [ ] carts, CBP's concern is a VAT invoice and a quotation from Vietnamese suppliers appearing to indicate that certain [ ] purchased by [ ] originated in China. *See* BC001302-03. From that, CBP concluded that "{t}he record does not clearly trace the raw material inputs used to produce the frame or chassis or establish that the frame or chassis was produced from Vietnamese-origin [ ]." BC001303. But CBP itself acknowledged that Bintelli had disclosed that [ ] purchases [ ] from Chinese suppliers and uses it "for certain parts of the golf carts *other than the chassis frame*." *Id.* (emphasis added). CBP pointed to nothing showing Chinese material in the frame.

Even assuming *arguendo*, that the raw metal used in the frames could not be fully traced, that gap would not make it reasonable to suspect transshipment. Transshipment is a theory that merchandise produced in China passes through a third country with little or no processing and is relabeled with a false country of origin. Raw aluminum sheet is not an LSPTV or a rolling chassis, and a frame bent, welded, and formed in Vietnam does not become a Chinese-origin rolling chassis because some of the metal, not used for the chassis frame, may have been purchased from a Chinese mill. CBP points to no evidence that any Chinese-origin frame with installed suspension and installed or installation-ready powertrain components entered Vietnam, much less Bintelli's carts. Speculation about the origin of raw inputs is "conjecture{}," not fact. *China Nat'l*, 264 F. Supp. 2d at 1240.

Moreover, the record before CBP contained overwhelming evidence that [ ] Vietnamese operations are in no event transshipment:

- Bintelli stated in its August 3, 2026 CF-28 responses that critical components, including the [ ], were produced in Vietnam and that the carts underwent production and final assembly operations there—facts the Notice of Initiation recites. B.C.14, BC001302.

- Those responses supplied raw-material purchase orders and invoices, production records, work instructions, production process flowcharts, and Certificates of Origin. Jackrel Decl. ¶ 33; BC001331-32; B.C.14; B.C.18, BC001818-2145.
- [ ] renovated its facility and rented four additional buildings specifically for frame and chassis bending and welding, painting, packing, and storage. Jackrel Decl. ¶ 28.
- The frames are produced from non-Chinese steel or aluminum that is bent, welded, and formed into frames at the Vietnamese factory; more than 50 percent of components are Vietnamese-origin; and all manufacturing and assembly labor is performed in Vietnam. *Id.* ¶ 32.
- In June and July 2026—before CBP imposed interim measures—the Vietnamese government seized and fully inspected 32 containers in response to a transshipment accusation, found no transshipped carts, inspected the factory, oversaw production for multiple days, and then reissued Certificates of Origin. *Id.* ¶¶ 30-31.

CBP's Notice does not attempt to address these facts and instead attempts to conflate Vietnamese and Thai manufacturing with transshipment. There simply is no rational connection between these facts and CBP's unfounded allegations of transshipment.

### *2. The Thai Carts.*

For the [ ] carts, CBP's summary of its finding is likewise one of raw-material tracing, asserting that Bintelli provided "insufficient tracing of raw material inputs for the chassis supplied through [ ]." B.C.14, BC001304. CBP acknowledged that the bill of materials identifies the chassis assembly as purchased from [ ] and as Thai-origin, and that Bintelli provided proof of payment to [ ], but faulted the record for lacking documents tracing where [ ] "obtained the chassis assembly or the inputs used to produce it." BC001303-04. With respect to the first assertion, there is ample evidence on the record that [ ] produced chassis assemblies in Thailand. With respect to the second, that is, at most, a documentation question about upstream inputs. CBP identified no evidence that the chassis was produced in China.

The pre-notice record, moreover, shows substantial manufacturing in Thailand. [ ] bends, welds, and forms the frames from non-Chinese steel; more than 50 percent of the components are Thai-origin; and all manufacturing and assembly labor occurs in Thailand. Jackrel Decl. ¶¶ 21, 32. Bintelli's president personally visited the facility, a very large multi-building complex at which [ ] "absolutely manufactures vehicles." *Id.* ¶ 38. In fact, [ ] is a large international manufacturer. It is the only company in the world authorized to build trucks for Ford outside a Ford assembly plant. *Id.* ¶¶ 24-25. Every [ ] shipment is accompanied by a Thai Certificate of Origin. *Id.* ¶ 27. CBP, for its part, did not visit [ ] or identify any evidence that it lacks the capability to produce what it ships. Unlike *American Pacific Plywood,* where a site visit revealed foreign-grown materials and factories lacking the sophistication to produce the merchandise, No. 20-03914, at *9, nothing here suggests transshipment.

Notably, CBP examined the operations of this same Thai manufacturer before in connection with imports of carts produced by [ ] in conjunction with consolidated plaintiff Venom. As Venom has shown in these proceedings, CBP issued a CF-28 on September 10, 2025 requesting country-of-origin information on the LSPTVs [ ] produced for Venom; Venom responded on December 1, 2025, with documentation corroborating [ ] production processes in Thailand and its use of Thai-origin raw materials and components; and by December 12, 2025, CBP had determined that the carts were properly declared as Thai origin and liquidated them as Type 01 entries, "No Change." Haney Decl. ¶ 18; *Venom EV, LLC v. United States et al.*, Ct. No. 26-3824 ("*Venom*"), ECF No. 4-1; 12/1/2025 Letter to CBP Regarding CF-28 Response ("12/1/2025 Venom CF-28 Response"); B.C.27, BC003606-19; *see also Venom*, ECF No. 4-2, 12/12/2025 CBP Posted Notice of Liquidation (listing "Entry Type 01" and "Action No Change"); B.C.27, BC003629-31. That December 2025 review also gave CBP "comprehensive

documentation and information about the manufacturing processes at [ ] Thai plant, including inspection reports from three different plant visits." Haney Decl. ¶ 25. As Venom explained, CBP provides no explanation as to why such information was sufficient in December 2025 but is now inadequate, and its unresolved questions regarding Thai chassis raw material sourcing suffer from the same flaw: CBP already reviewed the same sourcing from [ ] a few months prior and ultimately concluded that same merchandise was of Thai origin. CBP cannot reasonably treat [ ] as a transshipment conduit for Bintelli's carts when it accepted [ ] Thai production months earlier, and the Notice of Initiation makes no attempt to explain the inconsistency.

#### 3. *[ ] Commercial Role Does Not Make Vietnamese Or Thai Carts Chinese-Origin Rolling Chassis.*

For its sixth ground, CBP relies on pro forma invoices issued by [ ] for carts supplied through [ ], and on payment to [ ]. BC001304. But the involvement of a Chinese company in ordering, pricing, or payment says nothing about where a cart or its chassis was made. Rather, the Orders turn on the origin of the merchandise, 90 Fed. Reg. at 38,763, not on the nationality of a commercial counterparty. Bintelli has been transparent that it built its new Vietnamese and Thai supply chains "{i}n collaboration with {its} existing Chinese partners [ ] and [ ]." Jackrel Decl. ¶ 21. A disclosed commercial relationship is not a "particularized and objective basis for suspecting" transshipment. *AL Tech*, 575 F. Supp. at 1280.

#### 4. *CBP Never Asked Bintelli To Resolve The Questions It Now Invokes.*

Finally, the record does not reflect that CBP requested follow-up information about [ ] or [ ] raw-material inputs, or advised Bintelli that its August 3, 2026 CF-28 responses were deficient, before imposing interim measures barely two weeks later. *See*

Jackrel Decl. ¶¶ 33-36. CBP cannot generate its own reasonable suspicion by declaring documentation inadequate rather than asking the importer to clarify or supplement it. *ICON PI Order*, at 1371 (where Customs relied on CF-28 responses without providing an "opportunity for ICON to supplement or explain" them, its "conclusions . . . may well have been premature or mistaken"); *id.* at 1374 n.21 ("without additional investigation from Customs, there cannot be a reasonable suspicion of evasion"). Unlike the importers in *American Pacific Plywood*, moreover, Bintelli did not withhold requested information. *Cf.* No. 20-03914, at *9 (recounting that one importer "did not provide all the information requested by Customs nor explain its failure to do so").

**D. Even Considered In Their Totality, CBP's Stated Grounds Do Not Establish Reasonable Suspicion.**

Viewing CBP's grounds together does not change the result. A single 2025 parts entry that was not a rolling chassis, a lawful post-order shift to Vietnamese and Thai production, raw-metal documentation questions that CBP never asked Bintelli to answer, and a disclosed commercial relationship with a Chinese company do not add up to reasonable suspicion of transshipment. Zero plus zero still equals zero.

Bintelli is aware of the Court's admonition that "it is inappropriate to flyspeck the evidence piece-by-piece." *Am. Pac. Plywood*, No. 20-03914, at *9. Bintelli does not ask the Court to reweigh evidence. Its point is a legal one: none of CBP's grounds supplies a particularized and objective basis for reasonably suspecting the entry of *covered* merchandise, and whether that showing suffices is "a question of law." *AL Tech*, 575 F. Supp. at 1280 n.4. Because reasonable suspicion must "reflect the actual scope of the orders," *ICON PI Order*, at 1374, evidence that falls outside that scope cannot be aggregated into a "totality" that does. *See Aspects Furniture*, 607 F. Supp. 3d at 1268-69. Nor can these grounds satisfy a standard that demands more than the "reasonably

suggests" showing needed merely to open an investigation. *Am. Pac. Plywood*, No. 20-03914, at *8 n.10; *ICON Intervention Order*, at 10 n.9.

Finally, the Notice of Initiation recounted the Coalition's assertions that Bintelli misclassified merchandise under HTSUS codes for golf balls and golf equipment and undervalued entries. *See* B.C.14, BC001291-92. Bintelli's actual customs data reflect no golf-ball or golf-equipment entries of golf cart merchandise, Jackrel Decl. ¶ 39, and the Notice of Initiation does not list misclassification or undervaluation among the grounds supporting its finding, B.C.14, BC001304. To the extent the Government relies on them, those allegations do nothing to support reasonable suspicion.

In sum, none of these facts rise to a cognizable basis for CBP to determine a reasonable suspicion of evasion. Bintelli is entitled to judgment on Count Three.

## CONCLUSION

For the foregoing reasons, Bintelli respectfully asks this Court to grant its motion for summary judgment and judgment on the agency record, declaring CBP's imposition of interim measures under 19 USC § 1517(e)(3) unlawful and permanently enjoining CBP from enforcing the interim measures against Bintelli.

Dated: November 24, 2026

Respectfully submitted,

*/s/ Daniel R. Wilson*

Daniel R. Wilson
Carolyn Bethea Connolly
Rachel Anna Beck
Faegre Drinker Biddle & Reath LLP
1500 K Street, N.W., Ste. 1100
Washington, DC 20005
Phone: (202) 230-5000
Fax: (202) 842-8465
daniel.wilson@faegredrinker.com
carrie.connolly@faegredrinker.com
rachel.beck@faegredrinker.com

Lawrence G. Scarborough
Jovana Crncevic
Taylor Lynn Norton
Faegre Drinker Biddle & Reath LLP
1177 Avenue of the Americas, 43rd Floor
New York, New York 10036
Phone: (212) 248-3140
Fax: (212) 248-3141
lawrence.scarborough@faegredrinker.com
jovana.crncevic@faegredrinker.com
taylor.norton@faegredrinker.com

Jesse Long Marks
Faegre Drinker Biddle & Reath LLP
1144 15th Street, Suite 3400
Denver, Colorado 80202
Phone: (303) 607-3500
Fax: (303) 607-3600
jesse.marks@faegredrinker.com

*Counsel for Plaintiff Bintelli, LLC*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Motion For Summary Judgment And Judgment On The Agency Record complies with the word limitation set forth in the Standard Chambers Procedure 2(B)(1) and contains 13,750 words.

Dated: November 24, 2026

Respectfully submitted,

*/s/ Daniel R. Wilson*

Daniel R. Wilson